# EXHIBIT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

United States of America,

     v.

Hannah C. Dugan

     Defendant.

Case No. 2:25-cr-00089-LA-NJ

### *AMICUS CURIAE* BRIEF OF FORMER STATE AND FEDERAL JUDGES
### IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Abbe David Lowell*
Brenna Frey*
David A. Kolansky*
Isabella M. Oishi*
*Counsel for Amici*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., 2nd Fl.
Washington, DC 20005
Tel: (202) 964-6110
Alowellpublicoutreach@lowellandassociates.com
BFrey@lowellandassociates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

Jeffrey A. Mandell [Bar No. 1100406]
TR Edwards [Bar No. 1119447]
*Counsel for Amici*
LAW FORWARD, INC.
222 W. Washington Ave.
Suite 680
Madison, WI 53703
Tel: (608) 285-2485
jmandell@lawforward.org
tedwards@lawforward.org

Norman L. Eisen*
*Counsel for Amici*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue, S.E.
Suite 15180
Washington, D.C. 20003
Tel: (202) 594-9958
norman@statedemocracydefenders.org

**Application for admission forthcoming*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ........................................................................................ 1

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 5

I.   Judicial Immunity Provides No Fewer Protections for Judges as the Immunities Applicable to the Other Two Branches of Government ........................................................... 5

    A.   The Absolute Immunity Afforded to Judges for Official Acts Is the Same as That Which Is Afforded to Legislators and Members of the Executive Branch ................... 5

    B.   Judicial Immunity Is an Absolute Immunity that Protects Against Prosecution of the Case Itself – It is Not Merely a Defense ...................................................................... 6

    C.   The Absolute Nature of Protection for Official Acts Renders the Official's Motive Irrelevant ............................................................................................................................. 7

II.  This Prosecution Creates a Critical Chilling Effect on Judges By Threatening to Undermine Judicial Independence and the Judiciary's Ability to Maintain Control Over Their Courtrooms ....................................................................................................................... 8

    A.   Absent Judicial Immunity, the Mere Specter of Federal Prosecution for Any Misstep Concerning Federal Immigration Enforcement Will Inevitably Erode the Independence and Impartiality of Judges in the Discharge of Their Constitutional Duties ................................................................................................................................ 8

    B.   Our Justice System Requires that Judges Maintain Control Over Their Courtrooms . 10

    C.   When Judges Err in Their Official Capacity, the Proper Recourse Is the Appellate Process or Referrals to the Judicial Conduct Commission—Not Federal Prosecution 13

III. This Prosecution Threatens Public Trust in the Judicial System and the Ability for the Public to Avail Themselves of Courthouses Without Fear of Consequences ..................... 14

IV. The Prosecution Is Barred By the Tenth Amendment and Undermines Core Principles of Federalism .......................................................................................................................... 17

CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986) ................................................................ 10

*BP Expl. & Prod., Inc. v. Claimant ID 100246928*, 920 F.3d 209 (5th Cir. 2019) ..................... 17

*Bradley v. Fisher*, 80 U.S. 335 (1871) ..................................................................................... 2

*Braun v. Terry*, 148 F. Supp. 3d 793 (E.D. Wis. 2015) ............................................................ 17

*Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009) ................................................. 10

*City of Chicago v. Barr*, 957 F.3d 772 (7th Cir. 2020) ............................................................. 20

*City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018) .......................................... 20

*City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276 (3d Cir. 2019) ..................... 20

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) ............................... 20, 21

*Eades v. Sterlinske*, 810 F.2d 723 (7th Cir. 1987) ................................................................... 7

*Ford v. Kenosha Cnty.*, 160 Wis. 2d 485, 466 N.W.2d 646 (Wis. 1991) ................................... 9

*Forrester v. White*, 484 U.S. 219 (1988) ............................................................................ 6, 8

*Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014) ................................................................. 19

*Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005) ............................................................... 17

*Jackson v. Elrod*, 881 F.2d 441 (7th Cir. 1987) ..................................................................... 6

*Mahmoud v. Ortiz*, 2003 WL 22998119 (Wis. Ct. App. Dec. 23, 2003) ................................... 3

*Maus v. Baker*, 641 F. App'x 596 (7th Cir. 2016) ................................................................. 13

*Mireles v. Waco*, 502 U.S. 9 (1991) ...................................................................................... 8

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .............................................................................. 7

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) .................................... 5, 19, 21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) .................................................. 19

*New York v. United States*, 505 U.S. 144 (1992) ................................................. 19, 21, 22, 23

*Printz v. United States*, 521 U.S. 898 (1997) ........................................................................ 20

*Sefick v. Gardner*, 164 F.3d 370 (7th Cir. 1998) ................................................................... 17

*Sheppard v. Maxwell*, 384 U.S. 333 (1996) ...................................................................... 3, 12

*State v. Hermann*, 2015 WI 84, 364 Wis. 2d 336, 867 N.W.2d 772 (Wis. 2015) ..................... 10

*Stevens v. Osuna*, 877 F.3d 1293 (11th Cir. 2017) ......................................................... 3, 12, 13

*Stump v. Sparkman*, 435 U.S. 349 (1978) ............................................................................. 8

*Trump v. United States*, 603 U.S. 593 (2024) .................................................................. 3, 7, 9

*Tumey v. State of Ohio*, 273 U.S. 510 (1927) ....................................................................... 10

*United States ex rel. Powell v. Irving*, 684 F.2d 494 (7th Cir. 1982) ...................................... 6

*United States v. Brewster*, 408 U.S. 501 (1972) ................................................................. 8, 9

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ...................................................... 19

*United States v. DeLuca*, 137 F.3d 24 (1st Cir. 1998) ........................................................... 12

*United States v. Meacham*, 65 F. App'x 529 (6th Cir. 2003) ................................................. 12

**Statutes and Rules**

18 U.S.C § 1071 .................................................................................................................. 19

18 U.S.C. § 1505 ................................................................................................................. 19

8 U.S.C. § 1373 ................................................................................................................... 20

SCR 60.02 .......................................................................................................................... 13

SCR 60.03 ...................................................................................................................... 9, 13

SCR 60.04 ...................................................................................................................... 9, 13

Case 2:25-cr-00089-LA-NJ    Filed 05/30/25    Page 4 of 26    Document 25-1

**Other Authorities**

R. Seth Davis, *Conditional Preemption, Commandeering, and the Values of Cooperative Federalism*, 108 Colum. L. Rev. 404, 417–19 (2008)............................................................. 18

Shawn Patterson Jr., et al., *The Withering of Public Confidence in the Courts*, 108 Judicature 1, Duke L. Sch. (2024) ........................................................................................................... 16

## STATEMENT OF INTEREST

*Amici*, 138 former state and federal judges from across the nation, respectfully submit this *amicus curiae* brief in support of Defendant the Honorable Hannah C. Dugan's motion to dismiss the indictment in this matter. ECF 15, 21. The government's indictment of Judge Dugan represents an extraordinary and direct assault on the independence of the entire judicial system. Permitting the prosecution of a state circuit court judge for conduct falling squarely within her rightful exercise of judicial discretion establishes a dangerous precedent that will chill judicial decision-making at every level. This case directly threatens the ability of all judges to do their jobs without fear of retaliatory prosecution. As judges with an obligation to preserve the integrity of the judiciary, we believe our perspective on the historical and legal underpinnings of judicial immunity will materially assist the Court in navigating the significant constitutional questions presented by this case.[1]

## INTRODUCTION

A judge plays many roles when sitting on the bench in a courtroom. More than simply interpreting and applying the law to issue rulings, a judge controls the courtroom, ensuring that proceedings run smoothly and efficiently. Judges manage the flow of the case by setting and managing deadlines in order to reach a final resolution in a timely manner. A paramount duty of a judge is to remain neutral and unbiased, never advocating for either side but always ensuring that all parties have a fair opportunity to present their arguments and evidence. All these demanding duties collectively ensure that every individual before the court has access to legal proceedings that are conducted fairly, lawfully, and in an orderly manner. It is precisely because of these

---

[1] No counsel for any party authored this brief in whole or in part and no person or entity, other than *amici curiae* and their counsel, has contributed money that was intended to fund preparing or submitting the brief.

expansive and critical responsibilities that judicial immunity is not merely a privilege for individuals serving on the bench, but a bedrock principle with deep historical roots stretching back to English common law. From its roots in 17th century English common law to its establishment in American jurisprudence, judicial immunity is indispensable to safeguarding judicial independence and ensuring that decisions are rendered "without apprehension of personal consequences." *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). This enduring doctrine ensures a judge can juggle all their official acts and duties without fear of prosecution, thereby upholding the integrity and effectiveness of the entire legal system.

The federal government's prosecution of Wisconsin Circuit Court Judge Hannah C. Dugan, if permitted, threatens to undermine centuries of precedent on judicial immunity, crucial for an effective judiciary. The indictment alleges that while acting in her official capacity as she presided over a misdemeanor proceeding in the Milwaukee County Courthouse on April 18, 2025, Judge Dugan (i) knowingly concealed a person from arrest and (ii) obstructed an official proceeding— namely the administrative arrest for purposes of removal proceedings—through her management of a criminal defendant's movements in the courthouse when Immigrations and Customs Enforcement (ICE) agents had targeted him for arrest. The alleged conduct ranges from directing people's movement in and around the courtroom to advising a party that he could appear remotely for his next hearing. ECF 6 (Indict.) at 1–2. As argued in Judge Dugan's Motion to Dismiss, this prosecution is contrary to law and its problems "are legion." ECF 15 at 1.

*Amici*, a group of former state and federal judges who have come together in support of Judge Dugan, write to offer the following points in support of her motion to dismiss.

*First*, the government cannot prosecute Judge Dugan for the alleged actions because, as a judge, she is entitled to absolute immunity for her official acts; this bar on prosecution is the same

2

absolute immunity that is given to members of the legislative and executive branches for their actions taken in an official capacity. Immunity is not a defense to the prosecution to be determined later by a jury or court; it is an absolute bar to the prosecution at the outset. *See Trump v. United States*, 603 U.S. 593, 630 (2024) ("[t]he essence of immunity is its possessor's entitlement not to have to answer for his conduct in court") (internal quotations and citations omitted). Where the alleged conduct is based on judicial acts within a judge's official capacity, "judges are entitled to absolute immunity . . . without regard to the motive with which those acts are allegedly performed." *Stevens v. Osuna*, 877 F.3d 1293, 1304 (11th Cir. 2017). There can be no dispute that here, regardless of whether Judge Dugan in fact undertook the conduct the government alleges, she was acting within her official capacity when engaging in activities in and near her courtroom.

*Second*, allowing prosecution of Judge Dugan for the alleged actions would create a chilling effect on judges that would stifle independent decision-making and cast doubt on the universal recognition that judges are in charge of maintaining order and decorum in their courtrooms and courthouses. Judges *must* retain control of their courtroom [and courthouse] in order to discharge their constitutional duties and ethical obligations. "The court has not only the right, but also the responsibility to maintain control of the courtroom." *Mahmoud v. Ortiz*, 2003 WL 22998119, at *3 (Wis. Ct. App. Dec. 23, 2003); *see Sheppard v. Maxwell*, 384 U.S. 333, 358 (1996) ("the courtroom and courthouse premises are subject to the control of the court"). Here, Judge Dugan's alleged conduct was a quintessential exercise of judicial control over the courtroom and courthouse premises. When deciding how to respond to a federal officer's attempt to arrest a party at a courthouse, let alone a defendant in an official proceeding *in her courtroom*, a judge must weigh multiple constitutional considerations, including whether facilitating the law enforcement officer's attempts to arrest someone inside a courthouse could chill judicial

3

independence and impartiality, as well as public access to court proceedings.

In exercising their duties, government officials sometimes err. No less judges than those in the executive and legislative branches. But redress for such errors is circumscribed. When judges are alleged to have gotten something wrong or have abused authority dedicated exclusively to the judiciary, it falls exclusively to the *judiciary*, not prosecutors, to investigate the purported mistake through the appellate process or judicial misconduct proceedings. But a judge's exercise of the judiciary's power to control their courtrooms and courthouses—including the physical movements of parties—cannot be deemed a criminal obstruction of the executive branch. If it is a crime for judges to perform judicial functions in a manner contrary to executive preferences, then federal and state prosecutors will be free to prosecute judges whenever they are deemed to have stymied the actions of law enforcement officers inside a courtroom or courthouse. Worse yet, members of the public would have every reason to suspect that their constitutional rights to due process, and to fair and public trials, will give way to the judiciary's interest in avoiding state or federal prison.

*Third*, this egregious overreach by the executive branch threatens public trust in the judicial system and the ability of the public to avail themselves of courthouses without fear of reprisal. If citizens believe judges can be prosecuted for their official conduct, it undermines faith in the rule of law and deters individuals from seeking justice in our courts.

*Fourth*, the prosecution of a state court judge for not actively assisting federal law enforcement officials raises troubling constitutional questions that jeopardize the anticommandeering principle of the Tenth Amendment, which bars the federal government from compelling the states to administer a federal regulatory program. The charged conduct falls squarely within a sphere long recognized by courts to be a state judicial prerogative—in particular,

judicial administration that preserves access to justice and protects the dignity and decorum of the courthouse. Here, there can be no more "direct affront to state sovereignty" than installing federal officers in state courthouses and allowing them to coerce or threaten state officials into assisting in federal enforcement activities. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018).

As former state and federal judges with a deep and abiding interest in the preservation of an independent judiciary, *Amici* offer this perspective to assist the Court in navigating the grave constitutional implications presented by the instant prosecution.

## ARGUMENT

I. **Judicial Immunity Provides No Fewer Protections for Judges as the Immunities Applicable to the Other Two Branches of Government**

A. **The Absolute Immunity Afforded to Judges for Official Acts Is the Same as That Which Is Afforded to Legislators and Members of the Executive Branch**

The doctrine of judicial immunity is not an isolated legal anomaly but instead is co-equal to the immunities afforded to the legislative and executive branches. The fundamental premise underlying these distinct, yet analogous protections is the imperative that each branch of government operate free from the threat of personal reprisal from the other branches for actions taken in an official capacity.

As the Supreme Court has recognized, the very "nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have." *Forrester v. White*, 484 U.S. 219, 226 (1988). This, the Court explained, is "the principal characteristic that adjudication has in common with legislation and with criminal prosecution, which are the two other areas in which absolute immunity has most generously been provided." *Id.* This framework underscores why judges, like legislators and executive officials

5

such as prosecutors, require robust protection to perform their duties without fear of external pressure.

Indeed, the Seventh Circuit has consistently affirmed this parallel, noting that "[f]or officials whose constitutional status or special functions demand total protection from suit there is the defense of absolute immunity." *Jackson v. Elrod*, 881 F.2d 441, 443 (7th Cir. 1987). That court explicitly described "[t]he absolute immunity of judges in their judicial functions and legislators in their legislative functions" as "well-settled," and extended the concept to "certain executive officials such as prosecutors, executive officers engaging in adjudicatory functions, and of course the President of the United States." *Id.* at 443–44. This broad recognition confirms that official immunity, whether for executive, legislative, or judicial officers, "insulates . . . from liability arising out of their performance of official duties." *United States ex rel. Powell v. Irving*, 684 F.2d 494, 495 (7th Cir. 1982).[2]

### B. Judicial Immunity Is an Absolute Immunity that Protects Against Prosecution of the Case Itself – It is Not Merely a Defense

The protection afforded by official immunity is not merely a shield against an adverse judgment; it is an absolute entitlement "'not to have to answer for [its possessor's] conduct' in court." *Trump*, 603 U.S. at 630 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985)). This distinction is critical. As the Supreme Court emphasized in *Mitchell*, absolute immunity "is an *immunity from suit* rather than a mere defense to liability" and "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526 (emphasis in original).

---

[2] While some judicial pronouncements, such as a footnote in *Eades v. Sterlinske*, have suggested differences in the scope of judicial and legislative immunity, these distinctions pertain to concepts not applicable here rather than the core principle of immunity from criminal prosecution for official acts. 810 F.2d 723, 725 n.1 (7th Cir. 1987) (citing *Dennis v. Sparks*, 449 U.S. 24, 30 (1980)); *see also Dennis*, 449 U.S. at 30–31 (explaining judicial immunity does not insulate judges from being called to respond as witnesses when they have information material to a criminal or civil proceeding).

6

To permit the prosecution of Judge Dugan to proceed, even to the stage of trial, would impose precisely the burden that judicial immunity is designed to prevent. The very act of defending against criminal charges, regardless of the ultimate outcome, would inherently distract the judge from her official duties, consume her resources, and subject her to the very pressures that undermine judicial independence. Such a result would render the absolute nature of judicial immunity meaningless, transforming it from a fundamental right not to be sued into a mere defense.

### C. The Absolute Nature of Protection for Official Acts Renders the Official's Motive Irrelevant

A defining characteristic of absolute immunity, whether for judges, legislators, or the President and other representatives of the executive branch, is that it shields official acts regardless of the official's alleged motive. This principle is vital to protect the integrity and independence of all three branches of government. *See Forrester*, 484 U.S. at 227 (finding an "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches") (emphasis in original); *see also United States v. Brewster*, 408 U.S. 501, 507 (1972) ("The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators.").

The Supreme Court's landmark decision in *Stump v. Sparkman*, 435 U.S. 349 (1978), unequivocally established this point. The Court held that a judge "will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" *Id.* at 356–57 (internal citation omitted); *see also Mireles v. Waco*, 502 U.S. 9, 11 (1991) ("judicial immunity is not overcome by allegations of bad faith or malice"). This means

7

that even if Judge Dugan's actions were alleged to be malicious or erroneous, so long as they were judicial acts performed within her official capacity, immunity applies. As the Wisconsin Supreme Court has articulated, "[u]nlike a privilege, an immunity is conferred upon a defendant because of the status or position of the defendant, not because of the existence of a particular set of facts or the moral justification of an act." *Ford v. Kenosha Cnty.*, 160 Wis. 2d 485, 495, 466 N.W.2d 646, 650 (Wis. 1991). The U.S. Supreme Court has made similar findings with respect to legislative and presidential immunities. *See, e.g.*, *Brewster*, 408 U.S. at 509 (stating that the Speech or Debate Clause "protect[s] Members [of Congress] from inquiry into legislative acts or the motivation for performance of such acts"); *Trump*, 603 U.S. at 618 ("In dividing official from unofficial conduct, courts may not inquire into the President's motives."). The shared reluctance to delve into subjective intent for high-level official acts across all three branches underscores the structural nature of these immunities. *See id.* (noting that inquiry into motive would "risk exposing even the most obvious instances of official conduct to judicial examination on the mere allegation of improper purpose").

## II. This Prosecution Creates a Critical Chilling Effect on Judges By Threatening to Undermine Judicial Independence and the Judiciary's Ability to Maintain Control Over Their Courtrooms

### A. Absent Judicial Immunity, the Mere Specter of Federal Prosecution for Any Misstep Concerning Federal Immigration Enforcement Will Inevitably Erode the Independence and Impartiality of Judges in the Discharge of Their Constitutional Duties

This extraordinary prosecution, and the specter of similar prosecutions in the other states, casts an intimidating shadow over the exercise of judicial independence and threatens to chill judicial officials in Wisconsin and in all other states who do not give way to federal immigration demands or arrest warrants in or near their courtrooms. The federal government's prosecution of Judge Dugan for what she is alleged to have done announces to every judge in a state court that he

8

or she must manage their courtroom to become an active party in federal arrests when sought, or risk professional humiliation, financial ruin, and criminal prosecution. Judges must not be forced to either accept federal immigration demands for those who may appear in their courtrooms or incur a federal prosecution.

Under the due process protections of the Fifth and Fourteenth Amendments of the U.S. Constitution, every litigant is entitled to an independent and impartial judge. *See Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927) (due process violated where judge failed to be impartial); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821–25 (1986) (same); *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 885–86 (2009) (same); *State v. Hermann*, 2015 WI 84, ¶ 25, 364 Wis. 2d 336, 348, 867 N.W.2d 772, 778 (Wis. 2015) ("[t]he right to an impartial judge is fundamental to our notion of due process") (internal quotation marks omitted). Thus, when a law enforcement officer seeks to arrest a party at a state courthouse, a judge's response to those demands in, near, or outside their courtroom implicates the judge's independence and constitutional duty of impartiality. *See, e.g.*, SCR 60.04 ("A judge may not be swayed by partisan interests, public clamor or fear of criticism."); *id.* at cmt. 2 ("A judge must perform judicial duties impartially and fairly. A judge who manifests bias on any basis in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute."); SCR 60.03 (judges "shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary").

In practice, the Department of Justice is effectively requiring state court judges, in running their courtrooms and otherwise discharging their judicial responsibilities, to prioritize the interests of federal law enforcement above all else or risk federal prosecution. For instance, if the courtroom has two exits, a judge might conclude that they must first inquire of another branch about which exit a party must use to enter or leave the courtroom. In other words, the federal government seeks

9

to use criminal statutes—here, obstruction and concealment—as a means of compelling state court officials to prioritize the interest of federal officers, whenever they appear, over the parties, witnesses, and victims in the case and above the requirements of the state law to be applied. This resulting specter of federal prosecution for any misstep—regardless of the federal law enforcement issue—will inevitably chill the independence and impartiality of state court judges in the discharge of their constitutional oath.[3]

In fact, the current Administration has emphasized this very notion: on April 28, White House Press Secretary Karoline Leavitt went so far as to say that the Administration will not rule out arresting members of the United States Supreme Court.[4] As former state and federal judges, we can state with confidence that, if this prosecution is permitted to proceed, the practical consequences for the judiciary would be devastating. Should this Court allow the prosecution of Judge Dugan to proceed, judges in every state and federal courthouse across the nation will feel a constant, ever-present threat to refrain from actions that might antagonize federal officials, and it will not just be limited to immigration enforcement. Let this case serve as a warning for what else could come should this prosecution be allowed to go forward.

## B. Our Justice System Requires that Judges Maintain Control Over Their Courtrooms

Our justice system dictates that "the courtroom and courthouse premises are subject to the control of the court" to ensure impartiality to litigants. *Sheppard*, 384 U.S. at 358. This

---

[3] The oath of Wisconsin state court judges pledges, "I . . . do solemnly swear that I will support the constitution of the United States and the constitution of the state of Wisconsin; that I will administer justice without respect to persons and will faithfully *and impartially discharge the duties of said office* to the best of my ability. So help me God." Wis. Stat. § 757.02(1) (emphasis added). The oaths for judges in every other state require the same commitment. *See, e.g.*, Arkansas Const. art. 19, § 20 (same); Ohio R.C. § 3.23 (same); Maryland Const. art. 1, § 9 (same).

[4] Ltr. from Former State and Federal Judges to Att'y Gen. Pamela Bondi (May 6, 2025), *available at* https://societyfortheruleoflaw.org/150-former-judges-rebuke-attacks-on-the-judiciary/.

10

foundational principle is particularly important in circumstances that require "difficult judgment[]" about "matters of courtroom governance" that *must* be made by the judge because they "require 'a sensitive appraisal of the climate surrounding a trial and a prediction as to the potential security or publicity problems that may arise during the proceedings.'" *United States v. DeLuca*, 137 F.3d 24, 34 (1st Cir. 1998) (internal citation omitted).

       The authority of judges to control their courtrooms is not some judicial power grab. Rather, it is the recognition that judges must possess authority over their courtrooms so they can fulfill their constitutional obligations. *See Stevens*, 877 F.3d at 1305 n.9 ("We reject the position that a judge's ordering a person removed from a courthouse constitutes an administrative, legislative, or executive (apart from a judicial) function. A judge's authority to control his courtroom—and, necessarily, the environment surrounding his courtroom—stems directly from his duties as a judge."); *United States v. Meacham*, 65 F. App'x 529, 533 (6th Cir. 2003) ("To efficiently administer justice, district courts are vested with power to control their courtrooms."). Judges *must* be able to control these environments so that they can meaningfully fulfill their constitutionally prescribed responsibilities to parties and to the public and also balance the complex legal and practical considerations that often operate in tension with one another. *See Stevens*, 877 F.3d at 1305 (describing how judges are empowered to maintain control over their courtrooms specifically, and the courthouse generally); *Maus v. Baker*, 641 F. App'x 596, 600 (7th Cir. 2016) ("The district court has discretion to use reasonable measures to maintain order and safety in the courtroom."). "[T]he issuance of an order removing persons from the courthouse in the interest of maintaining such control is an ordinary function performed by judges[.]" *Stevens*, 877 F.3d at 1305. This includes, for example, the need to make split-second considerations about how counsel, parties, court staff, victims or witnesses move about a courtroom, or instant decisions

11

to ensure those inside a courtroom are shielded from any sudden violence or outburst that could

be provoked.  Similarly, another tool for judges to control a courtroom environment is facilitating

the use of a particular hallway or exit to address the needs of a party, a witness, or counsel.

The Wisconsin Code of Judicial Conduct, like every judicial code of conduct across the

country that is in accordance with the American Bar Association's Model Code of Judicial

Conduct,[5] recognizes that "[a] judge shall require order and decorum in proceedings before the

---

[5] *See* ABA Model Code of Judicial Conduct, *available at* https://www.americanbar.org/groups/professional_responsibility/publications/model_code_of_judicial_conduct/; *see also* Alabama Canons of Judicial Ethics Canon 3A(2) ("A judge should maintain order and decorum in proceedings before him"); Alaska Code of Judicial Conduct Canon 3B(3) (same); Arizona Code of Judicial Conduct R. 2.8(A) (same); Arkansas Code of Judicial Conduct R. 2.8(A) (same); California Code of Judicial Ethics Canon 3B(3) (same); Colorado Code of Judicial Conduct Canon 3A(2) (same); Connecticut Code of Judicial Conduct R. 2.8(A) (same); District of Columbia Code of Judicial Conduct R. 28(A) (same); Delaware Judges' Code of Judicial Conduct R. 2.8(A) (same); Code of Judicial Conduct for the State of Florida Canon 3(B)(3) (same); Georgia Code of Judicial Conduct R. 2.8(A) (same); Hawai'i Revised Code of Judicial Conduct R. 2.8(a) (same); Idaho Code of Judicial Conduct R. 2.8(A) (same); Illinois Code of Judicial Conduct R. 2.8(A) (same); Indiana Code of Judicial Conduct R. 2.8(A) (same); Iowa Code of Judicial Conduct R. 51:2.8(A) (same); Kansas Code of Judicial Conduct R. 2.8(A) (same); Kentucky Code of Judicial Conduct R. 2.8(A) (same); Louisiana Code of Judicial Conduct Canon 3A(2) (same); Maine Code of Judicial Conduct R. 2.8A (same); Maryland Code of Judicial Conduct R. 2.8(a) (same); Massachusetts Code of Judicial Conduct R. 2.8(A) (same); Minnesota Code of Judicial Conduct R. 2.8(A) (same); Mississippi Code of Judicial Conduct Canon 3B(3) (same); Missouri Supreme Court Code of Judicial Conduct Canon 2-2.8(A) (same); Montana Code of Judicial Conduct R. 2.8(A) (same); Nebraska Revised Code of Judicial Conduct § 5-302.8(A) (same); Nevada Code of Judicial Conduct R. 2.8(A) (same); New Hampshire Code of Judicial Conduct R. 2.8(A) (same); New Jersey Code of Judicial Conduct Canon 3A(2) (same); New Mexico Code of Judicial Conduct § 21-208A (same); New York Code of Judicial Conduct § 100.3(b)(2) (same); North Carolina Code of Judicial Conduct Canon 3(A)(2) (same); North Dakota Code of Judicial Conduct R. 2.8(A) (same); Ohio Code of Judicial Conduct R. 2.8(A) (same); Oklahoma Code of Judicial Conduct R. 2.8(A) (same); Oregon Code of Judicial Conduct R. 3.7(A) (same); Pennsylvania Code of Judicial Conduct R. 2.8(A) (same); Rhode Island Code of Judicial Conduct Canon 2 R. 2.8(A) (same); South Carolina Code of Judicial Conduct Canon 3B(3) (same); South Dakota Code of Judicial Conduct Canon 3B(3) (same); Tennessee Supreme Court Code of Judicial Conduct R. 2.8(A) (same); Texas Code of Judicial Conduct Cannon 3(B)(3) (same); Utah Code of Judicial Conduct R. 2.8(A) (same); Vermont Code of Judicial Conduct R. 2.8(A) (same); Canons of Judicial Conduct for the Commonwealth of Virginia Canon 3D (same); Washington Code of Judicial Conduct R. 2.8(a) (same); West Virginia Code of Judicial Conduct R. 2.8(A); Wisconsin Code of Judicial Conduct R. 60.04(1)(c) (same); Wyoming Code of Judicial Conduct R. 2.8(A) (same).

12

judge." SCR 60.04(c). This rule applies to "litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity . . . and others subject to the judge's direction and control." SCR 60.04(d). The rules are clear that, within the courtroom, control over order and decorum is left solely to the judge's discretion and direction. Moreover, judges have a responsibility to "establish[], maintain[] and enforc[e] high standards of conduct and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved" in "every aspect of judicial behavior except purely legal decisions." SCR 60.02.

### C. When Judges Err in Their Official Capacity, the Proper Recourse Is the Appellate Process or Referrals to the Judicial Conduct Commission—Not Federal Prosecution

Allegations of misconduct for official judicial conduct, whether in issuing an opinion or in decorum on the bench, are not without remedy, but such redress is certainly not relegated to the executive branch to address. Rather, judicial decision making is subject to the normal appellate process and judicial misconduct is relegated exclusively to the appropriate judicial conduct commission. Federal and state prosecutors have no role in policing perceived judicial misconduct.

In Wisconsin, for example, the Wisconsin Judicial Commission is tasked with investigating—and prosecuting, if necessary—allegations of misconduct or disability on the part of state judicial officials. *See* Wis. Judicial Commission, *Annual Report* at 4 (2024) ("The Commission reviews and investigates allegations of judicial misconduct or disability. If it finds probable cause of judicial misconduct or disability, it initiates and prosecutes an action in the Supreme Court against the judicial official.").[6] The Judicial Commission's purpose is two-fold: to (i) protect the integrity of the judicial process and to preserve public confidence in the courts; and (ii) hold state judicial officials accountable for violations of the Wisconsin Code of Judicial

---

[6] State of Wisconsin Judicial Commission, *Annual Report* (2024), *available at* https://www.wicourts.gov/courts/committees/judicialcommission/wjcannualreport2024.pdf.

Conduct while maintaining the independence of the judiciary. The Commission is clear that it alone is responsible for resolving what constitutes proper or improper judicial conduct, and if necessary, prosecuting any allegations of judicial misconduct.

Yet here, federal prosecutors have seemingly seized authority and taken the unprecedented and brazen step of criminally charging Judge Dugan for conduct that occurred entirely within her judicial role and ambit. Judge Dugan's alleged conduct, including directing a defendant's movement in and around the courtroom, was a quintessential exercise of court control over the courtroom and courthouse premises. When deciding how to respond to a federal officer's attempt to arrest a party inside a courthouse, a judge *must* weigh multiple considerations, including whether facilitating the arrest would impair the targeted party's due process right to be treated fairly, and whether the law enforcement officer's attempts to arrest someone inside a courthouse could chill people's access to our courts, and thus impair both the targeted party's Sixth Amendment right to a public trial and the public's First Amendment right to access court proceedings. By stepping in now, federal prosecutors have improperly seized the duties left to the state's Judicial Commission to assess credible allegations (if any).

## III. This Prosecution Threatens Public Trust in the Judicial System and the Ability for the Public to Avail Themselves of Courthouses Without Fear of Consequences

Arresting judges acting in their official capacity, who do not do as another branch believes is proper, can significantly undermine public trust in the integrity and transparency of judicial processes in several ways.

First, it creates the perception that judges are not truly neutral and impartial, which is a cornerstone of the public trust afforded to the judiciary. If judges fear arrest or prosecution for their official acts, they may become overly cautious or swayed by popular opinion or political considerations. The public expects judges to apply the law fairly, even when it leads to unpopular

14

results, and the threat of arrest can undermine this expectation. Judges must be seen as operating as neutral arbiters of the law and not an arm of law enforcement.

Second, the act of arresting a judge creates a disruption in the judicial process. Even if the judge is later cleared, the arrest causes immediate disruption to court proceedings, delays justice for litigants, and creates instability within the judicial system. This visible disruption can shake public confidence in the system's reliability and efficiency. That includes the ability for the public, whether a defendant, members of their family, or anyone else, to attend courthouse proceedings without fear of reprisal or collateral consequences. *See BP Expl. & Prod., Inc. v. Claimant ID 100246928*, 920 F.3d 209, 210 (5th Cir. 2019) (explaining that public access to courthouses promotes the trustworthiness of the judicial process, curbs judicial abuses, and provides the public with a more complete understanding of the judicial system, including a better perception of its fairness); *Braun v. Terry*, 148 F. Supp. 3d 793, 802 (E.D. Wis. 2015) ("the function of a courthouse and its courtrooms is principally to facilitate the smooth operation of a government's judicial functions....[T]he presiding judge is charged with the responsibility of maintaining proper order and decorum") (quoting *Huminski v. Corsones*, 396 F.3d 53, 91 (2d Cir. 2005)). Accordingly, courts—including the Seventh Circuit—have held that courthouses are non-public forums because their primary purpose is the impartial and efficient *administration* of justice—and not to provide a platform for political statements, public assembly, or debate. *Braun*, 148 F. Supp. 3d at 802; *Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998) (establishing that the interior of a courthouse is a nonpublic forum).

Third, when judges are arrested, it can also create the impression that the judiciary is not independent and coequal to the executive branch. The public might perceive that judges are subject to control for political reasons or for making unpopular decisions, rather than being held

accountable for actual criminal conduct. This erodes confidence that legal outcomes are based solely on law and fact, rather than external pressures. Historically, the federal judiciary has enjoyed more public trust than the legislative and executive branches of the federal government, as Americans have long believed that judges, unlike politicians, make their decisions independently, impartially, and based on legal reasoning rather than politics.[7] Public trust in the judicial process requires assurance that when deciding how to respond to a federal officer's attempt to arrest a party at a courthouse, let alone a defendant in a criminal proceeding *in his or her courtroom*, a judge will weigh all relevant constitutional considerations, rather than the political optics of the situation.

Fourth, arresting judges undermines confidence in the rule of law. Judges are perceived by the public to be the guardians of the rule of law. If the very individuals entrusted with upholding the law are seen as susceptible to arbitrary arrest or prosecution for their official duties, it suggests that no one is truly above political maneuvering. This can lead to widespread cynicism and a loss of faith in the legal system's ability to deliver justice.

Finally, arresting a judge can confuse the concept of error in a judge's official acts with a crime. The public generally understands that judges may make errors which are corrected through the appeals process. However, an arrest implies criminal wrongdoing. If the line between a judicial error (which can and should be addressed through the appeals process or disciplinary processes) and a criminal act is blurred by arrests for official conduct, it can lead the public to believe that judges are inherently corrupt or that the system is designed to punish them for their decisions, rather than to correct legal mistakes.

---

[7] Shawn Patterson Jr., et al., *The Withering of Public Confidence in the Courts*, 108 Judicature 1, Duke L. Sch. (2024), *available at* https://judicature.duke.edu/articles/the-withering-of-public-confidence-in-the-courts/.

16

## IV.  The Prosecution Is Barred By the Tenth Amendment and Undermines Core Principles of Federalism

Basic principles of federalism require this Court to dismiss this prosecution because applying 18 U.S. Code sections 1071 and 1505 to ICE courthouse enforcement activities would risk inviting widespread violations of the anticommandeering doctrine.  The anticommandeering doctrine recognizes that "[t]he Federal Government may not compel the States to . . . administer a federal regulatory program," *New York v. United States*, 505 U.S. 144, 188 (1992), including federal immigration enforcement activities.  *See also United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019); *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) ("[A] conclusion that a detainer issued by a federal agency is an order that state and local agencies are compelled to follow, is inconsistent with the anti-commandeering principle of the Tenth Amendment.").  The Supreme Court has described this limitation on federal power as a "fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States."  *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). States have the prerogative "not [to] yield[ ] to federal blandishments when they do not want to embrace the federal policies as their own."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) (internal quotation marks omitted).

The anticommandeering limitations on the federal government also protect state *officials* from commands to execute federal law.  In *Printz v. United States*, for example, states challenged the Brady Handgun Violence Prevention Act, which, under threat of criminal sanction, required local municipal officials to conduct background checks on handgun purchasers, and imposed a criminal sanction for violations.  521 U.S. 898, 904 (1997).  The Court held that portions of the statute violated the Tenth Amendment because the federal government cannot "conscript[] the State's officers directly."  *Id*. at 935.

17

Recently, courts have applied the anticommandeering doctrine in the immigration context in both *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018), *aff'd and remanded sub nom. City of Chicago v. Barr*, 957 F.3d 772 (7th Cir. 2020), and *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018), *aff'd in part, vacated in part sub nom. City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276 (3d Cir. 2019). These decisions enjoined enforcement of portions of Section 1373 of the Immigration and Nationality Act, which barred states from restricting state officials from providing information to the Immigration and Naturalization Service and sharing information among state and federal law enforcement. The district courts held that these provisions violated the Tenth Amendment's anticommandeering principle by interfering with a state's sovereign power to enact legislation. *See City of Philadelphia*, 309 F. Supp. 3d. at 329. Even though section 1373 was phrased as a prohibition, rather than a command, it was struck down as an attempt to control the conduct of state officials. *Id.* at 328–29 (quoting *Murphy*, 584 U.S. at 474) (likening section 1373 to the provision struck down in *Murphy* as "unequivocally dictat[ing] what a state legislature may and may not do").

The anticommandeering ban is not limited to direct commands; it also bars indirect commands that deny state officials the option of refusing to *participate* in a federal scheme. *See* R. Seth Davis, *Conditional Preemption, Commandeering, and the Values of Cooperative Federalism*, 108 Colum. L. Rev. 404, 417–19 (2008). In *New York v. United States*, a federal statute gave states a "choice" between accepting radioactive waste from producers or implementing regulations outlined by Congress. This, the Court held, was functionally a direct command that the states implement federal regulations. 505 U.S. at 176 ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all."). In *Murphy*, the Court found no distinction between laws that direct states to act, as was the case in *Printz*, and laws that prohibit

18

them from acting. *Murphy*, 584 U.S. at 474–75. In short, just as federal authorities may not constitutionally order a state officer to cooperate in an immigration arrest, so too are they barred from punishing an officer for *failing to cooperate*. Each approach is "unconstitutionally coercive," *see New York*, 505 U.S. at 176, and the exercise of *criminal* indictment powers the more so. Each approach "unequivocally dictates" what a state, acting through its officials, "may and may not do." *Murphy*, 584 U.S. at 474. Each is an attempt to regulate the states through coercion applied to state officials. *See New York*, 505 U.S. at 166 (noting that "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States").

In the instant prosecution, the coercion arises from the alleged exercise by a Wisconsin circuit court judge of matters occurring in and outside her courtroom. The conduct charged in the indictment is alleged to have all taken place in, outside, or near a *state* courtroom, in courthouse operating at the *state*'s own expense, for the purpose of administering *state* cases, and to be carried out by a *state* judicial officer who was, at the time, administering a proceeding arising under *state* law. The charged conduct was squarely within a sphere long recognized by courts to be judicial prerogative—in particular, deemed a necessary aspect of judicial administration that preserves access to justice and protects the dignity and decorum of the courthouse. *See supra* Part II.B. Simply put, there can be no more "direct affront to state sovereignty" than installing federal officers in state courthouses and allowing them to coerce or threaten state officials into assisting in federal enforcement activities. *Murphy*, 584 U.S. at 474.

Here, by seeking to coerce and commandeer the judicial actions of Judge Dugan, the indictment seeks to leverage the federal government's coercive power to bear on the State of Wisconsin itself in violation of the Tenth Amendment. As *Murphy*, *Printz*, and *New York* all demonstrate, the government's premise—that it can commandeer state facilities and coerce state

19

actors in order to facilitate immigration arrests—is precisely what the Tenth Amendment forbids.[8]

Applying federal obstruction statutes in this manner would effectively coerce state judges into facilitating federal law enforcement and deferring to federal law enforcement's needs and perceived priorities over legitimate but countervailing state interests. That would deny state court judges the "critical alternative" required by the Tenth Amendment to "decline to administer the federal program." *New York*, 505 U.S. at 176–77. This Court cannot now allow the federal government to coerce, commandeer and indeed intimidate a state (Wisconsin), through its judicial officers, for alleged non-cooperation with federal immigration enforcement efforts within or near its courtrooms.

## CONCLUSION

As judges with a duty to uphold the integrity of the judiciary, we file this "friend of the court" brief to offer our perspective on the historical and legal principles of judicial immunity, judicial independence and impartiality, and Tenth Amendment considerations in hopes of materially assisting the Court in navigating the significant constitutional questions presented by this case. Accordingly, *Amici* respectfully file this brief in support of Judge Dugan's motion to dismiss the indictment in this case.

---

[8] The government's effort upends a core rationale of the Tenth Amendment; that the federal government cannot shift the cost of policy enforcement on the states. The effect of this prosecution is to commandeer courthouses built and maintained by Wisconsin as centers for its enforcement policy, and to force the judicial officers whom Wisconsin appoints to assist in effectuating that policy. A key policy objective of the Tenth Amendment is to force the federal government to finance its own initiatives, and to prevent it from shifting that cost on to the States. *Murphy*, 584 U.S. at 474.

Dated: May 30, 2025

Respectfully Submitted,

s/ *Abbe David Lowell*
Abbe David Lowell*
Brenna Frey*
David A. Kolansky*
Isabella M. Oishi*
*Counsel for Amici*
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., 2nd Fl.
Washington, DC 20005
Tel: (202) 964-6110
Alowellpublicoutreach@lowellandassociates.com
BFrey@lowellandassociates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

*Application for admission forthcoming*

s/ *Norman L. Eisen*
Norman L. Eisen*
*Counsel for Amici*
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Ave, S.E., Suite 15180
Washington, D.C. 20003
Tel: (202) 594-9958
norman@statedemocracydefenders.org

s/ *Jeffrey A. Mandell*
Jeffrey A. Mandell [Bar No. 1100406]
TR Edwards [Bar No. 1119447]
*Counsel for Amici*
LAW FORWARD, INC.
222 W. Washington Ave. Suite 680
Madison, WI 53703
Tel: (608) 285-2485
jmandell@lawforward.org
tedwards@lawforward.org