UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

               Plaintiff,

     v.                                 Case No. 25-CR-89 (LA)

HANNAH C. DUGAN,

               Defendant.

**RESPONSE TO MOTION TO DISMISS THE INDICTMENT**

     The United States of America, by Acting United States Attorney Richard G. Frohling, hereby responds to defendant Hannah C. Dugan's motion to dismiss the indictment. (Dkt. 15.) For the following reasons, the Court should deny the motion.

**BACKGROUND**

     The indictment alleges that on April 18, 2025, the defendant took actions in the Milwaukee County Courthouse to prevent the arrest of "E.F.R.," who was wanted on a federal warrant for "purposes of removal proceedings conducted by the United States Department of Homeland Security." (Dkt. 6.) More particularly, the indictment alleges that the defendant, upon learning of agents' plan to execute the federal warrant:

Count One: Knowingly concealed E.F.R. to prevent his discovery and arrest on a warrant, in violation of 18 U.S.C. § 1071; and

Count Two: Corruptly endeavored to influence, obstruct, and impede E.F.R.'s arrest on a warrant by committing affirmative acts to assist E.F.R. in evading such arrest, in violation of 18 U.S.C. § 1505.

(Dkt. 6.)

The affirmative acts alleged in Count Two include:

a.    confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

b.    upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c.    addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d.    directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e.    advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

(Dkt. 6 at 2.)

# INTRODUCTION

Dugan asks the Court to dismiss the indictment based on (1) judicial immunity; and (2) "the Tenth Amendment and the Constitution's vertical separation of powers." (Dkt. 15.) However, she cites no case in which a court has dismissed an indictment on either basis, and neither ground has merit. *See United States v. Joseph, et al.,* 2020 WL 4288425 (D. Mass. July 27, 2020) (rejecting similar arguments for dismissal).

In her lengthy memorandum,[1] Dugan concedes that "[j]udges, like legislators and executive officials, are not above the law." (Dkt. 21 at 2.) Nonetheless, she claims that judges are entitled to absolute immunity from criminal prosecution except for "three categories of crimes," none of which—according to Dugan—applies here. (Dkt. 15 at 1; 21 at 5, 13.) She also contends that state judges cannot be prosecuted federally for judicial acts based on the "structure of the United States Constitution itself, encapsulated in the Tenth Amendment." (Dkt. 15 at 1; 21 at 5, 23.) Dugan gleans this state-court-immunity doctrine from

---

[1] The Court set a 30-page limit for any legal memorandum filed in this case. *See* Dkt. 18 ("The length of any legal memorandum shall be in accordance with Civil L.R. 7(f)."). Dugan has supplemented her initial 7-page filing with a 36-page legal memorandum. Although the Court would be fully justified in striking Dugan's memorandum in whole or in part given her failure to comply with the Court's order, this response addresses her arguments in their entirety.

the principles of "federalism," "comity," and a "vertical separation of powers."
(*Id.*)

Dugan's arguments for immunity from criminal prosecution inaptly rely on civil law and the notion that judicial immunity applies absent express Congressional abrogation. However, she does not point to any direct authority for her theories. Nor could she, as the Supreme Court has made clear that judges are *not* immune from criminal liability. *See O'Shea v. Littleton*, 414 U.S. 488, 503 (1974). In the end, Dugan asks for this Court to develop a novel doctrine of judicial immunity from criminal prosecution, and to apply it to the facts alleged in the indictment, all without reasonable basis—directly or indirectly—in the Constitution, statutes, or case law.

Dugan's federalism argument is equally flawed, resting on inapposite caselaw as well as the factually unsupported and inaccurate storyline that the federal government somehow tried to "commandeer" or "control" a state courtroom. The Court should reject Dugan's manufactured version of judicial immunity, as well as her unfounded concerns about federalism, and deny her motion.

## STATEMENT OF THE CASE

Rule 12(b)(1) of the Federal Rules of Criminal Procedure states that "[a] party may raise by pre-trial motion any defense, objection, or request that the court can determine without a trial on the merits." In this case, Dugan seeks to dismiss the indictment.

Under Federal Rule of Criminal Procedure 7(c)(1), an indictment only "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Indictments "need not exhaustively describe the facts surrounding a crime's commission nor provide lengthy explanations of the elements of the offense." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir.1996). Ultimately, "[t]he defendant's constitutional right is to know the offense with which [s]he is charged, not to know the details of how it will be proved." *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir.1981). When deciding a motion challenging the sufficiency of an indictment, the Court assumes that the indictment's factual allegations are true and must "view all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *see also United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010) (per curiam) ("An indictment is reviewed on its face, regardless of the strength or weakness of the government's case.").

Dugan says that she takes the indictment's allegations at "face value" (Dkt. 21 at 3), but many of the factual claims she asserts in her motion and supporting memorandum go beyond the four corners of the indictment, are contradicted by materials provided in discovery, and present a view of the indictment *least* favorable to the government. For example, Dugan asserts that agents "disrupted active proceedings," "disrupted [the defendant's] courtroom," and "decided how they wanted [the defendant] to control [her] courtroom and the people in and near it." (Dkt. 15 at 5; Dkt. 21 at 1). None of this is true.

The trial evidence, including video footage from the public hallways, witness accounts, and audio recordings of the events which took place inside Dugan's courtroom, will show quite the opposite: that the "planned" arrest referenced in the indictment was to occur *outside* the defendant's courtroom, *after* E.F.R.'s hearing, so as *not* to disrupt court proceedings. In fact, the agents had announced themselves to security when they arrived, and the security officials *actually* responsible for controlling access to the courthouse had admitted the agents into the building with full knowledge of the arrest planned for outside of Dugan's courtroom after E.F.R.'s hearing. The evidence also will show that agents were not in the courtroom when Dugan took the bench, but that—after being told by a member of her staff that ICE agents were present in the hallway—Dugan chose to pause an unrelated case, leave her courtroom, disrupt proceedings in a

6

colleague's courtroom to commandeer her assistance, and then confront agents in the public hallway. The evidence will further show that after directing the agents through a set of double doors to the Chief Judge's office (at a time Dugan knew the Chief Judge was out of the office), Dugan quickly returned to her courtroom and, among other things, directed E.F.R.'s attorney to "take your client out and come back and get a date" and then to go through the jury door and "down the stairs" before physically escorting E.F.R. and his attorney into a non-public hallway with access to a stairwell that led to a courthouse exit. She did this all just days after thanking a colleague for providing information which explained that ICE could lawfully make arrests in the courthouse hallway.

Put simply, nothing in the indictment or the anticipated evidence at trial supports Dugan's assertion that agents "disrupted" the court's docket; instead, all events arose from Dugan's unilateral, non-judicial, and unofficial actions in obstructing a federal immigration matter over which she, as a Wisconsin state judge, had no authority. At the very least, for purposes of deciding this motion, Dugan's claims to the contrary find no support in the indictment and should be rejected.

## DISCUSSION

**I.      The doctrine of judicial immunity applies to civil suits but does not shield judges from liability for their criminal acts.**

Dugan asserts that "this is no ordinary criminal case, and [she] is no ordinary criminal defendant." (Dkt. 15.)  However, the fact that Dugan is a state-court judge does not shield her from federal criminal prosecution.  Her state judicial post is not a license to engage in conduct that violates federal criminal law.

Under the established doctrine of judicial immunity, "generally, a judge is immune from a suit for money damages" for judicial acts. *Mireles v. Waco*, 502 U.S. 9 (1991) (per curiam).  The doctrine evolved to shield judges from civil liability based on their judgments, to promote independent decision-making in both civil and criminal cases. *Dennis v. Sparks*, 449 U.S. 24, 31 (1980) (judicial immunity "arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear"). Dugan argues that this doctrine should be extended to the criminal context, even though the Supreme Court long "has recognized that a judge is not absolutely immune from criminal liability." *Mireles*, 502 U.S. at 10 n.1 (citing *Ex parte Virginia*, 100 U.S. 339, 348-49 (1879)).

In fact, the Supreme Court discussed the limits of judicial immunity in terms that could not be clearer, stating:

> Whatever may be the case with respect to civil liability generally, or civil liability for willful corruption, we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, *the judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress*.

*O'Shea*, 414 U.S. at 503 (cleaned up; emphasis added); *see also Imbler v. Pachtman*, 424 U.S. 409, 428-429 (1976) ("This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally").[2]

Consistent with these authorities, judges have been prosecuted in dozens of cases for a wide range of criminal conduct, including obstruction. *See, e.g., Kugler v. Helfant*, 421 U.S. 117, 131 (1975) (judge indicted on state charges of obstruction of justice and lying to a grand jury); *United States v. Cochran*, 682 F. App'x 828, 842 (11th Cir. 2017) (affirming state court judge's convictions for, *inter alia*, witness tampering in violation of 18 U.S.C. § 1512); *United States v. Baumgartner*, 581 F.

---

[2] Dugan's memorandum focuses on the long (and irrelevant) history of common law immunity from *civil* proceedings. The only case she cites for the purported existence of common law immunity from *criminal* proceedings is *Floyd v. Barker*, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607). However, that single and limited case – with distinguishable facts from 1607 England – cannot bear the weight of establishing blanket immunity in the United States from federal criminal charges for all judges for whatever transpires in their courtrooms – especially given Supreme Court precedent and the long list of cases in modern times in which judges have been held accountable for their criminal conduct.

9

App'x 522, 534 (6th Cir. 2014) (affirming conviction of state court judge for misprision of a felony, in violation of 18 U.S.C. § 4); *United States v. Grubb*, 11 F.3d 426, 438 (4th Cir. 1993) (affirming conviction of state court judge under 18 U.S.C. § 1503 for obstructing a grand jury investigation by lying to FBI agent); *United States v. Claiborne*, 727 F.2d 842, 843 n.1 (9th Cir. 1984) (federal judge prosecuted for urging a grand jury witness to lie, in violation of 18 U.S.C. § 1503); *United States v. Ash*, No. 19-mj-9341-UA (S.D.N.Y. filed Oct. 4, 2019) (state court judge prosecuted under 18 U.S.C. § 1512(c) and other statutes for obstructing a grand jury proceeding); *United States v. Moreland*, Crim. No. 17-00066 (M.D. Tenn. May 24, 2018) (state court judge convicted under 18 U.S.C. § 1512(c)(2) and other statutes for directing grand jury witness to lie and destroy documents); *United States v. Walker*, Crim. No. 14-00093-DCB-FKB (S.D. Miss. Oct. 7, 2014) (state court judge convicted under 18 U.S.C. § 1512(c)(2) for telling grand jury witness that a subpoenaed document "probably needs to be somewhere else"); *United States v. DeLaughter*, Crim. No. 09-0002-GHD-SAA (N.D. Miss. July 30, 2009) (state court judge convicted under 18 U.S.C. § 1512(c)(2) for lying to FBI about case in which he made rulings favorable to the defense at the request of an attorney friend); *State v. Brady*, 172 A.3d 550, 559 (N.J. Super.) (upholding indictment of state court judge who harbored her boyfriend knowing he was a fugitive), *appeal denied*, 177 A.3d 109 (2017); *Michigan v. Brennan*, File No. 18-3155-FY (53rd District Court,

10

Livingston County, Mich. filed Dec. 13, 2018) (state court judge prosecuted for perjury and evidence tampering for deleting information from her phone and then lying about it).

Dugan would have this Court ignore both Supreme Court precedent and modern practice. She suggests that the Supreme Court's statements in *O'Shea* and *Imbler* should be disregarded as *dicta*, or as strictly applying to violations of civil rights statutes passed under Congress's authority to enforce the Thirteenth, Fourteenth, and Fifteenth Amendments. (Dkt. 21 at 9.) Dugan assumes that, because Congress did not explicitly abrogate judicial immunity in either of the statutes charged in the indictment—as it did in 18 U.S.C. § 242 (concerning deprivation of civil rights) – she is immune from criminal prosecution. But there was no judicial immunity from criminal prosecution *in the first place*, and thus, nothing to abrogate.

Moreover, Sections 1505 and 1071 have been on the books for many years, during which time (1) the Supreme Court has never indicated that there is any judicial immunity for criminal conduct, and (2) there have *been* prosecutions of judges under other generally applicable laws, including under bribery and public corruption statutes that contain no specific abrogation of judicial immunity. *See, e.g., United States v. Hastings*, 681 F.2d 706, 710 (11th Cir. 1982). Section 242, which arose in a very particular historical context—indeed, partly in response to judges

11

violating civil rights—should not be taken for the proposition that judges are immune from criminal prosecution in the absence of a specific abrogation of immunity.[3]

Dugan's discussion of modern caselaw is no more persuasive than her discussion of history. She points to *United States v. Trump*, 603 U.S. 593, 630 (2024), and other cases, like *Pierson v. Ray*, 386 U.S. 547, 553-55 (1967), *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), and *Stevens v. Osuna*, 877 F.3d 1293, 1305 (11th Cir. 2017), in support of her position. (Dkt. 15 at 3; 21 at 10, 23).

*Trump* is clearly distinguishable. The Supreme Court in *Trump* held that the *President* has criminal immunity for official acts based on the presidency's "unique position in the constitutional scheme" and the "unique risks to the effective functioning of government" if Presidents were forced to constantly assess whether their decision-making while in office might one day prompt criminal inquiries by state or federal prosecutors. 603 U.S. at 611, 613. Applying *Trump*

---

[3] Even if Dugan were correct that judges have been denied judicial immunity only in cases involving civil rights statutes, it would not follow that judicial immunity applies in every other criminal case. It would be imprudent to create a blanket rule of judicial immunity for all other crimes – or even just for obstruction crimes like those charged here, in part because it is impossible to identify every single way in which a person, including a judge, might obstruct justice. "Federal obstruction statutes...are drafted with an eye to the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *United States v. Rainey*, 757 F.3d 234, 245 (5th Cir. 2014) (citation and internal quotation marks omitted).

outside the presidential context to the tens of thousands of people across the country who serve in judicial roles would be an unwarranted and baseless extension.

Citing *Trump*, Dugan says that "*Fitzgerald* itself was rooted in cases applying absolute judicial immunity, both civil and criminal, to official acts, like *Pierson*." (Dkt. 21 at 10.) And citing *Pierson*, Dugan says that "Congress evinced no intention to strip absolute judicial immunity even when a judge's official acts violated the due process rights of a human being protected by the Fourteenth Amendment." (Dkt. 21 at 23.). Dugan's reliance on these cases is misplaced. *Pierson* dealt with the limits of judicial immunity from civil suit under 42 U.S.C. § 1983, not from criminal prosecution. Like *Pierson*, *Fitzgerald* only examined immunity from civil suit—this time for a former president—and not from criminal prosecution. 457 U.S. at 733.

Dugan also cites *Osuna* for the proposition that she "has absolute immunity from criminal prosecution" because judges have the authority to control the "courthouse generally" such as issuing "an order removing persons from the courthouse in the interest of maintaining . . . control[.]" (Dkt. 15 at 3.). Yet *Osuna* also involved a civil suit, brought under *Bivens*, against an immigration judge. 877 F.3d at 1299-1300. There, the Eleventh Circuit affirmed dismissal, reasoning that judicial immunity from civil lawsuits extends to immigration judges who are "functionally comparable . . . and possess many of the same powers as a trial

13

judge." *Id.* at 1302. Dugan ignores *Osuna's* strictly civil law context. There is simply no hint in cases like *Pierson*, *Fitzgerald*, and *Osuna* that judicial immunity applies to the criminal context. In fact, as Dugan's own brief concedes, judges have been prosecuted for civil rights violations, official corruption, sexual assault, and a wide range of "wholly unofficial acts."

Her attempts to distinguish these "categories" of crimes are unpersuasive. First, Dugan seems to assume that, because her criminal case does not fall into any of these categories—or perhaps because she did not engage in "self-dealing" or "thuggery"—she is immune from prosecution. But the fact that criminal prosecutions of state judges are undisputedly permitted in those circumstances does not in any way imply that such prosecutions are forbidden in other circumstances. To infer otherwise would be a logical fallacy and would beg the question: "If judicial immunity applies in some criminal cases but not others, what is the principled basis for determining when it does and does not apply?"

Dugan's proposal also would create a situation in which the same conduct would constitute a "judicial act" for civil immunity purposes but not a "judicial act" for criminal immunity purposes. For example, suppose a judge makes a favorable judicial decision in return for compensation. That is undeniably a judicial act for which there would be civil but not criminal immunity. *See, e.g., Wallace v. Powell*, 2009 WL 4051974 at *6, *8-9 (M.D. Penn 2009) (holding that

14

judicial decisions were "judicial acts" subject to civil judicial immunity, even if they were motivated by bribery; noting the same judges were indicted for that behavior; and pointing out that "egregious behavior by judges is subject to prosecution under the criminal law" as a reason justifying absolute civil judicial immunity).

Quite simply, the Supreme Court has never retreated from its determination that judicial immunity does not apply in criminal cases. As such, whether something is a judicial act has never been the focus. Rather, the dividing line is whether the conduct fits the elements of a criminal statute.

## II.    Even if judicial immunity applies, it only would immunize "judicial acts" from prosecution.

Because judicial immunity does not apply, the Court need not inquire into whether the charged acts are "judicial" or "non-judicial" in character. However, even if the doctrine of judicial immunity truly applied, it would not help Dugan. As alleged in the indictment, she went well beyond her official role when she endeavored to prevent federal law enforcement officers from executing a valid arrest of E.F.R. in a public area of the Milwaukee County Courthouse.

The considerations that gave rise to civil judicial immunity help distinguish judicial from non-judicial acts. "Judicial immunity arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear of being mulcted for damages

15

should an unsatisfied litigant be able to convince another tribunal that the judge acted not only mistakenly but with malice and corruption." *Dennis*, 449 U.S. at 31 (emphasis added). Civil judicial immunity exists, in other words, to protect the "adjudicative function." *Forrester*, 484 U.S. at 226-227 ("paradigmatic judicial acts" are those that involve "resolving disputes between parties who have invoked the jurisdiction of a court"). Dugan's invocation of immunity here bears no relation to that purpose. Prosecuting her for violating Sections 1071 and 1505 thus would not impair "the independent and impartial exercise of judgment vital to the judiciary." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993).

Traditional "adjudicative" functions "include such things as weighing evidence, making factual findings, reaching legal determinations, choosing sanctions, and expounding reasons for decisions." *Goldstein v. Galvin*, 719 F.3d 16, 25 (1st Cir. 2013) (citation and internal quotation marks omitted). Judicial acts also include entering judgment, *Pope v. United States*, 323 U.S. 1, 12 (1944); imposing or altering a sentence, *United States v. Benz*, 282 U.S. 304, 311 (1931); and issuing a search warrant, *Buckley v. Fitzsimmons*, 509 U.S. 259, 271 (1993).

By the same token, as this case demonstrates, some actions taken by judges are *not* judicial acts. *See, e.g., Forrester*, 484 U.S. at 220 (a state-court judge's decision to dismiss a subordinate court employee); *id.* at 227 (a state-court judge's performance of "administrative, legislative, or executive functions"); *id.* at 229 (a

16

state-court judge's acts in "supervising court employees" or "overseeing the efficient operation of a court"); *Antoine*, 508 U.S. at 427 (acting as a court reporter); *Ex Parte Virginia*, 100 U.S. at 348 (a state-court judge's selection of trial jurors); *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 731 (1980) (state-court judges acting to promulgate a code of conduct for attorneys).

Endeavoring to obstruct an *unrelated* proceeding before a different sovereign—in a public space where federal agents had every right to enforce federal law—is not "a function normally performed by a [state court] judge." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). As the Court observed in *Ex parte Virginia*, a judge does not engage in a judicial act when she acts "outside of [her] authority and in direct violation of the spirit" of a criminal statute. 100 U.S. at 348.

Dugan gives extensive examples of a judge's authority within her courtroom and over her cases, but *none* of those examples are what is alleged in this case, which is that Dugan took it upon herself to interfere with a lawful federal arrest in a public area of the courthouse.

Dugan suggests that her situation is different because the arrest "concerned [a person] scheduled to appear before her that morning." (Dkt. 21 at 20). But even assuming she was aware of that fact at the time she left the bench and confronted the officers—which is not alleged in the indictment, and which is contradicted by facts the government will prove at trial—this would not transform her conduct

17

into judicial acts. There is *no* allegation that federal agents sought to prevent E.F.R.'s appearance in Dugan's courtroom or to involve themselves in Dugan's performance of her judicial responsibilities in any way. Instead, they patiently waited in a public hallway for the state proceeding in Dugan's courtroom to conclude so they could execute an unrelated federal warrant. It was Dugan who took it upon herself to interfere with the federal agents' performance of *their* responsibilities, first by trying to remove them from the hallway without authority and then by endeavoring to help E.F.R. leave the courthouse undetected.

Although Dugan's memorandum presents a narrative that an agent-initiated "disruption" caused her to seek out and direct the five agents of which she was aware to the chief judge's office, this version of events is inconsistent with the facts the government will establish at trial. At a minimum, accepting Dugan's factual assertion as true would be premature and require the Court to reject the indictment's allegation that Dugan "falsely [told agents] that they needed a judicial warrant to effectuate the arrest of E.F.R." (Dkt. 6 at 2.) That would be untenable under the applicable standard of decision. *See Yashar*, 166 F.3d at 880.

Moreover, as Dugan concedes, the limits of her authority derive from Wisconsin law:

> A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.'" *McDonnell v. United States*, 579 U.S. 550, 576 (2016),

Case 2:25-cr-00089-LA-NJ    Filed 06/09/25    Page 18 of 25    Document 28

quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Judge Dugan was elected by the people of Milwaukee County *to adjudicate their disputes and administer the laws of Wisconsin*. WIS. CONST. ART. VII, §§ 2, 7.

(Dkt. 15 at 5)(emphasis added). Both by law and Dugan's own reckoning, therefore, she cannot point to any basis empowering her to adjudicate E.F.R.'s dispute with federal immigration authorities or to interfere with the ability of federal agents to enforce federal law. It is meritless for her to claim that she could do so as a "duly elected Wisconsin state judge" who "was performing the duties that both Wisconsin law and her chief judge assigned her [under] Wis. Stats. § § 753.03, 757.01, [and] Wis. SCR 70.19(3)(a)." (Dkt. 21 at 28-29.)  Nothing in those Wisconsin statutes or court rules, or any others not cited by Dugan, authorizes a Wisconsin judge to intervene in the enforcement of federal immigration law. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) (federal law preempts state-court jurisdiction over federal immigration law); *see also Int'l Ass'n of Machinists v. Allen*, 904 F.3d 490, 498 (7th Cir. 2018).[4]

To summarize, even if judicial immunity existed in a criminal context, it fails to provide a basis for dismissing the indictment in this case. Dugan plainly

---

[4] Although Dugan stresses her duties under state law, she tellingly omits any mention of her duties to victims (including E.F.R.'s victims who were present in the courtroom). *See, e.g.,* W.S.A. §§ 950.04(1v)(ar) and (b) (a crime victim has the right to attend court proceedings and to have his or her interest considered when the court is deciding whether to grant a continuance in the case). In any event, no duties under state law could have authorized Dugan to intentionally conceal someone from federal arrest or to corruptly endeavor to obstruct a federal proceeding.

19

exceeded the scope of her judicial duties when she decided that helping E.F.R. evade federal arrest was more important than attending to the scheduled proceedings in her courtroom.

### III. The Tenth Amendment does not preclude criminal prosecution of state judges who commit federal crimes.

Dugan also invokes federalism—which she refers to as "vertical separation of powers"—in arguing that the Tenth Amendment bars this prosecution. The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. As the Seventh Circuit has explained:

> The Tenth Amendment does not itself demarcate the boundary dividing state from federal authority; its text "is essentially a tautology," declaring only that the States retain those powers not surrendered. Whether Congress has invaded the province reserved to the States by the Tenth Amendment is therefore a question that must be answered by inquiring whether Congress has exceeded the limits of authority bestowed upon it by Article I of the Constitution.

*Gillespie v. City of Indianapolis*, 185 F.3d 693, 704 (7th Cir. 1999) (quoting and citing *New York v. United States*, 505 U.S. 144, 156-57 (1992)).

Dugan's wide-ranging discussion of federalism touches upon, among other things, the dormant Commerce Clause, Second Amendment rights, general police power, and the Indian Child Welfare Act. However, Dugan does not cite a single

case saying that the Tenth Amendment, or "vertical separation of powers," bars the prosecution of a state judge who commits a federal crime. The immigration enforcement that Dugan attempted to obstruct was lawful—in a public space—and lay wholly within the jurisdiction of the federal government. *See Arizona*, 567 U.S. at 395-99 (federal power over immigration – including removal – is undoubted and exclusive). The sources of this power include the federal government's "constitutional power to 'establish a uniform Rule of Naturalization,' Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign states," as well as the Supremacy Clause. *Id.* (citation omitted).

As noted above, Dugan talks about a "vertical separation of powers." However, even if Dugan were a *federal* official asserting immunity from prosecution based on the separation of powers, her claim would fail. *See, e.g., United States v. Schock*, 891 F.3d 334, 337 (7th Cir. 2018) (holding that the separation of powers "is an institutional doctrine rather than a personal one," and therefore conveys no "personal immunity from [federal] prosecution or trial" on a U.S. congressman); *Hastings*, 681 F.2d at 708-09 (11th Cir. 1982) (same for federal judge).

Dugan's invocation of federalism's "vertical separation of powers," is even weaker than the "horizontal separation of powers" at the federal level— as the Supremacy Clause decisively strikes the institutional balance against the states.

*See, e.g., United States v. Gillock*, 445 U.S. 360, 370 (1980) (finding "no support" for extending speech-or-debate immunity "to state legislators in federal criminal prosecutions," because "in those areas where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over state exercises of power"); *cf. id.* ("[F]ederal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch."). Indeed, the Supreme Court in *Gillock* expressly rejected the argument that the Tenth Amendment confers on state officials an evidentiary immunity against federal prosecution, holding that appeals to federalism "have no special force with regard to state legislators," "state executive officers *and members of the state judiciary*," even if a federal prosecution impinges upon "traditional state governmental functions." *Id.* at 371 (emphasis added). Accordingly, the Court should reject her reliance on a "vertical separation of powers."

IV. **Dugan's invocation of "constitutional avoidance" invites the Court to decide issues of proof that go beyond the four corners of the indictment.**

Toward the end of her brief, Dugan briefly invokes "constitutional avoidance" and suggests that the issues of judicial immunity and federalism might be bypassed altogether by deciding the motion on a different basis, *i.e.*, that there

was no "pending proceeding" within the meaning of Section 1505. (Dkt. 21 at 35.).

The argument is not developed, and thus arguably waived. *United States v. Davis*,

29 F.4th 380, 385 n. 2 (7th Cir. 2022) (explaining that perfunctory and undeveloped

arguments are waived). Regardless, Dugan's reliance on "constitutional

avoidance" is misplaced.[5] "Constitutional avoidance" is a canon of statutory

construction which "provides that when a serious doubt is raised about the

constitutionality of an act of Congress, [a court] will first ascertain whether a

construction of the statute is fairly possible by which the question may be

avoided." *Nielsen v. Preap*, 586 U.S. 392, 418-419 (2019) (cleaned up). The canon

only comes into play when, "after the application of ordinary textual analysis, [a]

statute is found to be susceptible of more than one construction." *Id.* Dugan cites

no case suggesting that a court may instead rely on that doctrine to circumvent the

restrictions on a motion to dismiss and decide non-constitutional statutory

interpretation questions that are not properly before the court in order to avoid

deciding constitutional claims that (though meritless) are properly before the

court. The government will prove at trial that Dugan obstructed a qualifying

---

[5] In the event Dugan attempts to provide a more fulsome analysis, for the first time, in her reply brief, the Court should decline to consider it. If Dugan were allowed to make the claim in detail in her reply, the government respectfully requests an opportunity to provide additional briefing on this question.

23

proceeding. Dugan's premature, drive-by assertion that the government will not be able to meet its burden provides no basis for dismissal of the indictment.

## CONCLUSION

Dugan asks this Court for an unprecedented dismissal on grounds of judicial immunity, ignoring well-established law that has long permitted judges to be prosecuted for crimes they commit. Combined with Dugan's attempt to define "judicial acts" expansively, such a ruling would give state court judges *carte blanche* to interfere with valid law enforcement actions by federal agents in public hallways of a courthouse, and perhaps even beyond. Dugan's desired ruling would, in essence, say that judges *are* "above the law," and uniquely entitled to interfere with federal law enforcement. The Supreme Court has repeatedly rejected such a proposition. This Court should decline to expand judicial immunity in this fashion, reject unfounded federalism concerns as a basis for dismissing the indictment, and deny the motion to dismiss.

Respectfully submitted on June 9, 2025.

/s/ Richard G. Frohling
Acting United States Attorney
State Bar No.: 1021952
Email: richard.frohling@usdoj.gov

/s/ Keith Alexander
Criminal Division Chief
State Bar No.: 1053000
Email: keith.alexander@usdoj.gov

24

/s/ Kelly B. Watzka
Deputy Criminal Division Chief
State Bar No.: 1023186
Email: kelly.watzka@usdoj.gov

/s/ Timothy W. Funnell
Green Bay Branch Chief
State Bar No.: 1022716
Email: tim.funnell@usdoj.gov

/s/ Jonathan H. Koenig
Appellate Co-Chief
State Bar No.: 1045517
Email: jonathan.h.koenig@usdoj.gov

Attorneys for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Rm. 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738