UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *v.*                                 Case No. 25-CR-0089-LA

HANNAH C. DUGAN,

    *Defendant.*

_____

**DEFENDANT'S REPLY SUPPORTING
MOTION TO DISMISS**

_____

## I.

### INTRODUCTION

The government's response confirms that Judge Dugan faces federal criminal prosecution only for actions taken in and near her courtroom during court hours, none of which involved self-dealing or self-gratification. A prosecution like this is very rare: the parties and *amici curiae* have found only one other like it. There, the federal courts never resolved the merits of a judicial immunity claim. The rarity is for good reason. This prosecution is at war with our system of federalism and barred by judicial immunity.

While the government quibbles about the edges of judicial immunity, cases referring to individual constitutional rights under the Reconstruction Amendments and 18 U.S.C. §§ 241, 242 do not help it. The recent decision in *Trump v. United States*, 603 U.S. 593 (2024),

hurts it, for that decision drew on judicial immunity cases to create and fortify presidential immunity.

This leaves the government to debate whether Judge Dugan's actions involved official acts. All five acts the government seeks to punish criminally did bear closely on discharge of her official duties. The Court cannot allow this prosecution to move forward.

## II.

### REPLY

After reciting FED. R. CRIM. P. 7(c)(1), the government makes no serious argument that the Court can defer a decision on an immunity bar that a criminal defendant raises. Neither does it claim that a Court may inquire into an accused's motives if the immunity bar applies or defer a decision on this motion asserting an immunity bar.

So Judge Dugan can start with narrow points of agreement before turning to why every act here falls within settled judicial immunity from criminal prosecution. The heart of that question is the scope of judicial acts or a judge's official acts.

### A. All Agree that a Judge's Wholly Unofficial Acts are Not Subject to Criminal Immunity.

Like Judge Dugan, the government observes that judges may be prosecuted for crimes of general application when the acts at issue are unofficial. Government Response at 9–11. For one example, the federal bribery statute, 18 U.S.C. § 201, makes clear that bribes *per se* are outside the scope of any public office.

The federal prosecutions of judges the government cites all are of this stripe: wholly (and wildly) unofficial acts. For example, there is the Georgia judge who sexually

assaulted the county clerk, propositioned another woman, and after the second woman's husband exposed his misconduct, ordered sheriff's deputies to plant methamphetamine in the woman's car. *United States v. Cochran*, 682 F. App'x. 828 (11th Cir. 2017). The closest call might be *United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984), where a federal judge solicited and accepted a $30,000 bribe from a Nevada brothel owner to rule favorably on motions in a pending criminal case. He sold his office, even if the handling of motions *after* taking a bribe was in form a judicial act. *Compare United States v. Brewster*, 408 U.S. 501, 526 (1972) (prosecution of former U.S. Senator; taking a bribe not a legislative act).

### B. All Agree that Denying Individual Constitutional Rights is Not Subject to Judicial Immunity from Prosecution under 18 U.S.C. §§ 241, 242, But None of that is at Issue Here.

Likewise, the government correctly agrees with Judge Dugan that state judges may be prosecuted under two federal statutes, 18 U.S.C. §§ 241 and 242, for violating constitutional rights guaranteed to persons under the Thirteenth, Fourteenth, and Fifteenth Amendments. Indeed, every case the government cites to support its broader argument that there is no judicial immunity for prosecution for federal crimes relates to constitutional rights that the Reconstruction Amendments assure and to one or both of those two statutes. *See* Defendant's Memorandum at 7–8, discussing *O'Shea*, *Imbler*, and *Ex Parte Virginia* (which questionably held the judge's acts unofficial or non-judicial, but involved violating Fourteenth Amendment rights of Black prospective jurors in any event).[1]

---

[1] Here, Judge Dugan thinks she should note two omissions in the government response. First, in the passage of *Imbler* that the government quotes at page 9, it omits the rest of the second sentence. In full, that sentence reads, "Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally *for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242,[] the criminal analog of § 1983.*" *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (italics added for emphasis and note omitted). The government's omission is meaningful: without the full sentence, the snippet seems to support the government; with it, the whole

Those cases reinforce judicial immunity here, in a case involving only statutes enacted under Congress's original Article I authority. Not until after the Civil War did states give Congress new and narrow, but important, power in the enforcement clauses that those three amendments include. *See* U.S. CONST. amend. XIII, § 2; amend. XIV, § 5; amend. XV, § 2. The enforcement clauses would be pure surplusage if Congress had that power before the Reconstruction Amendments. It did not. Those clauses, by their express terms, extended that enforcement power no further than the scope of the three amendments themselves. *Cf.* Government's Response at 11.

## C. The Disagreement: Scope of Judicial or Official Acts.

### 1. *Presidential Criminal Immunity is Rooted Indirectly in Judicial Immunity Cases.*

In expanding its argument that a judge's official acts, or judicial acts, never get immunity from criminal prosecution, the government goes on to distinguish *Trump*. The government has to concede, of course, that *Trump* affords a president or former president immunity from criminal prosecution for core powers and official acts and even presumptive criminal immunity for acts that are at least possibly official. *Trump*, 603 U.S. at 606. But the government contends that a president has a unique role in our national government quite unlike judges, justifying special treatment for the president. Government's Response at 12–13.

---

supports Judge Dugan. Second, in quoting *O'Shea*, also at page 9, the response omits that passage's citations to *Bradley* and *Ex Parte Virginia*, among other cases. The government explains that omission parenthetically as presenting the block quotation "cleaned up." Incidentally, the passage the government quotes with omitted citations follows immediately the text of 18 U.S.C. § 242. For all, *see O'Shea v. Littleton*, 414 U.S. 488, 503 (1974).

That would be a responsive argument, were Judge Dugan arguing that she enjoys criminal immunity as a judge because the president does.[2] It is almost the other way around, though. From beginning to end, the *Trump* majority relied repeatedly, if indirectly, on judicial immunity cases in fashioning a similar criminal immunity for the president. In a real sense, that is, a president now enjoys criminal immunity for official acts because judges have had longstanding, recognized judicial immunity, including as to criminal prosecutions like this one. *See* Defendant's Memorandum at 8, 10–11 (tracing *Trump* majority's reliance on *Nixon v. Fitzgerald*, which in turn relied on *Spalding v. Vilas* and *Pierson v. Ray*).

      2.   *Judges Do Have Settled Immunity from Prosecution for Official Acts that Do Not Deny Individual Constitutional Rights.*

The government accuses Judge Dugan of citing only a single case "for the purported existence of common law immunity from *criminal* proceedings." Government's Response at 9 n.2, noting *Floyd v. Barker*, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607). Even as to that case, the government claims it has "distinguishable facts from 1607 England." *Id.* Without even gesturing at what those distinguishable facts are, the government dismisses that foundational case entirely.

In fact, Lord Coke's decision in *Floyd* represents the common law rule that came to America and that the Framers—and early American courts and prosecutors— would have understood. It also is not the only case recognizing judicial immunity from

---

[2] There also is a good counterargument. The Constitution provides essentially no intrabranch controls over the President of the United States. Judges, by contrast, have significant intrabranch oversight. They are subject to appellate review and disciplinary control by the judiciary itself. Likewise legislators, who face intrabranch control through committee assignments, parliamentary procedure, ethics committees, and floor censure, sanction, or even expulsion (recall Rep. George Santos in early December 2023). The threat of criminal prosecution, then, arguably would be a more important final control over presidents than it is over judges or legislators, precisely because presidents are so uniquely powerful and otherwise unconstrained within the executive branch. *See also Trump*, 603 U.S. at 662–63 (Sotomayor, J., dissenting).

criminal prosecution for official acts that Judge Dugan cited; on that, the government simply is wrong.

Judge Dugan discussed nineteenth-century cases that explicitly recognized criminal immunity for judges. *See* Defendant's Memorandum at 6, citing *Yates v. Lansing*, 5 Johns. 282, 291–93, 1810 WL 1044 (N.Y. Sup. Ct. 1810) (Chancellor Kent relying on *Floyd*), *aff'd*, 1811 WL 1445 (N.Y. 1811);[3] and *Hamilton v. Williams*, 26 Ala. 527, 533, 1855 WL 345 (Ala. 1855). She cited the 1871 U.S. Supreme Court decision that relied expressly on *Floyd* and *Yates* in expanding criminal immunity to civil immunity for judges. Defendant's Memorandum at 7; *Bradley v. Fisher*, 80 U.S. 335, 347 nn.12 & 13, 347–48 (1871).

She then advanced to the twentieth century, citing cases that again explicitly acknowledge judicial immunity from criminal prosecution for official acts not involving constitutional rights under the Reconstruction Amendments. Defendant's Memorandum at 9–10, discussing *Commonwealth v. Tartar*, 239 S.W.2d 265, 266 (Ct. App. Ky. 1951), quoting 48 C.J.S., *Judges*, § 71; and *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944). She cited a twenty-first-century decision, too. *Rockett v. Eighmy*, 71 F.4th 665, 668–69 (8th Cir. 2023) (civil case acknowledging that, "Judicial immunity continues to apply today, not only in prosecutions like *Floyd*, but in civil-rights actions brought under 42 U.S.C. § 1983").

---

[3] Although many have forgotten him, Chancellor James Kent was for ten years the highest-ranking judge in New York, the first professor of law at Columbia University, and the author of Kent's COMMENTARIES ON AMERICAN LAW, in its sixth edition when he died in 1847 and still cited. The Supreme Court cited Kent's COMMENTARIES as recently as last year. *Sheetz v. County of El Dorado, California*, 601 U.S. 267, 277–78 (2024). *See also* https://history.nycourts.gov/figure/james-kent/; https://www.britannica.com/biography/James-Kent.

Importantly, Judge Dugan also discussed *Pulliam v. Allen*, 466 U.S. 522 (1984), the Supreme Court decision that continues to frame an immunity analysis. First, courts should refer to the common law. And second, they should assess whether Congress has abrogated a common law immunity. *Pulliam*, 466 U.S. at 529; Defendant's Memorandum at 5, 34. These two statutes give no such indication. *Pulliam* itself relied extensively on *Floyd*, *see Pulliam*, 466 U.S. at 530–32, making clear that *Floyd* anchors common law on this topic and remains vital. Moreover, in deciding whether Congress abrogated immunity, as whenever the federal-state balance is at stake, courts must recognize that "the Fourteenth Amendment does not override all principles of federalism." *Gregory v. Ashcroft*, 501 U.S. 452, 469 (1991) (rejecting extension of ADEA to high state officials, even though that act generally was within Congress's power under the Commerce Clause); *see also City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) (RFRA exceeded congressional power as to states; although § 5 of the Fourteenth Amendment is a positive grant of power, Congress's realm under that enforcement clause "extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment;" citing *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966)).

The government never cited *Pulliam*.

The problem, then, is not that Judge Dugan can point to only four centuries of decisions expressly recognizing judicial immunity from criminal prosecution for official acts. The problem is that the government cannot point to a single decision denying judicial immunity from criminal prosecution for official acts, outside the conceded

exception of denying constitutional rights to individuals under the Reconstruction Amendments.

### 3. *Deciding Immunity and Dismissing Now.*

The district court's decision in *United States v. Joseph*, No. 19-CR-10141-LTS, 2020 WL 4288425, * 1, *3 (D. Mass. July 27, 2020), cited at Government's Response at 3, did not reject judicial immunity for such acts: instead, it treated the issue as premature, deferring to the face of the indictment. The First Circuit in turn also avoided the merits. It held that judicial immunity, even if it applied, afforded no right not to be tried; it did not support jurisdiction on an interlocutory appeal for that reason. *United States v. Joseph*, 26 F.4th 528, 533–34 (1st Cir. 2022).

Neither court had the benefit of the Supreme Court's later decision in *Trump*, which clarified the duty to dismiss at the outset when immunity properly bars a prosecution. 603 U.S. at 635–36. Further, *Trump* itself started with denial of a motion to dismiss in the district court, went up to the D.C. Circuit on interlocutory appeal, and then on *certiorari* to the Supreme Court—all before trial.

### 4. *The Indicted Acts Here All were Judicial and Official.*

That brings Judge Dugan to the heart of the dispute: whether her acts were judicial and official and who, then, has control of courtrooms and courthouses. They necessarily were official and judicial. That becomes unavoidably clear when viewed in the light of the government's contrary theory.

Start with a fairly recent case, close to home, to understand the difference between a judge's official acts and his unofficial acts. In 2021, a Milwaukee County judge,

8

Brett Blomme, faced criminal indictment in the Western District of Wisconsin for two counts of distributing child pornography. He shared visual depictions through a messaging app with another user. *United States v. Blomme*, No. 21-CR-49-JDP (W.D. Wis.).

Yes, he was a sitting state court judge at the time. But the alleged conduct (for which Judge Blomme later was convicted on guilty pleas) had no official quality at all. He was on his own time, physically not in Milwaukee County or even in the Eastern District of Wisconsin, and he was sharing digital files of child porn with another user of a messaging app. None of it had any connection to a case, a party, his courtroom, his courthouse, or his judicial role.

Consider a counterfactual alternative, though. Suppose instead that Judge Blomme was presiding over a child pornography trial in his courtroom. Wisconsin also has criminal laws against production, possession, and distribution of child pornography. WIS. STAT. §§ 948.12, 948.125. If digital files of child pornography were offered in evidence, or otherwise contained in court files or found in the courtroom, the judge himself knowingly would be in constructive—and probably actual—possession of child pornography. If the judge allowed such exhibits to be displayed to the jury or to counsel or other participants in the trial, he would be distributing or displaying child pornography.

But at least before today, nobody would consider those acts federal crimes. The judge would be acting in a judicial role, engaged in official acts—no matter how misguided, disputable, or subject to discretionary second-guessing. Judicial immunity from criminal prosecution clearly would apply. No sensible person, again at least to date,

would argue otherwise. Yet nothing in either federal or Wisconsin child pornography statutes on their face would bar prosecution. No; reasonable judges, applying four centuries of judicial immunity case law, would foreclose that prosecution.

The same must be true here. All five acts that the indictment alleges in Count 2 concern selfless conduct by Judge Dugan either in her courtroom or in the hallway immediately outside her courtroom. All of them concern an actual defendant assigned to her branch. All of them concern acts performed either while she was on the bench or very near that courtroom during business hours.

Now turn to those acts specifically and phrase them from the perspective of this indictment's theory of criminal liability for a state court judge:

**a.     At risk of federal criminal prosecution,** *you must not* **confront ICE Task Force members and "falsely tell[ ] them they needed a judicial warrant to effectuate" an arrest of a party in Judge Dugan's branch**.

This first alleged act calls for deeper exploration. The indictment accuses Judge Dugan of "falsely telling" agents they needed a judicial warrant. Think about that. The question of whether an administrative warrant suffices under the Fourth Amendment to arrest an undocumented person in a public place is a quintessential question of law: the very kind of question we commit to judges as a core function of their job. The sinister wording cannot change the fact that here, the government seeks to prosecute Judge Dugan in part for getting a question of law wrong, when opining on the fly. More, she offered that view on a question of law while overseeing activity right outside her courtroom door.

When we think judges got a question of law wrong, we do not say they falsely told us something; we say they erred or made a mistake. A possible error is subject to judicial correction in the ordinary course of further consideration or appeal. [4]

And those kinds of judicial errors on questions of law do not always happen in the course of formal adjudication. For example, often law enforcement agents approach judges *ex parte* in chambers or at home with a request for a search warrant. On the fly, a judge makes a probable cause determination: again, a classic question of law or mixed question. Regardless how she sees it, the judge either will be right or wrong by the lights of a later reviewing judge or court. But no less has the judge engaged in a judicial act, and certainly has not "falsely" told an agent that there is or is not probable cause.

**b. At risk of federal criminal prosecution, upon learning that agents have only an administrative warrant for arrest,** *you must not* **direct members of the ICE Task Force to go to the Chief Judge's office next door**.

**c. At risk of federal criminal prosecution,** *you must not* **address a criminal case off the record, at least not while some of the ICE Task Force agents are in the Chief Judge's office**.

**d. At risk of federal criminal prosecution,** *you must not* **direct the party and his lawyer to leave through a non-public jury door**.

**e. At risk of federal criminal prosecution,** *you must not* **advise the party's lawyer that he could appear by Zoom for his next court date**.

---

[4] Assuming she said what the government claims now, Judge Dugan probably was wrong about whether an ICE administrative warrant meets Fourth Amendment muster, but that is not entirely settled. The Supreme Court never has resolved the question. *See Abel v. United States*, 362 U.S. 217, 230–34 (1960) (declining to decide whether an INS administrative warrant satisfied the Fourth Amendment, as the issue had not been raised below and had been disavowed; but noting statutes allowing administrative arrests of non-citizens back to 1798); *Arizona v. United States*, 567 U.S. 387, 407–08 (2012) (assuming but not deciding the constitutionality of administrative warrants for arresting aliens); *Aditya W.H. v. Trump*, No. 25-CV-1976-KMM/JFD, 2025 WL 1420131, *4 n. 3 (D. Minn. May 14, 2025) (reading *Abel* as implicitly finding constitutional the use of administrative warrants in an immigration context). Whether wrong or not, the key point here is that she was responding to a pure question of law—again, a core judicial act.

As to each of these acts, then, the indictment posits that federal law enforcement agents had the right to control the handling of one case in Judge Dugan's courtroom that morning, had the right to insist that she answer a question of law in the way they preferred, and had the right not to be told to talk to the Chief Judge about their intentions. They had that right of control; the judge presiding over that courtroom did not — and can be arrested and prosecuted for her acts.

Framing it as the indictment does reveals just how wrong the government is: just how clearly Judge Dugan's acts were judicial and official, and how out of bounds and unofficial are the claims of federal law enforcement agents that they, not she, had the right to make those decisions. A judge rightly can opine off the cuff on what does not satisfy the Fourth Amendment. She can direct people outside her courtroom to talk with the Chief Judge about a planned arrest. She can address a misdemeanor case off the record. She can tell people in her courtroom what door to use to re-enter the same public hallway. And she can allow a party to appear by Zoom at a later date. All of those decisions are reviewable within the state judiciary itself, and rightly so. They are not bases for a federal criminal prosecution.

### D. What the Tenth Amendment Adds.

Most of the government's response as to the Tenth Amendment, and powers reserved to the states and denied to the federal government, requires no reply. In short, state control over state judges is part of what the Tenth Amendment assures. It confirms that states, through their judicial branches, have that control; the federal government does not. Again, while the Reconstruction Amendment enforcement clauses rebalance

federal and state power there, the principles of federalism that constrain federal legislation only "are attenuated when Congress acts pursuant to its powers to enforce the Civil War Amendments." *Gregory*, 501 U.S. at 468 (referring there to Commerce Clause powers).

Additionally, *United States v. Gillock*, 445 U.S. 360 (1980), Government's Response at 22, does warrant brief comment. It is not an immunity case at all. Rather, there a state legislator who had accepted bribes sought suppression of his legislative activities on an argument that the court should recognize a privilege under FED. R. EVID. 501 for state legislators' debate. Reversing the courts below, *Gillock* declined to create a privilege for state legislators akin to the Speech and Debate Clause, U.S. CONST. art. I, § 6, cl. 1, that serves as a privilege for federal legislators. Neither common law, federalism concerns, nor the Tenth Amendment required such an evidentiary privilege in federal courts. *Gillock*, 466 U.S. at 366–73.

The case has no bearing here. That state legislator only urged a new evidentiary privilege to limit the government's proof at an otherwise proper trial. Judge Dugan does not.

### E. Constitutional Avoidance.

The government swipes at Judge Dugan for making an argument it calls undeveloped as to the alleged "proceeding" at stake in Count 2 of the indictment. Government Response at 22–23. It is in a poor position to do that, because the indictment does not say what "proceeding" the government has in mind. Even in its response, the government is coy: it does not claim (wisely) that an arrest itself is a "proceeding." It

teases only that, "The government will prove at trial that Dugan obstructed a qualifying proceeding." Government's Response at 23–24.

Without more than the indictment and the government offer, Judge Dugan's construction of the statutory terms "concealment" and "proceeding"—supported by citations to the Code of Federal Regulations and a Seventh Circuit decision—reasonably addresses textual ambiguity and avoid constitutional questions. That is all the canon of constitutional avoidance requires.

## III.

### CONCLUSION

The federal government has no right or power to prosecute a state judge for the five acts or decisions that this indictment alleges. Federal employees can disagree with those decisions and acts; anyone is free to do that. But they cannot prosecute a judge for doing as she did here, rather than as they wished. Again, the Court should dismiss the indictment.

Dated at Madison, Wisconsin, June 13, 2025.

Respectfully submitted,

HON. HANNAH C. DUGAN, *Defendant*

 *s/ Dean A. Strang*
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724
Dean A. Strang
Wisconsin Bar No. 1009868

14

Strang Bradley, LLC
613 Williamson Street., Suite 204
Madison, Wisconsin  53703
(608) 535-1550
john@strangbradley.com
rick@strangbradley.com
william@strangbradley.com
dean@strangbradley.com


                                        s/ Steven M. Biskupic
                                        Steven M. Biskupic
                                        Wisconsin Bar No. 1018217


Steven Biskupic Law Office, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com


                                        s/ Jason D. Luczak, Nicole M. Masnica
                                        Jason D. Luczak
                                        Wisconsin Bar No.  1070883
                                        Nicole M. Masnica
                                        Wisconsin Bar No. 1079819


Gimbel, Reilly, Guerin & Brown LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
(414) 271-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com