UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

 *Plaintiff,*

 *v.*            Case No. 25-CR-0089-LA

HANNAH C. DUGAN,

 *Defendant.*

---

## DEFENDANT'S OBJECTIONS
## TO MAGISTRATE JUDGE'S RECOMMENDATION ON
## MOTION TO DISMISS

---

## I.

### INTRODUCTION

Today the Court confronts a case in which a state judge faces federal prosecution for official acts in the course of her ordinary judicial duties, and nothing more. The magistrate judge agrees that every act this indictment names is "part of a judge's job." Report & Recommendation at 30 (July 7, 2025) (Dkt. 43). The indictment alleges no graft, no *quid pro quo*, no unofficial acts at all. It does not allege violation of any person's civil rights that the Thirteenth, Fourteenth, or Fifteenth Amendments protect. This is a federal criminal prosecution of a state judge for doing her job; not in the way that some federal agents preferred, true, but her job all the same. Yet the magistrate judge would allow it to proceed.

Why?  Under the magistrate judge's proposed rule, every official act of state judges potentially is fair game for federal prosecution:

> Again, the distinction that takes these official duty cases out of the shield of immunity is not self-enrichment or the motive of the judge. It is whether the criminal law has been violated. In other words, a judge's actions, even when done in her official capacity, do[ ] not bar criminal prosecution if the actions were done in violation of the criminal law.

Report & Recommendation at 28 (July 7, 2025) (Dkt. 43); *see also id*. at 23, 29 (to same effect).

That recommendation offers no limiting principle and clashes with first principles and decisions as recent as *Trump v. United States*, 603 U.S. 593 (2024). It posits a rule that would have been anathema to the Framers. They yielded sovereignty only to a federal government with strictly limited powers. The idea that the federal government someday could arrest and prosecute state judges for official acts in derogation of long-settled English immunity would have been wrong to them.

It still is. If this Court adopted the recommendation, state and federal judges would be vulnerable to prosecution by the federal executive any time they handle a trial involving contraband in evidence or schedule a hearing in ways that inconvenience—and thus arguably impede—federal officers. A judge handling a child pornography case or a drug case, with either child pornography images or controlled substances passed around as evidence in court (that is, possessed and distributed), would be at the mercy of federal law enforcement. So would any state or federal judge scheduling a hearing or holding over an undocumented accused, victim, or material witness in ways that irritate or slow federal officers hoping to arrest or remove the undocumented person with a crucial role in the case.[1]

---

[1] Some of these examples seem farfetched. So did this prosecution until it happened.

But the magistrate judge errs. In fact from the start, American law has prevented such prosecutions on principled grounds. Immunity is not restricted to the civil sphere; it protects against criminal liability for most official acts. Indeed, it began in the criminal sphere and extended to the civil from there.

For purposes here, the central lessons of *Trump v. United States*, 603 U.S. 593 (2024), are that as to federal criminal prosecutions, official acts are immune, it is not sufficient to rely on the discretion of federal prosecutors, and immunity must be resolved before trial. Note at the outset that the Report & Recommendation echoes the mistake that the district court made in *Trump*. That district court acknowledged civil immunity from damages for presidents. But it denied the motion to dismiss, writing, "'former Presidents do not possess absolute federal criminal immunity for any acts committed while in office.'" *Trump*, 603 U.S. at 604 (quoting district court opinion).

That is not just a superficial parallel to this case. The linkage between judicial immunity and the presidential immunity that *Trump* settled is deeper than that. As Judge Dugan traced in her earlier briefs, *Trump* rests in significant part on judicial immunity cases for official acts. Presidents and former presidents now have what judges had first.

Now, it is not as clear that judicial immunity is or must be coextensive with the possible limits of presidential immunity, which *Trump* left fuzzy at the edges. Judicial immunity does not and need not extend beyond official acts. Unofficial acts, including those involving graft or coercive sexual gratification for which collateral judicial acts are the inducement or the threat, get no criminal judicial immunity. Official acts that deny individual constitutional rights under the Reconstruction Amendments do not, either.

Other official acts—that is, not involving graft or sexual gratification, and not denying constitutional rights—clearly do enjoy judicial immunity from prosecution. As to ordinary criminal laws, the Founders' vision remains intact: federal prosecutors cannot target a judge's official actions in and around the courtroom. That immunity leaves plenty of scope for prosecuting corrupt judges.

The Court can avoid definitively resolving these constitutional questions by recognizing that the statutes at issue here do not reach the conduct alleged. There are countless ways to obstruct justice or harbor a fugitive that do not involve the exercise of state judicial power. There is no reason to think that the Congress that enacted these statutes thought it was empowering federal agents to arrest and prosecute state judges for official acts. And there is no reason to extend these statutes to circumstances that threaten to upend the federal-state balance and chill state judges in the discharge of their official duties. Whether by recognizing the breadth of immunity or the limits of the statutes at issue, this Court should dismiss the indictment.

## II.

### OBJECTIONS

Again, the magistrate judge agrees that each of the five specific acts this indictment alleges (in Count 2, because Count 1 claims only that Judge Dugan "concealed" E.F.R.) "all are part of a judge's job." Report & Recommendation at 30. They were, in other words, official acts and the magistrate judge does not contend otherwise.

Picking up there, Judge Dugan relies on her previous motion and two briefs. She also agrees with the *amicus* brief of 138 former state and federal judges (Dkt. 22-1).

## A. Judicial Immunity from Criminal Prosecution for Official Acts.

State supreme courts and our highest federal court repeatedly and consistently have recognized judicial immunity from prosecution for more than 200 years, even if the magistrate judge remains unconvinced that the Supreme Court ever has recognized criminal judicial immunity in any setting. The recognition of immunity from prosecution for official judicial acts has flowed from Lord Coke's foundational decision in *Floyd v. Barker*, 12 Co. Rep. 23, 24-25, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607).[2] *See* Defendant's Memorandum at 5-11 (Dkt. 21). The Report & Recommendation does accept that this first clear statement of judicial immunity doctrine applied to criminal prosecutions for official acts. That was the explicit issue in *Floyd*. *See* Report & Recommendation at 4-5.

Lord Coke's decision in *Floyd* articulated the rule that came to America and that the Framers—and early American courts and prosecutors steeped in English common law—surely understood. From the first years of the nineteenth-century, state cases explicitly recognized criminal immunity for judges. *See Yates v. Lansing*, 5 Johns. 282, 290–94, 1810 WL 1044 (N.Y. Sup. Ct. 1810) (Chancellor Kent relying on *Floyd*), *aff'd*, 1811 WL 1445 (N.Y. 1811);[3] and *Hamilton v. Williams*, 26 Ala. 527, 533, 1855 WL 345 (Ala.

---

[2]  Precursors to judicial immunity may date back to the mid-fourteenth century. *See* Jay Feinman & Roy S. Cohen, *Suing Judges: History and Theory*, 31 S.C. L. REV. 201, 206 (1980).

[3]  Although some have forgotten him, Chancellor James Kent was for ten years the highest-ranking judge in New York, the first professor of law at Columbia University, and the author of Kent's COMMENTARIES ON AMERICAN LAW. That was in its sixth edition when he died in 1847. The Supreme Court cited Kent's COMMENTARIES as recently as last year. *Sheetz v. County of El Dorado, California*, 601 U.S. 267, 277–78 (2024). *See also* history.nycourts.gov/figure/james-kent/; www.britannica.com/biography/James-Kent. The magistrate judge devalues the importance *Yates* in shaping American law. Chancellor Kent and Justice Joseph Story (1779–

1855). An 1871 U.S. Supreme Court decision then relied expressly on *Floyd* and *Yates* in extending the established criminal immunity of judges to civil cases. *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 nn.12 & 13, 347–48 (1871). A quarter century later, the Supreme Court recognized in *Spalding v. Vilas*, 161 U.S. 483, 494 (1896), that judicial criminal immunity is part of the nation's law: "The doctrine which holds a judge exempt from a civil suit or *indictment* for any act done or omitted to be done by him, sitting as judge, has a deep root in the common law." *Spalding*, 161 U.S. at 494, quoting *Yates* (italics added).

Twentieth-century cases again explicitly acknowledged judicial immunity from criminal prosecution for official acts not involving constitutional rights under the Reconstruction Amendments. *See Commonwealth v. Tartar*, 239 S.W.2d 265, 266 (Ct. App. Ky. 1951) (sustaining demurrer to indictment of judge for acts in official capacity), quoting 48 C.J.S., *Judges*, § 71; and *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944). Even a twenty-first-century decision acknowledges judicial immunity for official acts not violating individual constitutional rights. *Rockett v. Eighmy*, 71 F.4th 665, 668–69 (8th Cir. 2023) (civil case recognizing that, "Judicial immunity continues to apply today, not only in prosecutions like *Floyd*, but in civil-rights actions brought under 42 U.S.C. § 1983").

Importantly, *Pulliam v. Allen*, 466 U.S. 522 (1984), continues to shape immunity analysis around the common law. First, courts should refer to the common law. And second, they should assess whether Congress has abrogated a common law

---

1845; author of COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833)) were the only two preeminent antebellum American judges who also have been remembered as important commentators on United States law. For that matter, Lord Coke's importance needs no further comment.

immunity. *Pulliam*, 466 U.S. at 529. *Pulliam* itself relied extensively on *Floyd*, *see id.* at 530–32, making clear that *Floyd* anchors common law on this topic and remains vital.

In deciding whether Congress abrogated the immunity of state actors—or whenever the federal-state balance is altered—courts must demand clear statements from Congress and recognize that "the Fourteenth Amendment does not override all principles of federalism." *Gregory v. Ashcroft*, 501 U.S. 452, 469 (1991) (rejecting extension of ADEA to high state officials, even though that act generally was within Congress's power under the Commerce Clause); *see also City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) (Section 5 of the Fourteenth Amendment is a positive grant of power, but Congress's realm under that enforcement clause "extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment;" citing *South Carolina v. Katzenbach*, 383 U.S. 301, 326 (1966)).

So it is not clear that Congress has the power to abrogate the immunity of state officials at all except when exercising its distinct powers under the Reconstruction Amendments. At a bare minimum, Congress would need to indicate an intent to abrogate with clarity. Congress did not here.[4]

---

[4] Judge Dugan knows of no evidence that Congress ever has sought to abrogate judicial immunity from prosecution for official acts of state officers, even assuming that Congress could. If Congress already had the power to punish the acts of state officers, including judges, for official acts under color of state law, the three enforcement clauses in the Thirteenth, Fourteenth, and Fifteenth Amendments would be sheer surplusage. Constitutional text cannot be read that way. Here, a court would have to read not just one constitutional clause as surplusage, but three: the separate enforcement clauses in all three Reconstruction Amendments.

In fact, as *Gregory v. Ashcroft*, *City of Boerne*, and *Katzenbach* all suggest implicitly, before the Reconstruction Amendments the Tenth Amendment foreclosed congressional power to enact federal crimes punishing state officers for official acts. *See also Ex Parte Virginia*, 100 U.S. 339, 346 (1880) ("Nor does it make any difference that such legislation [the 1876 Act criminally punishing the exclusion of otherwise qualified Black jurors] is restrictive of what the State might have done before the constitutional amendment was adopted. The prohibitions of the Fourteenth Amendment are directed to the States, and they are, to a degree, restrictions of State power. It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial"). Judge Dugan returns to the Tenth Amendment in part II.B below.

1. *Lack of Opportunity for Application does not Undermine Acceptance.*

The problem, then, is not that Judge Dugan can point to only four centuries of decisions expressly recognizing judicial immunity from criminal prosecution for official acts. The problem is that the magistrate judge and the government cannot point to a single decision denying judicial immunity from criminal prosecution for official acts, outside the conceded exception for statutes enacted pursuant to the Reconstruction Amendments.

The fact that the Supreme Court necessarily has referred to that criminal immunity in *dicta*, because the cases before it unsurprisingly were civil, does not erode the recognition of criminal immunity. Consider the obvious. In civil cases, there would be no reason to mention criminal immunity at all if it was not extant and alive. Continued recognition of judicial immunity from indictment for official acts acknowledges the origins and ongoing vitality of that application of judicial immunity. It does not proclaim absence or suggest that we await emergence of criminal immunity.

No, the opposite. Criminal immunity has been around longer than civil. Putting aside fair questions about the exact scope of that civil immunity, the temptation to extend criminal immunity to civil immunity for judges' official acts was understandable because attempted civil litigation against judges has proliferated since the nineteenth century. Yet the reasons for judicial immunity are stronger, if anything, in its original criminal application: the risk that a judge will be arrested, shackled, and jailed for carrying out the duties of his or her office, and the *in terrorem* effect that necessarily would have on that judge and others, is a much greater threat to the judicial task and role than civil cases.

*Floyd* identified several reasons supporting judicial immunity. *Floyd*, 12 Co. Rep. at 24-25. In modern parlance, those were finality; maintaining the dignity of, and respect for, courts; and preventing harassment of judges by litigation. Nancy Amoury Combs, *Redressing Judicial Misbehavior: An Integrated Approach to Judicial Immunity*, 58 U.C. DAVIS L. REV. 1165, 1188 (2024), citing *Floyd*, 77 Eng. Rep. at 1307. Another rationale emerged later: judicial independence. Combs, *Redressing Judicial Misbehavior*, 58 U.C. DAVIS L. REV. at 1190-92; *see also Yates*, 5 Johns. at 291. That one has become preeminent. Criminal immunity fits better with that top concern than civil immunity, too, given the loss of liberty and reputation that criminal prosecutions alone threaten.

Like the England of Lord Coke, the modern United States has rival courts, an unavoidable aspect of federalism. Criminal immunity not only prevents a judge from being walked handcuffed into a rival court; unlike civil immunity, it also protects judicial independence from the executive branch. A disappointed litigant can file a lawsuit, but the executive branch can search, arrest, and jail. Those powers endanger judicial independence much more than a civil litigant ever could.

Beyond that, in civil cases, judges and other state actors are unlikely to carry their own defense costs: practically, either state Attorney General's offices or local city attorneys or county corporation counsel usually defend. When there are civil judgments against police officers and other law enforcement actors who have only qualified immunity, these actors are entirely or mostly indemnified more than 99% of the time. *See* Joanna C. Schwartz, *Police Indemnification*, 89 N.YU. L. REV. 885, 912–17 (2014). More, even when a judgment includes punitive damages, the officers themselves almost never pay any part of

that. Schwartz, *Police Indemnification* at 917-18. There is no reason to think judges would be different. At worst, civil liability would be an insurable risk for judges (or for the states that employ them), altogether unlike criminal prosecution. One cannot shift to an insurer the loss of liberty, or stigma and lost civil liberties as a convicted felon. Even as to finality, criminal prosecutions are clumsy ways to review the propriety of a judge's official acts, and often may not avoid an appeal or collateral attack by parties to the underlying case anyway.

Yet it is civil immunity for judges that has grown most—and came latest. The rationales for judicial immunity might have suggested just the opposite. Still, criminal immunity has remained largely fixed where it was in the nineteenth century, other than where legislation under the Reconstruction Amendments, current 18 U.S.C. §§ 241, 242, has curtailed rather than expanded it.

It is true, then, that the Supreme Court never yet has had occasion to apply judicial immunity from criminal prosecution for official acts outside the context of violating rights assured under the Reconstruction Amendments. But that is not because judicial immunity from prosecution for official acts rightly is in question. It has not been in question since the foundational English case in 1607. That likely is because the Justice Department under only one president in United States history has sought to prosecute state judges for official conduct anything like that alleged here.[5]

---

[5] The 2019 federal indictment of a Massachusetts state judge, Shelley Richmond Joseph, is the only case with remotely similar facts that Judge Dugan, the government, or the magistrate judge have found. At least on the research of the parties and the magistrate judge, every other federal prosecution of a judge since the founding has arisen from palpable graft, coercive sexual gratification, or other conduct wholly unrelated to judging, again outside the setting of individual constitutional rights protected by the Reconstruction Amendments.

A paucity of opportunities to apply judicial immunity to criminal prosecution for official acts is not empirical evidence that the law withholds that immunity, then. Instead, it is a reminder that the law so long has extended immunity to official acts untainted by graft or self-gratification that federal prosecutors rarely have been reckless enough to attempt such a prosecution.

Fundamentally, the magistrate judge is wrong in asserting that while "Lord Coke's pronouncements have taken root in American common law regarding judicial immunity in *civil* cases, the same cannot be said regarding criminal prosecutions." Report & Recommendation at 16 (italics in original). Civil immunity has taken root, that much is right; but criminal immunity for a judge's official acts is the very soil in which that civil immunity is rooted. We are not awaiting the Supreme Court's extension or expansion of civil immunity to criminal immunity. *Contra* Report & Recommendation at 36; *see also id.* at 26. Civil immunity is itself the extension and expansion.

2. *The Exception for Official Acts Violating Statutes Enacted Pursuant To The Reconstruction Amendments Proves the General Rule.*

All parties recognize that Congress does have the power to abrogate judicial immunity pursuant to the enforcement clauses of the Thirteenth, Fourteenth, and Fifteenth Amendments. *See O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) (denying injunctive relief and observing, "Judges who would willfully discriminate on the ground of race or otherwise would willfully deprive the citizen of his constitutional rights, as this complaint alleges, must take account of 18 U.S.C. § 242"); *Imbler v. Pachtman*, 424 U.S. 409, 428–29 (1976) (recognizing civil immunity but observing, "Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful

deprivations of constitutional rights on the strength of 18 U.S.C. § 242, [ ] the criminal analog of § 1983") (note omitted).

That exception proves the rule. The Reconstruction Amendments changed the constitutional order and gave Congress power to criminalize official state conduct that would have been unthinkable to the founders; unthinkable as a civil war itself.

And this new, extraordinary power was limited to statutes enacted pursuant to the Reconstruction Amendments, such as 18 U.S.C. § 242. As to ordinary criminal statutes like those at issue here enacted under Article I powers that remain unamended since the framing, Congress lacks any comparable power to criminalize the official acts of state officials, judges included. The distinction not only reflects our national history in which official acts in some states were abused to deny civil rights, but is critical to protecting individual liberty. It is one thing to empower federal prosecutors to ensure that state officials do not deny rights guaranteed to the People. It is quite another thing to empower federal prosecutors to arrest and prosecute state judges who do not stand accused of violating anyone's civil rights, but of interfering with federal law enforcement priorities. The latter is far more threatening to the federal-state balance and not within scope of the Reconstruction Amendments.

Although both the Court and the parties must take *Ex Parte Virginia*, 100 U.S. 339 (1880), on its own terms, the case would have been better framed as a recognition of congressional power under the Reconstruction Amendments to enact new federal crimes and apply them to state judges who violate the individual rights that those amendments protect. There, a state judge faced federal prosecution for excluding Black

prospective jurors. On a pretrial petition for a writ of *habeas corpus*, he raised a judicial immunity bar, arguing that "Congress cannot punish a State judge for his official acts." *Ex Parte Virginia*, 100 U.S. at 348. The Court disagreed, because of the Fourteenth Amendment. *Id.* at 349. Even beyond that, the judge's act was "outside of his authority and in direct violation of the spirit of the State statute." *Id.* The exclusion of Black jurors simply because they were Black "was not left within the limits of his discretion" under state law. *Id.*

The Court in effect ducked the judicial immunity challenge by holding that the judge's acts were "ministerial," not judicial acts at all. *Id.* at 348. It ducked again in holding that not even state law permitted the judge to exclude Black jurors.[6] Here, the magistrate judge misreads *Ex Parte Virginia*. The Court did not, as she says, hold that, "even if the act was judicial, the judge had no authority to select jurors in violation of the Constitution." Report & Recommendation at 14. It could have, but did not. Rather, it held that *state* law gave the judge no authority to exclude Black jurors, which underscored the conclusion that his acts were not judicial at all.

So the case, on its holding, goes squarely into the category of unofficial acts, for which judges have no criminal immunity. It would have fit better in the category of official acts that violate individual rights under the Fourteenth Amendment, and thus do not enjoy criminal immunity even though official. In any event, the Court allowed the

---

[6]  Of course it is chancy and maybe nearly idle to second-guess a 145-year old decision with wispy reasoning; understood. But that said, *Ex Parte Virginia* was a U.S. Supreme Court decision directly concerning a state judge charged with a federal crime for the way in which he selected jurors and jury pools. It would have been easy enough for the Court just to say there is no criminal judicial immunity, ever, if the Report & Recommendation is right. That would have ended *Ex Parte Virginia*, were it so.

13

judge's prosecution to go forward under a post-Reconstruction statute that rested on the enforcement clause of the Fourteenth Amendment for its legitimacy. *Ex Parte Virginia*, 100 U.S. at 349.

That leaves all other official acts. They continue to fall within judicial immunity, including in criminal cases, as they long have. Again, the magistrate judge has the relationship between criminal and civil judicial immunity backwards.

3. *There is No Serious Line-Drawing Problem Between Genuinely Official Acts and Unofficial Acts that Exploit a Judicial Office.*

a. Unofficial Acts Cases.

Recognizing judicial immunity for official acts poses no threat to federal criminal prosecutions targeting graft or sexual misconduct. Indeed, federal prosecutions of sitting members of Congress for such conduct have peacefully co-existed with the Speech or Debate Clause. Sexual misconduct or privately distributing child pornography are as unofficial as they get, and it is well-established that bribery can be prosecuted by targeting the corrupt promise rather than the official act of casting a vote. *See, e.g., United States v. Brewster*, 408 U.S. 501, 526 (1972) (prosecution of former U.S. Senator; taking a bribe not a legislative act).

The largest set of those unofficial acts cases is easy and obvious: there is no immunity for murder, sexual assault, distributing child pornography through a messaging app, tax evasion, drunk driving and so on, no matter if a judge does it. *See* Defendant's Memorandum at 11-14 (Dkt. 21); Defendant's Reply Memorandum at 2-3, 8-10 (Dkt. 28). For an additional colorful Wisconsin case that Judge Dugan did not previously cite, *see United States v. Raineri*, 670 F.2d 702 (7th Cir. 1982) (Iron County judge

prosecuted for a variety of federal crimes in connection with running a prostitution ring through a Hurley strip bar in which he had extensive involvement); *and see Archie v. Lanier*, 95 F.3d 438, 441 (6th Cir. 1996) (denying civil immunity claim because stalking and sexual assault never are judicial acts).

For that matter, when someone who currently is a federal judge commits perjury in a grand jury investigation of crimes before he was a judge, or chooses to sit privately for an FBI interview about that earlier activity and lies, these are unofficial acts entirely. Nothing about being a grand jury witness or a voluntary participant in an FBI interview has any connection to a judicial role. That was the sad coda to Otto Kerner, Jr.'s career. *See United States v. Isaacs*, 493 F.2d 1124, 1132–44 (7th Cir. 1974) (*per curiam* with one judge dissenting in part and concurring in part and one judge dissenting).[7]

Unofficial acts cases provide a good reminder. The term "absolute immunity" is potentially misleading, in a judicial context or any other. Judge Dugan has acknowledged from the start that unofficial acts get no immunity from prosecution.

There is a subcategory of these cases in which judges faced prosecution for unofficial acts, but in which judicial acts were connected to the wholly unofficial and criminal. These are most of the graft cases collectively, and the few sexual assault cases where a judge used his judicial status as a means of coercion or intimidation.

---

[7] Notably, most of those unofficial act cases offer no indication that the defendant-judge even sought to raise a judicial immunity bar or argument. Perhaps its inapplicability was as obvious to their lawyers and them as it is to Judge Dugan and her lawyers. One partial exception is *Isaacs*. But even there, Judge Kerner argued only that judicial immunity barred his prosecution *until after impeachment*. *Isaacs*, 493 F.2d at 1140-44. His indicted conduct was wholly unofficial—indeed, some of it preceded his time as a judge—and the court correctly rejected that limited immunity argument. Just for the sake of completeness, note that the Seventh Circuit later overruled *Isaacs* on unrelated grounds, after the demise of the intangible rights theory of fraud. *United States v. Gimbel*, 830 F.2d 621, 626 (7th Cir. 1987).

To be clear, these cases all are in the category of unofficial acts and rightly so. That is where Judge Dugan has grouped them from the outset, *see again* Defendant's Memorandum at 11-14; Defendant's Reply Memorandum at 2-3, although in her opening brief she broke out this subset as a third bullet point.

In all of them, the promised or actual judicial act was connected but adjunct. Every time, some linked judicial act was held out as an inducement for a bribe or kickback, or as a threat by which to extort either money or the pretense of consent (acquiescence, not true consent) to a sexual encounter. And in each of those cases, graft or sexual imposition that was the gravamen of the prosecution. The indictments alleged graft or coercion as their centerpiece. It was bribery, extortion, kickbacks, or assault that the indictments charged, not judicial acts alone or in their own right.

Take *United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984) (*per curiam*), where a federal judge solicited and accepted a $30,000 bribe from a Nevada brothel owner to rule favorably on motions in a pending case. Judge Dugan still thinks this case the closest one reported, although the magistrate judge disagrees. Report & Recommendation at 22-23. But Judge Dugan agrees with the magistrate judge that Harry Claiborne had no immunity from prosecution. The dispute with the magistrate judge comes down to the gravamen of the charged crimes: whether the indicted acts were official and still got no criminal immunity, as the magistrate judge contends, or they were unofficial acts leveraging a promise of judicial acts, as Judge Dugan sees them.

In *Claiborne*, the government did not accuse the judge of crimes for how he handled, or intended to handle, motions and pending cases. It did not challenge

the correctness of his judicial or official acts. No, it indicted him for soliciting a bribe, scheming to defraud a brothel owner, obstructing justice by urging a witness to give false testimony before a grand jury, failing to report the bribes on his income tax returns, and failing to disclose a loan on his financial disclosure form. *Claiborne*, 727 F.2d at 843 & 843 n.1. All of that plainly was unofficial conduct. The expected disposition of motions was but the *quid pro quo* allegation that 18 U.S.C. § 201(b)(2) requires for bribery, and nothing more. That is, the indictment claimed that Judge Claiborne sold his office, even if the handling of motions after taking a bribe would have been in form a judicial act. *Compare Brewster*, 408 U.S. at 526 (again, taking a bribe for a later vote is not a legislative act and gets no immunity).

The gravamen of the charges against Harry Claiborne did not concern his judicial acts, then; it concerned wholly unofficial conduct, like seeking and taking bribes, cheating on income taxes, suborning perjury, scheming to defraud a person of money, and failing to disclose a loan on a form. All of that the indictment alleged. Judge Claiborne mimicked Judge Kerner before him in asserting only that judicial immunity barred his prosecution until after his removal from office by impeachment. *Claiborne*, 727 F.2d at 843-44.[8] Given the unofficial acts that were the real subject of the indictment, the Ninth Circuit properly rejected that limited immunity claim.

The "Kids for Cash" case that Judge Dugan raised and the Report & Recommendation discusses at pages 20–22 and 27 is the same for these purposes. There

---

[8] The subsequent history of that case, which was an interlocutory appeal on the limited immunity argument, is interesting. After a first jury deadlocked, the government elected to dismiss the four bribery counts. A second jury then acquitted Claiborne of the failure to disclose the loan, but convicted him on the two tax counts. The Ninth Circuit affirmed the convictions. *United States v. Claiborne*, 765 F.2d 784 (9th Cir. 1985).

again, the eventual indictment did not seek to punish those two Pennsylvania state judges for sentencing juveniles to detention or for any other judicial act. It sought to punish them for racketeering: a whole pattern of corrupt self-enrichment that exploited their judicial acts but as to which those acts themselves were not the gravamen of the crimes. The judicial acts were but the lever or means by which the judges extracted kickbacks and enriched themselves illicitly.

Contrary to the magistrate judge's view, then, those judges did not face criminal liability for "clearly judicial acts." Report & Recommendation at 22. They faced criminal liability for a scheme of graft and racketeering that linked and exploited their judicial acts as means of committing the broader crimes. The essence of the indictment there was entirely unofficial conduct, as to which official acts were but the inducement or predicate for the crimes.

In a sense, that case anticipated Justice Amy Coney Barrett's concerns in her partial concurrence in *Trump v. United States*, 603 U.S. 593 (2024). Justice Barrett did not join the majority's conclusion that a president's official acts cannot even be used as evidence in prosecuting him for unofficial acts. *Trump*, 603 U.S. at 650-57 (Barrett, J., concurring in part). Relevant here, she wrote:

> The Constitution, of course, does not authorize a President to seek or accept bribes, so the Government may prosecute him if he does so. [ ] Yet excluding from trial any mention of the official act connected to the bribe would hamstring the prosecution. To make sense of charges alleging a *quid pro quo*, the jury must be allowed to hear about both the *quid* and the *quo*, even if the *quo*, standing alone, could not be a basis for the President's criminal liability.

*Trump*, 603 U.S. at 655-56 (Barrett, J., concurring in part), citing Art. II, §4 (listing "Bribery" as an impeachable offense), and the Memorandum from L. Silberman, Deputy Atty. Gen., to R. Burress, Office of the President, Re: Conflict of Interest Problems Arising Out of the President's Nomination of Nelson A. Rockefeller To Be Vice President Under the **Twenty-Fifth Amendment** to the Constitution 5 (Aug. 28, 1974) (suggesting that the federal bribery statute applies to the President).

       The jury in the "Kids for Cash" case logically did hear, and rightly should have heard, testimony about sentences to detention and efforts to bully probation agents. That evidence did not make official acts the essence of the prosecution; it only helped prove the clearly unofficial graft. In the same way, Justice Barrett agreed that a president cannot be prosecuted for, say, granting a pardon, even corruptly. That is an official act, regardless of motive. But she was right: he could be prosecuted for taking a bribe. And if the bribe related to the official act of a pardon, in her view a jury properly could hear evidence of the pardon *in deciding the bribery charge*.

       The same is true as to judges tried for wholly unofficial acts like graft or coerced sex. The indictment can include, and the jury can hear, the collateral official acts. But it is not asked to convict, and cannot be, for those official acts. It is asked to convict on the unofficial acts that the official acts were used to induce or procure.

       In the end, the magistrate judge misunderstands the "Kids for Cash" case and others like it involving graft. The "Kids for Cash" case indeed may be an example of how the Supreme Court and lower federal courts have over-extended civil

judicial immunity. But that case does not establish, or fairly suggest, that the original criminal judicial immunity from which civil immunity grew does not exist.

    b.  <u>This Case</u>.

This case stands in sharp contrast to the unofficial acts cases, both those that had no connection at all to a judge's official role and those that did. Here, the government offers nothing in the indictment other than official acts. On this narrow point, the magistrate judge is exactly right: once more, everything the indictment alleges here was an official act, or as the magistrate judge puts it, "all part of a judge's job." Report & Recommendation at 30.

This indictment does not claim, or even hint at, bribe-seeking, extortion, kickbacks, theft, or graft of any kind. It does not describe any such acts. In fact, it includes nothing suggesting self-interest at all; no act beyond the official.

So when the magistrate judge then moves on more broadly just a paragraph later to assert that, "At bottom, the indictment does not charge Dugan for 'opining on the fly,' managing her courtroom, or allowing someone to appear by Zoom for future hearings," Report & Recommendation at 30, she is flatly wrong. That quite literally is what this indictment *does* charge in Count 2, the felony charge. *See* Indictment (Dkt. 6), Count 2.[9]

More importantly, it is *all* that the indictment charges as to acts. These are judicial acts, official acts, and they may not be prosecuted as crimes. The acts themselves are immune, because they are official judicial acts and no more. There is no

_____

[9] Count 1, the misdemeanor, does not offer even that much. It claims only concealment of E.F.R., and alleges no specific acts at all.

allegation of a crooked *quid pro quo* or other illegal act. The official acts are the gravamen, indeed the whole, of this indictment. That sets this case apart from all unofficial acts cases.

And it is why the indictment's rote inclusion of the statutory *mens rea* element, "corruptly," does not salvage it, despite the magistrate judge's view. *See* Report & Recommendation at 29, 30. Judge Dugan is immune from prosecution for these official *acts*. As to that reality of an immunity bar, judicial immunity is no different than the presidential immunity that arose from earlier judicial immunity cases: there can be no inquiry into motives, if the acts themselves are official and immune. The prosecution is barred at the outset. *See Trump*, 603 U.S. at 618.

There is no serious line-drawing problem, then, between the official and the unofficial. That means there also is no line-drawing problem as to judicial immunity and lack of judicial immunity, because it is easy enough to discern when an indictment alleges that official acts violated constitutional rights that the Thirteenth, Fourteenth, or Fifteenth Amendments assure. The magistrate judge's parade of horribles—"must Congress comb through every federal criminal statute to indicate which statutes apply to judges and which do not?," Report & Recommendation at 14—is easily ended. The answer is no: all federal crimes apply to the unofficial acts of judges, and none of them apply to a judge's official acts unless those official acts fall within 18 U.S.C. §§ 241 or 242 because they violate the Reconstruction Amendments.

This indictment does not concern any right that the Thirteenth, Fourteenth, or Fifteenth Amendments protect. It does not concern any individual right, period. Rather, it is limited to official acts affecting federal executive policies.

Even the law review article that the magistrate judge thrice cites, Report & Recommendation at 4, 5, 17, supports immunity from prosecution here, notwithstanding its pinched view of criminal immunity for judges generally. *See* Jeffrey M. Shaman, *Judicial Immunity from Civil and Criminal Liability*, 27 SAN DIEGO L. REV. 1, 18 (1990) ("The one area where judges can be said to enjoy immunity from criminal liability is for malfeasance or misfeasance in the performance of judicial tasks undertaken in good faith"). The indictment here charges nothing but the performance of judicial tasks, and other than bare repetition of the statutory mental elements of "corruptly" and "knowingly" offers nothing to suggest bad faith. For that matter, a bar like immunity operates at the outset to foreclose factual inquiry into motives and good or bad faith assessments. Anyway, it is not clear from the indictment that the alleged acts even would rise to the level of misfeasance, let alone malfeasance.

In all, Judge Dugan has judicial immunity from prosecution on both counts of this indictment. The magistrate judge is mistaken.

**B. The Tenth Amendment.**

The Report & Recommendation also missed the importance of the Tenth Amendment here. Until the Reconstruction Amendments and their separate enforcement clauses, Congress had no power to abrogate judicial immunity as to federal prosecutions of state officials who acted under color of state law, including judges. The Reconstruction Amendment enforcement clauses changed that; they ceded new power to Congress. But when Congress passes criminal laws pursuant to its ordinary Article I powers, it enjoys no comparable extraordinary power to punish criminally the official acts of state judges or

officials. This case involves only statutes passed pursuant to Congress' Article I powers, and there is no indication that Congress imagined it was reaching official judicial acts, let alone trying to abrogate immunity for those acts.

Again, this case does not concern an alleged violation of any right that the Thirteenth, Fourteenth, or Fifteenth Amendments protect. It is outside the ambit of Congress' powers under those amendments. So, Judge Dugan necessarily returns to the Tenth Amendment.

Just as its structure implies a horizontal separation of powers, the Constitution's structure also establishes a vertical separation of powers.[10] Federal law is supreme in its allocated realm. U.S. CONST. art. VI, cl. 2. There, it tops any state law to the contrary. But its realm is limited and explicitly demarcated. The states—or the people at base—retain all powers not allocated expressly to the federal government. No sovereign, neither federal nor the many states, is subordinate to another. Yet the federal and state governments are separated vertically, so to speak, with each bound to respect the other's realm.

The Tenth Amendment is the most explicit assertion of this vertical separation of powers. It reads in full:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

U.S. CONST. amend. X.

---

[10] While still at the University of Wisconsin Law School, Professor Victoria Nourse was first to make popular use of this term in a context broader than, but including, the one Judge Dugan describes here. *See* Victoria Nourse, *The Vertical Separation of Powers*, 49 DUKE L.J. 749 (1999). Nourse borrowed the term from Justice Kennedy. *See Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring); Nourse, *Vertical Separation of Powers*, 49 DUKE L.J. at 751 n. 10.

Specifically, the Constitution's vertical separation of powers means the Court now must assess whether the federal government, through its executive branch, has lawful power to exact criminal punishment from Judge Dugan for doing in and near her courtroom as the indictment contends. This is the core question here under the Tenth Amendment.

That is, has the federal government constitutional power to command a state government officer not to do as it alleges Judge Dugan did in the discharge of her official duties under state law? To tell her, no, you cannot muse that a judicial warrant is necessary to arrest someone in your state courthouse; no, you cannot send federal agents down the hall to confer with the chief judge; no, you cannot handle a routine court appearance off the record and while some agents are not directly outside your courtroom in the hallway; no, you cannot usher a person out a second door so that he re-enters the same hallway a few feet from the doors agents expected him to use; and no, you cannot allow a party in a pending case to make future court appearances by Zoom? More, can the federal government insist that a state judge answer federal criminal charges if she does any or all of those things?

It cannot. The federal government does not count this power among those delegated to it under the Constitution. While a state judge is bound by federal law in deciding cases, *Testa v. Katt*, 330 U.S. 386, 392–94 (1947), the issues here are not about properly honoring federal law when state law conflicts with it. The Supremacy Clause and the Tenth Amendment are part of the same Constitution. A federal assertion of power that offends the Tenth Amendment enjoys no supremacy.

Nothing in the Constitution allows the federal government to superintend the administration and case-by-case, daily functioning of state courts as this indictment

proposes. Even less has the federal government the power to supersede the judgment of state judges in and near their courtrooms, on prosaic matters like the indictment alleges. State law provides and controls that power.

Consider the brief opinion in *Page Co. v. MacDonald*, 261 U.S. 446 (1923). There a resident of Ontario, Canada, brought suit against a corporation in Massachusetts state court. The corporation then sued her in federal court in Massachusetts, claiming that her state action was libelous. The corporation served her with the federal summons and complaint while she was attending the state court case. She pleaded in abatement, alleging statutory immunity from service while attending a court proceeding.

The Supreme Court sustained her claim of immunity from service of process under those circumstances. That immunity was founded on "the necessities of the judicial administration," and both federal and state courts have equal interest in those necessities. *Page Co.*, 261 U.S. at 448. The federal government could not claim that its judicial administration interests overrode the state's judicial administration interests in its own courts. In effect, that is exactly what the federal executive branch claims here.

And this indictment arises in the context of ordinary state judicial and criminal enforcement proceedings. Empirically, almost all criminal cases are in state courts in this country, under state law. That is a natural consequence of the fact that the states retain the general police power: they did not delegate that power to the federal government, although valid federal powers sometimes may produce similar results. *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 156 (1919) (Brandeis, J.); *see also Berman v. Parker*, 348 U.S. 26, 32 (1954) (explaining breadth of "police power").

This case, involving the routine work of a state court and judge, is quite unlike the peculiar power of the federal government to control adoption of Indian children in state courts through the Indian Child Welfare Act, even though marriage, adoption, and domestic relations generally are reserved to states. *See Haaland v. Brackeen*, 599 U.S. 255, 272–91 (2023) (ICWA does not violate anti-commandeering doctrine of Tenth Amendment because of Congress's express, plenary authority under Article I, § 1 to legislate with respect to Indian tribes; rejecting Tenth Amendment arguments in the specific context of adoption of Indian children). The federal government has no similar grant of authority here that would give it the control that this indictment asserts.

Judge Dugan instead had that authority and control. She is a duly elected Wisconsin state judge, WIS. CONST. art. VII, § 7, and here was performing duties that both Wisconsin law and her chief judge assigned. WIS. STAT. §§ 753.03, 757.01, WIS. SCR 70.19(3)(a). The state has a comprehensive system for correcting errors on direct appeal or by writ. WIS. STAT. chs. 808, 809. It has a code of judicial ethics. WIS. SCR Ch. 60. It has a rule giving judges control over courthouse security. WIS. SCR 68.04. It has an established judicial disciplinary body, the Judicial Commission. That Commission has the power to enforce ethical requirements. WIS. CONST. art VII, § 11; WIS. STAT. § 757.83; WIS. ADMIN. CODE §§ JC 1 through JC 6. The judicial disciplinary process under state law extends to the conduct alleged in this indictment. WIS. SCR 60.02, 60.03; WIS. ADMIN. CODE § JC 3.07.[11] And Wisconsin allows removal of judges by impeachment, recall, or address. WIS. CONST. art. VII, §§ 1, 11, 13.

---

[11] The Wisconsin Supreme Court already has invoked its disciplinary power by suspending Judge Dugan during the pendency of this case.

All of these means of filling the state judiciary, overseeing it, and disciplining it are squarely within the powers that states retain under the U.S. Constitution. The states delegated the federal government no power to interfere with or replace state power—and state law—as to any of these functions. For that matter, again, Congress never has claimed that it was exercising any such claimed power in enacting the two statutes at issue here.

This case fits the reasoning of *Gregory v. Ashcroft*, 501 U.S. 452 (1991), then. There, the Supreme Court held that, in the absence of a plain statement by Congress, the Court would not apply the ADEA to state court judges because it was "at least ambiguous whether Congress intended that appointed judges . . . be included" in that federal age discrimination law. *Gregory*, 501 U.S. at 470. Without a plain statement of congressional intent, *Gregory* relied on the long line of cases recognizing "the authority of the people of the States to determine the qualifications of their most important government officials." *Id.* at 463. That authority lies at the heart of representative government, *Gregory* noted, and "is a power reserved to the States under the Tenth Amendment." *Id.*

**C. Constitutional Avoidance.**

The indictment's reference to the unusual mental element of the crime charged in Count 2, "corruptly," and its mention of a "proceeding" both leave ambiguity. The magistrate judge herself implicitly acknowledges the ambiguity as to the *mens rea* element of Count 2: she proposes that a jury can decide whether Judge Dugan acted corruptly or "was merely performing her judicial duties." Report & Recommendation at 32. Again implicitly in the magistrate judge's view, Judge Dugan would be guilty if the former, but not guilty if the latter. Yet the magistrate judge offers no explanation of how a jury would

distinguish those two things or what "corruptly" might mean here. The term "proceeding" also remains wholly undefined, even by alleged example, and the government has been coy about what "proceeding" it claims was at issue. *See* Government Response at 23-24 (Dkt. 25). In both places, the canon of constitutional avoidance would have a proper role in resolving the ambiguity.

Indeed, just last year, the Supreme Court rejected an effort by federal prosecutors to expand criminal activity by invoking a vague definition of corruptly and leaving it to the jury to sort out later whether a particular arrangement was corrupt. In *Snyder v. United States*, 603 U.S. 1 (2024), the Supreme Court limited 18 U.S.C. § 666 to true *quid pro quo* bribery and rejected the government's effort to extend the statute to corrupt or wrongful gratuities for past official acts. The Court faulted the government for failing to present a workable definition of "corruptly," *Snyder*, 603 U.S. at 15-16, and underscored that, for a statute that applies to countless state and local officials, the government needs to give more clear notice of what conduct was criminal. *Id*. at 15-16.

The same logic applies here. No one alleges that Judge Dugan's conduct was wrong or corrupt in the sense of *quid pro quo* corruption. An effort to extend the statutes here—which have endless applications that do not implicate judicial conduct—to official judicial actions with no more clarity or protection than a jury instruction on "corruptly" cannot help but affect judicial actions adversely and upset the state-federal balance.

Moreover, as the Supreme Court underscored in *Snyder*, courts cannot construe criminal statutes on the assumption that federal prosecutors will employ their

prosecutorial discretion responsibly and focus on the most serious cases. *See id.* at 17. They do not always do that, as this case proves.

If the Court cannot avoid the constitutional issues and the bar to prosecution that Judge Dugan asserts, then concededly there is no role for this canon. Dismissal on either judicial immunity or Tenth Amendment grounds would moot the doctrine of constitutional avoidance. Judge Dugan otherwise stands on her earlier briefing. *See* Defendant's Memorandum at 33-35 (Dkt. 21); Defendant's Reply at 13-14 (Dkt. 28).

## III.

### CONCLUSION

The federal government has no right or power to prosecute a state judge for the five acts or decisions that this indictment alleges. It never has. The issue at bottom is not that the Supreme Court never clearly has extended immunity for official judicial acts to criminal prosecution. That Court repeatedly has recognized and endorsed common law judicial immunity from criminal prosecution for official acts, outside individual rights under the Reconstruction Amendments. Indeed, the Supreme Court has extended criminal immunity to civil immunity as well.

Neither count in this indictment can stand. Both are barred by judicial immunity today, just as at this nation's founding. The Tenth Amendment confirms that.

Dated at Madison, Wisconsin, July 15, 2025.

Respectfully submitted,

HON. HANNAH C. DUGAN, *Defendant*

 *s/ Dean A. Strang*
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724
Dean A. Strang
Wisconsin Bar No. 1009868

STRANG BRADLEY, LLC
613 Williamson Street., Suite 204
Madison, Wisconsin 53703
(608) 535-1550
john@strangbradley.com
rick@strangbradley.com
william@strangbradley.com
dean@strangbradley.com

*s/ Steven M. Biskupic*
Steven M. Biskupic
Wisconsin Bar No. 1018217

STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com

*s/ Jason D. Luczak, Nicole M. Masnica*
Jason D. Luczak
Wisconsin Bar No. 1070883
Nicole M. Masnica
Wisconsin Bar No. 1079819

GIMBEL, REILLY, GUERIN & BROWN LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
(414) 271-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com