# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

**v.**                                                    **Case No. 25-CR-89**

**HANNAH C. DUGAN**
                **Defendant.**

## DECISION AND ORDER

Defendant Hannah Dugan moves to dismiss the indictment charging her with concealing a person from arrest, 18 U.S.C. § 1071, and obstructing removal proceedings of the Department of Homeland Security, 18 U.S.C. § 1505. Summarized, the government alleges that defendant, a state court judge, concealed from arrest and obstructed the apprehension of a person wanted by federal immigration authorities for removal. The magistrate judge handling pre-trial proceedings in this case issued a recommendation that the motion be denied. Defendant objects, requiring me to review the matter de novo. Fed. R. Crim. P. 59(b).

## I. THE INDICTMENT

When considering a motion to dismiss, the court limits its review to the face of the indictment, assumes all facts alleged are true, and views the facts in the light most favorable to the government. See Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952); United States v. White, 610 F.3d 956, 958 (7th Cir. 2010); United States v. Yashar, 166 F.3d 873, 880 (7th Cir. 1999). The parties have in their briefing related additional facts, but consideration of those facts on a motion to dismiss would be improper. See United States v. Yasak, 884 F.2d 996, 1001 (7th Cir. 1989).

The indictment alleges:

## COUNT ONE

**THE GRAND JURY CHARGES THAT**:

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

**HANNAH C. DUGAN**

knowingly concealed E.F.R., a person for whose arrest a warrant and process had been issued under the provisions of the law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R.

In violation of Title 18, United States Code, Section 1071.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT**:

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

**HANNAH C. DUGAN**

did corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, by committing affirmative acts to assist E.F.R. to evade arrest, including:

a) confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

b) upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c) addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

2

d) directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e) advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

In violation of Title 18, United States Code, Section 1505.

(R. 6.)

## II. DISCUSSION

In her motion, defendant argued that (1) she enjoys absolute judicial immunity for the official acts alleged in the indictment; (2) this prosecution violates the Tenth Amendment and the Constitution's vertical separation of powers by intruding on the authority of state judges to manage their own courtrooms and proceedings; and (3) §§ 1071 and 1505 should be construed so as to avoid the constitutional issues she raises. (R. 21 at 2.) The magistrate judge concluded that, while the Supreme Court has granted judges immunity from civil liability, no such rule has been established in the criminal context. (R. 43 at 27-31.) She further concluded that defendant's Tenth Amendment claim required the assessment of disputed facts and characterization of the events underlying the indictment, which could not be done on a motion to dismiss. (R. 43 at 31-32.) Finally, the magistrate judge rejected the constitutional avoidance argument, as defendant identified no ambiguity in the charging statutes. (R. 43 at 32-34.)

## A.    Immunity

In her objections, defendant begins with the proposition that every act alleged in the indictment is "'part of a judge's job.'"(R. 45 at 1, quoting the Report and Recommendation [R. 43] at 30.) In other words, they are all "official acts." (R. 45 at 4; see also R. 47 at 3, "core judicial acts".) She then posits that immunity is not restricted to the civil sphere; it protects

3

against criminal liability for most official acts. (R. 45 at 3; R. 47 at 3.) She admits three exceptions to the general rule of judicial immunity: (1) wholly unofficial acts, e.g., a judge who murders his wife in their home or who shares child pornography files on his own time; (2) graft or coercive sexual gratification, for which collateral judicial acts are the inducement or the threat; and (3) official acts that deprive persons of their constitutional rights under statutes enacted pursuant to the Reconstruction Amendments, which abrogated judicial immunity. (R. 45 at 3, 14-19; R. 21 at 13.)[1] Defendant concludes that her case involves none of these exceptions: all of the acts alleged in the indictment were done in her capacity as a judge; the indictment alleges no graft or self-interest, such as a bribe or kickback in exchange for an official act; and there is no allegation that she violated individual rights protected by the Thirteenth, Fourteenth, and Fifteenth Amendments. (R. 45 at 20-21.) While the indictment does allege that defendant "knowingly" concealed E.F.R. and "corruptly" obstructed the administration of law, she remains immune for the charged <u>acts</u>, as immunity operates to foreclose inquiry into motives. (R. 45 at 22; R. 47 at 1.)

The government responds that the Supreme Court has never recognized absolute judicial immunity from criminal liability (R. 46 at 5), and that defendant's assumption of immunity, subject to exceptions, wrongly inverts the analysis (R. 46 at 13). The government argues that defendant's creation of categorical exceptions to immunity constitutes an attempt to explain away the many historical prosecutions of judges in a gerrymandered way, one which excludes the conduct alleged here. (R. 46 at 13-14.) The government further contends that, even if a doctrine of immunity for judicial acts existed, the evidence in this case will show that

---

[1]To be clear, in the objections defendant contends that the graft cases are really a subcategory of the unofficial acts cases. (R. 45 at 16.)

4

defendant went well beyond her judicial role; instead, all events arose from her unilateral, non-judicial, and unofficial actions outside the role of a Wisconsin state judge by obstructing a federal immigration matter over which she had no authority. (R. 46 at 15-16.) Although the magistrate judge allowed that some of the allegations described conduct that could be considered part of a judge's job, she clarified that defendant was not being prosecuted for opining on the fly, managing her courtroom, or allowing someone to appear by Zoom; rather, the indictment charged specific violations of federal criminal laws. (R. 46 at 18-19.) The government concludes that defendant is not immune simply because she encountered federal agents while working at the courthouse. (R. 46 at 19.)

The dispute between the parties boils down to this: Defendant posits a general rule of immunity, subject to certain exceptions which account for the previous (and legitimate) prosecutions of judges. According to the government, there is no general rule of immunity, and what defendant calls exceptions are simply examples of the types of prosecutions that have been brought against judges. A review of the relevant history reveals the government has the better of the argument.

The concept of judicial immunity is often traced to Floyd v. Barker, 77 Eng. Rep. 1305 (Star Chamber 1607), where a judge who presided over a murder trial was hailed into a rival court and charged with conspiracy for his role. Lord Coke concluded that "a Judge, for any thing done by him as Judge, by the authority which the King hath committed him, and as sitting in the seat of the King (concerning his justice) shall not be drawn into question before any other Judge, for any surmise of corruption, except before the King himself[.]" Id. at 1307.

Relying on Floyd and similar English authorities, early American courts granted judicial immunity in civil cases, although at times they stated the rule more broadly. E.g., Yates v.

5

<u>Lansing</u>, 5 Johns. 282, 291 (N.Y. Sup. Ct. 1810), <u>aff'd</u>, 9 Johns 395 (N.Y. 1811) ("The doctrine which holds a judge exempt from a civil suit or indictment, for any act done, or admitted to be done by him, sitting as judge, has a deep root in the common law."); <u>id.</u> at 293 ("In the case of <u>Floyd v. Barker</u> (12 Co. 23), the subject underwent a solemn consideration by Lord Coke, and all the judges; and their resolution was . . . that no judge, who tries and gives judgment in a criminal case, or does any act in court, was to be questioned for it either at the suit of the party or of the king."); <u>see also</u> <u>Hamilton v. Williams</u>, 26 Ala. 527, 533 (Ala. 1855) (quoting the rule from <u>Yates</u>, 5 Johns. at 291).[2]

The Supreme Court first addressed the issue in <u>Randall v. Brigham</u>, 74 U.S. 523 (1869), a case in which a lawyer filed a civil action against a state court judge alleging that the judge wrongly removed him from the state bar. Relying on <u>Floyd</u>, <u>Yates</u>, and other authorities, the Court found the judge immune, stating: "[I]t is a general principle applicable to all judicial officers, that they are not liable to a civil action for any judicial act done within their jurisdiction." <u>Id.</u> at 535. In <u>Bradley v. Fisher</u>, 80 U.S. 335, 347 (1872), also a civil action brought by a lawyer alleging wrongful removal from the bar by a judge, the Court, again citing <u>Yates</u> and <u>Floyd</u>, concluded that a judge "cannot be subjected to responsibility for [a judicial act] in a civil action, however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff." The Court continued:

---

[2]As defendant notes, a recent civil case also stated the rule broadly. <u>See</u> <u>Rockett v. Eighmy</u>, 71 F.4th 665, 669 (8th Cir. 2023) ("Judicial immunity continues to apply today, not only in prosecutions like <u>Floyd</u>, but in civil-rights actions brought under 42 U.S.C. § 1983."). In <u>Spalding v. Vilas</u>, 161 U.S. 483, 494 (1896), the Court quoted from <u>Yates</u>, 5 Johns. at 291, but that case involved a claim of civil immunity by the Postmaster General, not a judge. As defendant concedes in reply, these references are dicta. (R. 47 at 6.) But to be fair, some of the language relied upon by the government is too. I have considered all of the caselaw cited in deciding this motion.

6

The principle . . . which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions, obtains in all countries where there is any well-ordered system of jurisprudence. It has been the settled doctrine of the English courts for many centuries, and has never been denied, that we are aware of, in the courts of this country.

Id. The Court also clarified that this exemption of judges from civil liability cannot "be affected by the motives with which their judicial acts are performed. The purity of their motives cannot in this way be the subject of judicial inquiry." Id.

In Pierson v. Ray, 386 U.S. 547 (1967), the Court granted immunity to a judge sued under 42 U.S.C. § 1983 based on his involvement in a prosecution of civil rights protestors. The Court explained:

We find no difficulty in agreeing with the Court of Appeals that Judge Spencer is immune from liability for damages for his role in these convictions. The record is barren of any proof or specific allegation that Judge Spencer played any role in these arrests and convictions other than to adjudge petitioners guilty when their cases came before his court. Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction, as this Court recognized when it adopted the doctrine, in Bradley v. Fisher, 13 Wall. 335 (1872). This immunity applies even when the judge is accused of acting maliciously and corruptly, and it "is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." (Scott v. Stansfield, L. R. 3 Ex. 220, 223 (1868), quoted in Bradley v. Fisher, supra, 349, note, at 350.) It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation.

Id. at 553-54 (footnote omitted).

The Court continued, in a number of subsequent cases, to afford judicial immunity in civil actions brought under § 1983, including some with egregious facts. See, e.g., Stump v.

7

Sparkman, 435 U.S. 349 (1978) (immunity for order authorizing sterilization of a minor performed under false pretenses); Dennis v. Sparks, 449 U.S. 24 (1980) (judge civilly immune for improperly issuing an injunction as part of an alleged conspiracy with other defendants, although the action could proceed against the other defendants, which may require the judge to testify and defend his judicial conduct); Mireles v. Waco, 502 U.S. 9 (1991) (immunity granted where a judge, angered that a lawyer failed to appear in his courtroom, ordered the police to forcibly and with excessive force seize and bring the lawyer into his courtroom).

In sum, then, a "long line of [the] Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages." Mireles, 502 U.S. at 9 (collecting cases).[3] "The Court, however, has recognized that a judge is not absolutely immune from criminal liability, Ex parte Virginia, 100 U.S. 339, 348-349 (1880), or from a suit for prospective injunctive relief, Pulliam v. Allen, 466 U.S. 522, 536-543 (1984), or from a suit for attorney's fees authorized by statute, id., at 543-544." Id. at 10 n.1.[4]

_____

[3]The Court has explained that this immunity is overcome in only two sets of circumstances. "First, a judge is not immune from liability for nonjudicial actions, i. e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. at 11-12 (internal citations omitted). The Court has also clarified that "immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." Forrester v. White, 484 U.S. 219, 227 (1988). In other words, immunity does not attach simply because the defendant is a judge. The Court has drawn a "distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." Id. The former gain immunity, the latter do not.

[4]The specific holdings of Pulliam have been superseded by statute. See Pub. L. 104-317, § 309(c), 110 Stat. 3847, 3853 (1996) (codified as amended at 42 U.S.C. § 1983) ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."); Pub. L. 104-317, § 309(b), 110 Stat. 3847, 3853 (1996), (codified as amended at 42 U.S.C. § 1988(b)) ("[I]n any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held

8

In Ex parte Virginia, a state court judge was charged with excluding Black persons from grand and petit juries. 100 U.S. at 340. The charging statute provided that:

> no citizen, possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State, on account of race, color, or previous condition of servitude; and any officer or other person charged with any duty in the selection or summoning of jurors who shall exclude or fail to summon any citizen for the cause aforesaid shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than $5,000.

Id. at 344. In declining to grant habeas relief to the judge, the Court spent most of its opinion discussing Congress's authority to enact the statute pursuant to the Thirteenth and Fourteenth Amendments. Id. at 344-48. At the end of the opinion, the Court briefly discussed immunity:

> It was insisted during the argument on behalf of the petitioner that Congress cannot punish a State judge for his official acts; and it was assumed that Judge Cole, in selecting the jury as he did, was performing a judicial act. This assumption cannot be admitted. Whether the act done by him was judicial or not is to be determined by its character, and not by the character of the agent. Whether he was a county judge or not is of no importance. The duty of selecting jurors might as well have been committed to a private person as to one holding the office of a judge. It often is given to county commissioners, or supervisors, or assessors. In former times, the selection was made by the sheriff. In such cases, it surely is not a judicial act, in any such sense as is contended for here. It is merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads. That the jurors are selected for a court makes no difference. So are court-criers, tipstaves, sheriffs, &c. Is their election or their appointment a judicial act?

> But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were

---

liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction."). However, the Court's consideration of common law immunity principles remains instructive, as defendant acknowledges. (R. 45 at 6-7; R. 47 at 5.) I discuss Pulliam further below.

9

colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

Id. at 348-49.

The Court returned to the issue in O'Shea v. Littleton, 414 U.S. 488 (1974), a case in which the plaintiffs sought injunctive and equitable relief against a number of county officials, including two judges, alleging ongoing civil rights violations in the handling of criminal cases. The Court held that the complaint failed to satisfy the case or controversy requirement imposed by Article III, id. at 493, and that granting relief would also result in unwarranted federal intervention into state proceedings, id. at 500. The Court concluded that the unavailability of injunctive relief did not mean federal law would exercise no deterrent effect in these circumstances:

> Judges who would willfully discriminate on the ground of race or otherwise would willfully deprive the citizen of his constitutional rights, as this complaint alleges, must take account of 18 U.S.C. § 242. See Greenwood v. Peacock, supra, at 830; United States v. Price, 383 U.S. 787, 793-794 (1966); United States v. Guest, 383 U.S. 745, 753-754 (1966); Screws v. United States, 325 U.S. 91, 101-106 (1945); United States v. Classic, 313 U.S. 299 (1941). Cf. Monroe v. Pape, 365 U.S. 167, 187 (1961). That section provides:
>
> > "Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined . . . or imprisoned . . . ."
>
> Whatever may be the case with respect to civil liability generally, see Pierson v. Ray, 386 U.S. 547 (1967), or civil liability for willful corruption, see Alzua v. Johnson, 231 U.S. 106, 110-111 (1913); Bradley v. Fisher, 13 Wall. 335, 347, 350, 354 (1872), we have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivations of constitutional rights. Cf. Ex parte Virginia, 100 U.S. 339 (1880). On the contrary, the judicially fashioned

10

doctrine of official immunity does not reach "so far as to immunize criminal conduct proscribed by an Act of Congress. . . ." <u>Gravel v. United States</u>, 408 U.S. 606, 627 (1972).

<u>Id.</u> at 503; <u>see also</u> <u>Imbler v. Pachtman</u>, 424 U.S. 409, 429 (1976) ("This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242, the criminal analog of § 1983.") (footnote omitted); <u>Dennis</u>, 449 U.S. at 31 ("But judicial immunity was not designed to insulate the judiciary from all aspects of public accountability. Judges are immune from § 1983 damages actions, but they are subject to criminal prosecutions as are other citizens.").[5]

_____

[5]While the statements in <u>Dennis</u>, <u>Imbler</u>, and <u>O'Shea</u> could be deemed dicta, lower federal courts have broadly denied criminal immunity to judges. <u>See, e.g.</u>, <u>United States v. Claiborne</u>, 727 F.2d 842, 845 (9th Cir. 1984) ("[T]he Constitution does not immunize a sitting federal judge from the processes of criminal law."); <u>id.</u> at 847 ("Article III protections, though deserving utmost fidelity, should not be expanded to insulate federal judges from punishment for their criminal wrongdoing."); <u>id.</u> at 848 ("We . . . think it unlikely that judicial independence would be measurably diminished by subjecting judges to the processes of criminal laws."); <u>United States v. Hastings</u>, 681 F.2d 706, 711 (11th Cir. 1982) ("Indeed, the miniscule increment in judicial independence that might be derived from the proposed rule would be outweighed by the tremendous harm that the rule would cause to another treasured value of our constitutional system: no man in this country is so high that he is above the law. . . . A judge no less than any other man is subject to the processes of the criminal law.") (citing <u>Dennis</u>, <u>Imbler</u>, and <u>O'Shea</u>); <u>id.</u> at 711 n.17 ("The rule of absolute immunity from criminal prosecution of active federal judges for acts committed in their official capacities poses too great a threat to the public interest in the rule of law to be adopted by this court."); <u>United States v. Isaacs</u>, 493 F.2d 1124, 1142 (7th Cir. 1974) ("The Constitution does not forbid the trial of a federal judge for criminal offenses committed either before or after the assumption of judicial office"); <u>id.</u> at 1144 ("[W]hatever immunities or privileges the Constitution confers for the purpose of assuring the independence of the co-equal branches of government they do not exempt the member of those branches 'from the operation of the ordinary criminal laws.'"); <u>see also</u> <u>Wallace v. Powell</u>, No. 3:09-cv-286, et seq., 2009 U.S. Dist. LEXIS 109163, at *35 (M.D. Pa. Nov. 20, 2009) ("Judges are also subject to criminal prosecutions. <u>O'Shea v. Littleton</u>, 414 U.S. 488, 503 (1974). Indeed, the judges here have been indicted by a federal grand jury for the conduct for which damages are sought in this case."). <u>Cf.</u> <u>United States v. Gillock</u>, 445 U.S. 360, 373

Thus, while the Court has declined to grant judicial immunity in the context of a criminal civil rights violation,[6] and cited 18 U.S.C. § 242 as an example of a statute that might be used,[7] the Court has never suggested that judges are immune from prosecution for other crimes involving official acts. The Court's discussion in Pulliam further shows that the Court has not accepted a common law immunity rule as broad as defendant suggests.

In Pulliam, the plaintiffs obtained injunctive relief under § 1983, as well as costs and attorney's fees under § 1988, in an action brought against a state judge.[8] 466 U.S. at 524-25. The Court surveyed the common law, drawing a parallel between the use of the prerogative writs of mandamus and prohibition by the King's Bench to control collateral and inferior courts in England, and the ability of federal courts in this country to grant injunctions against state

_____

(1980) (noting a similar rule for state legislators, drawing "the line at civil actions"). While these were bribery and kickback cases, I cannot accept defendant's attempt to distinguish them from her situation, for the reasons set forth below.

[6]Defendant argues that the Court in Ex parte Virginia essentially ducked the immunity issue, holding that the judge's acts were ministerial rather than judicial. (R. 45 at 13.) The Court itself has said the case did more than that. Mireles, 502 U.S. at 10 n.1; see also Pulliam, 466 U.S. at 541 n.21 ("The Court assumed that the judge was performing a ministerial rather than a judicial function. It went on to conclude, however, that even if the judge had been performing a judicial function, he would be liable under the statute. 100 U.S., at 348-349.").

[7]Defendant states that Ex parte Virginia would have been better framed as a recognition of congressional power under the Reconstruction Amendments, an argument in keeping with her contention that prosecutions under 18 U.S.C. § 242 are the exception that proves the rule. (R. 45 at 12-13; R. 47 at 6.) As discussed in the following text, however, the Court has never suggested that judges are immune from charges under other criminal statutes, and lower federal courts have regularly held they are not, as noted above. The Court's citation of 18 U.S.C. § 242, "the criminal analog to § 1983," Imbler, 424 U.S. at 429, in cases like O'Shea is best understood, not as endorsing an exception to immunity, but reassurance that civil rights violations will not necessarily go unpunished if judges are granted immunity from civil damages actions under § 1983.

[8]As noted above, Congress later amended §§ 1983 and 1988 in response.

12

judges. Id. at 535-36. The Court further concluded that permitting injunctive relief posed no significant threat to judicial independence, stressing the limitations already imposed by the requirements for obtaining equitable relief against any defendant. Id. at 536-37.[9] "Absent some basis for determining that such a result is compelled, either by the principles of judicial immunity, derived from the common law and not explicitly abrogated by Congress, or by Congress' own intent to limit the relief available under § 1983, we are unwilling to impose those limits ourselves on the remedy Congress provided." Id. at 539-40.

The Court acknowledged its previous holding in Pierson, granting immunity from damages actions under § 1983, but in that case the Court "simply declined to impute to Congress the intent to abrogate common-law principles of judicial immunity. Absent the presumption of immunity on which Pierson was based, nothing in the legislative history of § 1983 or in this Court's subsequent interpretations of that statute supports a conclusion that Congress intended to insulate judges from prospective collateral injunctive relief." Id. at 540. Apparently, then, the presumption of immunity the Court acknowledged in Pierson extended no further than civil damages.

Finally, the Court was unmoved by the dissenters' complaint that injunctive relief carried with it the threat of contempt—with the possibility of a fine or even imprisonment—which could deter even the most courageous judge from exercising free and independent judgment. Id. at 555 (Powell, J., dissenting); see id. at 538 n.19 (majority acknowledging that a judge risks

_____

[9]Of course, the requirements for obtaining a criminal conviction are even greater. See Claiborne, 727 F.2d at 848 ("First, aside from Article III safeguards, judges enjoy the same protection as ordinary citizens do from vindictive prosecution. Second, . . . a criminal prosecution encounters several procedural barriers -- such as the indictment, burden of proof, and presumption of innocence.") (internal citations omitted).

13

contempt for violating a writ of mandamus); see also In Re Kendall, 712 F.3d 814, 822 n.4 (3rd Cir. 2012) (finding judge not entitled to immunity from criminal contempt for judicial acts).

Against this authority, defendant cites two cases for the proposition that there is judicial immunity from criminal prosecution for official acts not involving constitutional rights under the Reconstruction Amendments. (R. 45 at 6.) The first is Commonwealth v. Tartar, 239 S.W.2d 265 (Ky. Ct. App. 1951), where a judge was indicted for "wrongfully and corruptly" certifying a list of grand jurors. While a state statute described the manner in which grand jurors were to be selected, failure to comply was not made a statutory offense. Instead, the prosecutor argued the judge committed the "common law offense of misfeasance in office." Id. at 266. The trial court sustained a demurrer to the indictment, and in a brief opinion the appellate court affirmed. The court of appeals first noted that "judges acting in their official capacities should be protected from harassment by either civil suits or criminal prosecutions." Id. (citing Yates). The court then stated:

> We believe the authorities are generally in agreement that misfeasance of a judicial officer, acting in his official capacity, did not constitute a criminal offense under the common law. The reasons for such rule are sound, since otherwise judges might be unduly burdened defending charges instigated by other governmental officers or aggrieved members of the public.

Id.

It is unclear whether the Tartar court found the judge immune or decided that the indictment failed to charge a common law offense against the judge. As the magistrate judge noted, one commentator, after stating a general rule that "judicial immunity does not exempt judges from criminal liability," in discussing Tartar stated:

> The one area where judges can be said to enjoy immunity from criminal liability is for malfeasance or misfeasance in the performance of judicial tasks undertaken in good faith. In some states malfeasance or misfeasance in office

14

is made criminal either by statute or common law rule. However, this criminal liability will be precluded by judicial immunity unless the malfeasance or misfeasance is accompanied by bad faith.

Jeffrey M. Shaman, Judicial Immunity from Civil and Criminal Liability, 27 San Diego L. Rev. 1, 18 (1990) (internal footnotes omitted).[10] If this is indeed the rule, it is inapplicable here, as defendant is not charged under a state statute or common law prohibition on malfeasance or misfeasance in office but rather a federal criminal statute of general applicability. (R. 43 at 17.) At all events, Tartar is a thin reed upon which to rest a claim of criminal judicial immunity, subject to narrow exceptions.

The other case is United States v. Chaplin, 54 F. Supp. 926 (S.D. Cal. 1944), where a judge was indicted for conspiracy to deprive civil rights under a predecessor to 18 U.S.C. § 242. The court, surveying caselaw dating back to England (and distinguishing Ex parte Virginia as a case involving ministerial acts), agreed the judge was immune from prosecution. Id. at 928-33.  The cases upon which the court relied generally involved civil immunity. The Chaplin court

_____

[10]In a more recent article, Professor Combs states: "[W]hereas American law provides judges absolute immunity against civil lawsuits, it provides no immunity whatsoever against criminal prosecutions." See Nancy Amoury Combs, Redressing Judicial Misbehavior: An Integrated Approach to Judicial Immunity, 58 U.C. Davis L. Rev. 1165, 1171 (2024); see also id. at 1174 ("[T]he bottom line is that judicial immunity is bipolar. Judges are entirely shielded from civil money damage suits, but they have no shielding whatsoever from criminal prosecutions."); id. at 1183 ("By contrast, judges possess no immunity whatsoever from criminal prosecutions."); id. at 1186 ("[I]t is uncontroverted that the doctrine of judicial immunity does not shield judges from criminal liability for their judicial acts.") (citing Shaman, supra, at 18-20; Samuel P. Stafford, An Overview of Judicial Immunity: Including Legal Representation of Judges, State Ct. J. 1, 4 (1977) ("It is axiomatic that common law judicial immunity has never been extended to shield a judge from criminal liability.")). "That said, somewhat tangentially, some cases have held that the misfeasance of a judge, when acting in his official capacity, does not constitute a criminal offense." Id. at 1186 n.119 (citing Tartar). One federal court has suggested, citing Tartar, that "there may exist a common law immunity from criminal prosecution" for acts done in the judge's official capacity "undertaken in good faith." Hastings, 681 F.2d at 711 n.17. I discuss this further below.

15

did cite Commonwealth v. Addison, 4 Dall. 225, 1 L. Ed. 810 (Pa. 1801), which involved a criminal accusation against a judge,[11] but the Addison court did not explicitly rely on immunity, stating, in full:

> We are, unanimously, of opinion, that the case does not present to our consideration an indictable offence; and, of course, it is not a case, in which an information ought to be granted. But we are (with the same unanimity) of opinion, that every Judge has a right, and, emphatically, that it is his duty, to deliver his sentiments upon every subject that occurs in Court. We add, so far as the expression of our sense of decorum may have weight, that we think, it would be indecent and improper, in any presiding Judge, to attempt to prevent his associates from the exercise of this right; from the performance of this duty.

> Motion refused.

Id.

The Chaplin court did make a strong policy argument that judges should be immune from criminal civil rights prosecutions, just as they are from civil damages actions:

> The immunity which has clothed judges for a century and a half in our country found its genesis in the English common law simultaneously with the independence of the judiciary. The disappointed litigant cannot embarrass the judge in a civil action for damages irrespective of the justice of his decision, nor can a defendant upon whom sentence has been pronounced, recover damages against the judge for the real or supposed wrong. A decision in favor of the Government in the instant criminal actions would place the official action of every justice of the peace, municipal or city court judges, Superior Court Judges, Appellate Court judges and Supreme Court judges in our country at the mercy of a United States Attorney. Every sentence imposed on a defendant would be subject to review by the representative of the Department of Justice, and if, in the judgment of the Attorney General of the United States or the United States Attorney for the District, the decision deprived the defendant of his civil rights, the judge could be indicted, tried, and, if convicted, punished. Every defendant sentenced to the county jail or the penitentiary is deprived of his civil rights, and

---

[11] In Addison, the attorney general made a motion for a rule to show cause why an information should not be granted against the defendant, the President of the Courts of Common Pleas, on the affidavit of J.C. Lucas, an associate Judge of the Court of Common Pleas of Allegheny county, stating that he had been wilfully prevented by Judge Addison from delivering his sentiments to the grand jury. Id.

in many instances the civil rights are not revived upon release. The same reasoning would apply to our Federal Courts. To sustain the Government's contention would be to destroy the independence of the judiciary and mark the beginning of the end of an independent and fearless judiciary. No doubt unjust decisions have been rendered and individuals have suffered damage, and others have been unjustly imprisoned, while a few innocent men have suffered the death penalty as the result of a jury's verdict. No judicial system yet devised by man is perfect. The rich tradition, the long line of decisions, the confidence of our people in the state and federal judiciary, the experience of over a century and a half expressed in our legal lore, coextensive with our national existence, cannot be ignored in deciding this issue. The house should not be burned to destroy the mouse. To sustain the Government's contention would invite similar actions against grand and petit jurors, prosecuting attorneys and attorneys representing clients before our courts and juries, now immune.

Id. at 933-34.

Significant as those concerns might be, it is hard to square Chaplin with subsequent cases like O'Shea, 414 U.S. at 503 ("Judges who would willfully discriminate on the ground of race or otherwise would willfully deprive the citizen of his constitutional rights, as this complaint alleges, must take account of 18 U.S.C. § 242."), and Imbler, 424 U.S. at 429 ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242, the criminal analog of § 1983."), as the magistrate judge noted. (R. 43 at 18.) Indeed, even defendant acknowledges that judges are not immune from prosecution for official acts under civil rights laws. In sum, then, Chaplin also provides little support for defendant's contention here.

Finally, defendant appeals to the recent decision in Trump v. United States, 603 U.S. 593 (2024), where the Supreme Court held the President is entitled to absolute immunity from criminal prosecution when exercising his core constitutional powers, and at least presumptive immunity for all his official acts. Defendant contends that the Court relied on judicial immunity cases for official acts, extending to the President what judges had first. (R. 45 at 3.) The Trump

17

decision relied primarily on the President's "unique position in the constitutional scheme, as the only person who alone composes a branch of government." Id. at 610 (internal citation and quote marks omitted). The Court concluded, based on separation of powers principles, that immunity was required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution. Id. at 614. These same concerns do not arise when one of the nation's many judges is subject to prosecution. Further, while the Court relied on its previous decision in Nixon v. Fitzgerald, 457 U.S. 731 (1982), granting the President immunity from civil damages actions, a decision which in turn cited Pierson v. Ray, the Court said nothing about criminal immunity for judicial acts.

Ultimately, as the Supreme Court has stated, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns v. Reed, 500 U.S. 478, 486 (1991);[12] see also Antoine v. Byers & Anderson, 508 U.S. 429, 432 (1993) ("The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity."). Defendant has not done so here.[13]

_____

[12]"We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant." Id. at 487 (internal citation and quote marks omitted).

[13]In her objections reply, defendant argues that, under Pulliam, "the burden is not on [her] to demonstrate that Congress or the United States Supreme Court created judicial immunity in criminal cases. The burden is on the government to show that the original criminal judicial immunity has been abrogated." (R. 47 at 5.) However, this assumes courts in this country have accepted a common law rule of criminal judicial immunity in the first place; as discussed above, they have not. See Combs, supra, at 1174 ("[T]he bottom line is that judicial immunity is bipolar. Judges are entirely shielded from civil money damage suits, but they have no shielding whatsoever from criminal prosecutions."). Defendant argues that the reasons for judicial immunity are stronger in the criminal context. (R. 45 at 8-10; R. 47 at 9.) It is true that the consequences for a judge, if criminally convicted, will likely be greater than if she is found

18

This is not to gainsay the very real concerns defendant raises. She wonders why, if official acts enjoy no immunity, a judge could not be prosecuted for handling contraband during a trial or scheduling a hearing in a manner that inconveniences federal law enforcement officers.[14] (R. 45 at 2; R. 47 at 10-11.) Saying "that is not the way the criminal justice system operates" (R. 46 at 22), and that as a matter of "common-sense" operatives in the system would not violate the criminal law if they "are in good faith carrying out their required duties" (R. 46 at 23), as the government does, is unsatisfying.

As the Eleventh Circuit noted in permitting the prosecution of a judge for bribery, "this

_____

civilly liable. And, while a public employee can be indemnified for a damages judgment, one cannot shift to an insurer the loss of liberty that comes with a criminal conviction. However, as Professor Combs explains, "criminal prosecutions and civil suits differ in key ways," and "these differences go a long way toward justifying the current doctrinal dichotomy." Combs, supra, at 1217. "[C]ivil suits present a greater threat to judges than criminal prosecutions both because judges are far more likely to be the target of a meritless civil suit than a meritless criminal prosecution and because the risk of a judgment against the judge is higher for a civil suit. Thus, because civil suits present a greater threat, immunity from these suits provides greater benefits, including to the value of judicial independence." Id. First, disappointed private litigants are far more likely to bring a civil suit against a judge than a prosecutor is to launch a criminal prosecution. Id. at 1219. Second, a far broader range of harms is compensable as civil wrongs than are punishable as crimes. Id. at 1223. Third, it is easier for a plaintiff to win a civil case than it is for a prosecutor to secure a conviction on the same facts, given the different burden of proof. Id. at 1223-24. Finally, "civil tort suits exist primarily to recompense individual victims who have suffered harm whereas criminal prosecutions not only vindicate the rights of individual victims but also society as a whole. . . . Consequently, immunity from criminal prosecution imposes costs not just on the individual victim of the judge's wrongful act but also on the larger community." Id. at 1225-26. Defendant concedes that the Supreme Court has never had occasion to apply judicial immunity from criminal prosecution for official acts outside the context of civil rights protected by the Reconstruction Amendments. But this is so, she contends, because prosecutions like this one have so rarely been attempted. (R. 45 at 10-11; R. 47 at 8.) The particulars of this case may be unusual; nevertheless, as discussed above and in the magistrate judge's recommendation, there is no firmly established judicial immunity barring criminal prosecution of judges for judicial acts. (R. 43 at 27.)

[14]Or, in a hypothetical closer to the mark, could a state court judge be prosecuted for obstruction if she remands an undocumented person into custody to answer for state charges, thereby thwarting a planned arrest and removal by federal immigration agents?

19

is not a case in which a judge is prosecuted for acts in his official capacity undertaken in good faith. In such a case, there may exist a common law immunity from criminal prosecution." Hastings, 681 F.2d at 711 n.17 (citing Braatelien v. United States, 147 F.2d 888, 895 (8th Cir. 1945); Commonwealth v. Tartar, 239 S.W.2d 265, 266 (Ky. App.1951)).[15] But this leads to the government's fallback position, that defendant is not being prosecuted for official acts in the ordinary course of her duties. (R. 46 at 15.) Instead, the government contends, the events alleged in the indictment arose from her unilateral, non-judicial, and unofficial actions outside the role of a state court judge. (R. 46 at 16.) While it would be improper to consider facts outside the four corners of the indictment on a motion to dismiss, viewing the facts that are alleged in the light most favorable to the government, as I must at this stage, and accounting for the indictment's allegation that defendant "knowingly concealed" E.F.R. and acted "corruptly," I cannot say as a matter of law that defendant's alleged conduct falls within even this more limited version of immunity. See United States v. Joseph, No. 19-cr-10141, 2020 U.S. Dist. LEXIS 132387, at *8 (D. Mass. July 27, 2020) ("Of course, any such immunity, if it exists, would never shield corruption or bribery. Where the Indictment charges that Joseph acted 'corruptly,' it is not within this Court's province on a motion to dismiss to determine whether judicial immunity, even if its reach encompasses criminal liability, provides a viable shelter for Joseph in the circumstances alleged here.") (internal citations and quote marks omitted).

_____

[15]In Braatelien, the court stated "that as a general rule a judge cannot be held criminally liable for erroneous judicial acts [d]one in good faith. 30 Am. Jur., Judges, 52. But he may be held criminally responsible when he acts fraudulently or corruptly. Judicial title does not render its holder immune to crime even when committed behind the shield of judicial office." 147 F.2d at 895. However, the court denied the defendant's immunity claim on factual grounds, stating: "Braatelien was not indicted for an erroneous or wrongful judicial act. . . .The crime charged is distinct from his official acts. It might have been consummated without the performance of a single judicial act on his part." Id.

There is no basis for granting immunity simply because some of the allegations in the indictment describe conduct that could be considered "part of a judge's job." As the magistrate judge noted, the same is true in the bribery prosecutions, concededly valid, where the judges were prosecuted for performing official acts intertwined with bribery. (R. 43 at 29-30.) Defendant argues that the gravamen of the offense in such cases is accepting the bribe (an unofficial act), with the collateral official act done in response presented as an evidentiary detail to complete the story. (R. 45 at 16-20.) The cases do not support this distinction.[16] See Hastings, 681 F.2d at 707 ("In this case we are asked to decide whether an active federal judge can be subject to federal criminal prosecution for acts involving the exercise of his judicial authority."); Wallace, 2009 U.S. Dist. LEXIS 109163, at *35, *40-41 (holding that a judge had civil but not criminal immunity for his "judicial acts" of sentencing juveniles to detention).[17] Or as the government puts it, a judge may use judicial acts or tools as the means to accomplish an unlawful end.[18] (R. 46 at 21.) Finally, to the extent defendant argues this category of cases

_____

[16]As defendant notes, Justice Barrett discussed this issue in her partial concurrence in Trump. (R. 45 at 18; R. 47 at 9.) However, her views did not carry the day. In any event, for the reasons stated above, Trump is inapposite.

[17]Professor Combs notes that a few cases suggest criminal acts somehow cease to be judicial acts. However, the earliest example, Braatelien, discussed in note 15 above, involved a situation where the defendant's criminal acts were "distinct from his judicial acts." Combs, supra, at 1195-96. "Fortunately, only a few courts implied that criminal judicial acts somehow ceased to be judicial acts. Moreover, even when that rationale has appeared, it has typically been paired with the primary rationale that courts invoke when rejecting immunity for judicial crimes: namely, a summary cost-benefit analysis that is deemed to weigh against immunity for crimes." Id. at 1196.

[18]It is also worth noting that the question is not whether the charged acts are "part of a judge's job." As the Supreme Court has made clear, judges enjoy immunity from civil damages actions for their "judicial acts," but not for "the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." Forrester, 484 U.S. at 27.

21

requires the judge act for the purpose of self-enrichment or gratification, she provides no authority for the proposition that the motive must be financial to be "corrupt." And to the extent defendant contends a court cannot inquire into the judge's motive for judicial acts, the same could be said in the bribery cases. Accordingly, even if a more limited version of judicial immunity exists, it does not support dismissal of the instant indictment.

## B.    Tenth Amendment

In the objections, defendant contends that the magistrate judge missed the importance of the Tenth Amendment here; she argues that, outside the context of the Reconstruction Amendment enforcement clauses, Congress lacks authority to punish criminally the official acts of state judges. (R. 45 at 22; R. 47 at 13.) However, defendant cites no authority for the proposition that federal criminal statutes of general applicability may not be applied to state court judges, as alleged in the instant indictment.

It is true that the Constitution establishes a system of "dual sovereignty." Printz v. United States, 521 U.S. 898, 918 (1997). Although the states surrendered many of their powers to the new federal government, they retained a residual and inviolable sovereignty, which is reflected in various provisions of the Constitution, including the Tenth Amendment. Id. at 918-19. And the Supreme Court has enforced limitations on the federal government's ability to intervene in state affairs. But none are plainly applicable here.[19] For instance, the indictment in no way

---

[19]Defendant cites Page Co. v. MacDonald, 261 U.S. 446, 447-48 (1923), where the Court held that a party was exempt from service of process initiating a federal action while attending a state court hearing. (R. 45 at 25.) While the Court noted "the necessities of the judicial administration," in which federal and state courts have "equal interest," id. at 448, I see nothing in the decision imposing a Tenth Amendment barrier to the instant prosecution. In a case closer to the mark, the Supreme Court declined to recognize an evidentiary privilege barring the introduction of evidence of the legislative acts undertaken by a state senator in exchange for bribes. Gillock, 445 U.S. at 361-62. The Court first concluded that the separation

22

suggests that the federal government may commandeer state judges into assisting in the enforcement of federal immigration law. Cf. Printz, 521 U.S. at 935. Nor does the indictment assert federal power to superintend the daily functioning of state courts. (R. 45 at 24-25; R. 47 at 12.) Whether this case involves the routine work of a state court and judge, as defendant contends (R. 45 at 26), or whether defendant added extraneous activities to her usual duties in order to defeat enforcement of federal immigration law, as the government alleges (R. 46 at 19, 25), is not something that can be decided on a motion to dismiss. See Joseph, 2020 U.S. Dist. LEXIS 132387, at *10 ("At bottom, the defendants' constitutional arguments require the assessment of disputed facts, characterizations of the events underlying the Indictment, or other evidentiary analysis.").

That state law permits discipline of judges for ethical violations, as defendant notes (R. 45 at 26), does not preclude the bringing of federal criminal charges. Cf. Hastings, 681 F.2d at 709 (rejecting the argument "that Congress has the exclusive primary jurisdiction to try and punish a federal judge for high crimes and misdemeanors through the impeachment process");

_____

of powers doctrine gave no support to the grant of a privilege to state legislators in federal criminal prosecutions. While the federal government has limited powers with respect to the states, "in those areas where the Constitution grants . . . the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power." Id. at 370; see also United States v. Schock, 891 F.3d 334, 337 (7th Cir. 2018) ("Neither the separation of powers generally, nor the Rulemaking Clause in particular, establishes a personal immunity from prosecution or trial. The separation of powers is about the allocation of authority among the branches of the federal government. It is an institutional doctrine rather than a personal one."). The Court further concluded that "Gillock's argument, resting on the Tenth Amendment, has no special force with regard to state legislators; on the rationale advanced, state executive officers and members of the state judiciary would have equally plausible claims that the denial of an evidentiary privilege to them resulted in a direct federal impact on traditional state governmental functions." Gillock, 445 U.S. at 371; see also id. at 373 ("We conclude, therefore, that although principles of comity command careful consideration, our cases disclose that where important federal interests are at stake, as in the enforcement of federal criminal statutes, comity yields.").

23

Isaacs, 493 F.2d at 1140-41 (rejecting the argument that impeachment, rather than criminal conviction, is the only means of removing a judge from office). Nor does one indictment against one judge result in the usurpation of Wisconsin's power to select, discipline, and remove its own judges. (R. 45 at 27.) Defendant cites Gregory v. Ashcroft, 501 U.S. 452 (1991), where the Court declined to apply the Age Discrimination in Employment Act to Missouri state court judges absent a clear statement that Congress intended to interfere with the state's power to define the qualifications of its own officials. (R. 45 at 27; R. 47 at 13.) Again, permitting this prosecution to proceed poses no similar threat to Wisconsin's sovereignty. Cf. Gillock, 445 U.S. at 371 (holding that denial of an evidentiary privilege to a state legislator prosecuted for federal crimes was not analogous to a direct regulation of state employee wages). Nor does defendant cite any authority for the proposition that a clear statement from Congress is needed before a criminal statute of general applicability may be applied to a state official. (R. 47 at 13.)

In reply, defendant cites the recent decision in United States v. Illinois, No. 25 CV 1285, 2025 U.S. Dist. LEXIS 142735 (N.D. Ill. July 25, 2025), where the court dismissed the government's complaint against the state of Illinois and various local entities and officials challenging so-called "sanctuary policies." (R. 47 at 13-14.) The court noted that the term "sanctuary policies" is a misnomer, as none of them immunized anyone to the reach of the federal government. Instead, they generally prohibited state and local government support of civil immigration activities, e.g., complying with detainers, giving immigration agents information about non-citizens. Id. at *5-6. The government claimed that these policies were designed to and in fact interfered with the government's enforcement of federal immigration law. Id. at *7. The court engaged in a wide-ranging discussion of preemption and inter-governmental immunity, ultimately concluding that the sanctuary policies reflected the defendants' decision

24

not to participate in enforcing civil immigration law, a decision protected by the Tenth Amendment and the anti-commandeering doctrine. Id. at *76. As indicated above, the instant indictment commands no one to participate in federal immigration enforcement; rather, it charges obstruction with those efforts pursuant to a statute of general applicability (not one regulating states and their political subdivisions, as in the cited case, see id. at *43).

## C.   Avoidance

Finally, in the objections defendant alleges ambiguity in the terms "corruptly" and "proceeding" used in count two. (R. 45 at 27.) Presumably, the court would construe these terms such that § 1505 does not apply to the conduct alleged, avoiding the need to determine whether the federal government could, consistent with the Tenth Amendment, use ordinary criminal statutes to target state judicial acts. (See R. 47 at 14-15.)

The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, a statute is found to be susceptible of more than one construction; the canon functions as a means of choosing between them so as to avoid constitutional concerns. Clark v. Suarez Martinez, 543 U.S. 371, 385 (2005). In other words, the canon is a tool for choosing between competing plausible interpretations of a provision; it has no application in the absence of ambiguity. Warger v. Shauers, 574 U.S. 40, 50 (2014).

Defendant cites no case finding these terms, as used in 18 U.S.C. § 1505 and further defined in 18 U.S.C. § 1515(b), ambiguous. Instead, she relies on Snyder v. United States, 603 U.S. 1, 5 (2024), where the Court held that 18 U.S.C. § 666—which makes it a crime for state and local officials to "corruptly" solicit, accept, or agree to accept "anything of value from any person, intending to be influenced or rewarded" for an official act—covered bribes but not gratuities. As part of its analysis, the Court did note federalism concerns with a more expansive

25

construction of the statute, as state and local governments had adopted a variety of approaches to regulating their officials' acceptance of gratuities. Id. at 14-15. The Court also had fair notice concerns, as the government did not "identify any remotely clear lines separating an innocuous or obviously benign gratuity from a criminal gratuity." Id. at 16. The Court declined to rely on the government's promise that federal prosecutors could be trusted not to enforce the statute against small-time violators. Id. at 17.

As noted, however, the issue in Snyder was whether § 666 covered gratuities as well as bribes. The Court did not find the term "corruptly" to be ambiguous.[20] Nor did the Court address the canon of constitutional avoidance. Moreover, as the government notes, defendant cites no authority for this court to decide non-constitutional statutory interpretation questions on a motion to dismiss. (R. 46 at 28.) Finally, even if it would be appropriate to address the issue now, defendant posits no competing, plausible construction of the statutory terms. (R. 46 at 28.) Rather, the issues she raises regarding whether the conduct alleged is covered by the statutes are properly addressed at trial.[21]

---

[20]To the extent the Court considered the term, it did so in concluding that § 666 is a bribery statute. Id. at 11-12 ("Therefore, the dividing line between §201(b)'s bribery provision and §201(c)'s gratuities provision is that bribery requires that the official have a corrupt state of mind . . . Section 666 shares the defining characteristics of §201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced in the official act. The statutory text therefore strongly suggests that §666—like §201(b)—is a bribery statute, not a gratuities statute."); id. at 18 ("The bribery statute for federal officials, §201(b), uses the term 'corruptly.' But the gratuities statute for federal officials, §201(c), does not. The term 'corruptly' therefore signals that §666 is a bribery statute.").

[21]To the extent defendant raised additional issues in making her avoidance argument before the magistrate judge, I agree with the magistrate judge's analysis. (R. 43 at 32-34.)

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 43) is adopted, and defendant's motion to dismiss (R. 15) is denied.

**IT IS FURTHER ORDERED** that this matter is scheduled for in-court hearing on **Wednesday, September 3, 2025, at 11:00 a.m.** to address further scheduling.

Dated at Milwaukee, Wisconsin, this 26th day of August, 2025.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

27