UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                        Case No. 25-CR-89 (LA)

HANNAH C. DUGAN,

Defendant.

## GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE*

The United States of America, by its counsel, respectfully moves this Court

for the following:

(1)    to preclude defendant from mentioning potential punishment or any
collateral consequences flowing from conviction;

(2)    to prohibit defendant from presenting evidence, argument, or
remarks designed to induce jury nullification, including, but not
limited to appeals for the jury to decide the case based on their
personal views of immigration policy and enforcement;

(3)    to bar discovery requests or commentary regarding discovery in the
presence of the jury;

(4)    to bar defendant from defining reasonable doubt;

(5)    to preclude defendant from eliciting her own out-of-court statements,
including a self-serving statement she made to MPD officers on April
22, 2025;

(6)     to bar argument or questioning concerning the motives of law enforcement;

(7)     to bar testimony, argument, or commentary to the effect that a judicial warrant is required for the arrest of an individual under the immigration laws;

(8)     to bar evidence or argument concerning the arrest of the defendant or alluding to alternative means of bringing her before the Court for an initial appearance;

(9)     to bar evidence or comment concerning the duration of the investigation, namely, the length of the interval between the alleged criminal conduct and the issuance of criminal charges;

(10)    to bar argument that the defendant should not be convicted because she did not succeed in preventing E.F.R.'s arrest;

(11)    to bar evidence of other ICE enforcement actions in the Milwaukee County Courthouse or elsewhere (except for impeachment/bias);

(12)    to bar evidence of defendant's alleged "good motives"; and

(13)    to bar evidence of defendant's "prior good acts."[1]

---

[1] The United States anticipates filing one or more additional motions. Specifically, counsel for Ms. Dugan has indicated that reciprocal discovery will be provided soon. Similarly, while in the courtroom on November 6, 2025, the defense handed government counsel a report and indicated that they planned to call an attorney as an "expert" to opine about the meaning of the term "proceeding," an element of the offense alleged in Count Two (a violation of 18 U.S.C. § 1505), based on his reading of the "plain text" of laws and regulations under Title 8, the Immigration and Nationality Act. The United States will move to exclude the attorney's opinion, as "proceedings" will be defined by the Court in the jury instructions. *See, e.g., United States v. Bloom*, 846 F.3d 243, 255 (7th Cir. 2017) (explaining that the "meaning of statutes, regulations, and contract terms is a subject for the court, not for testimonial experts" and that the "only legal expert in a federal courtroom is the judge"); *United States v. Sinclair,* 74 F.3d 753, 758, nt. 1 (7th Cir. 1996) (noting "Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues" and that experts "cannot testify about legal issues on which the judge will instruct the jury") (additional citations omitted); *United States v. Fruchtman,* 421 F.2d 1019, 1021 (6th Cir. 1970) (definition of proceeding in § 1505 is "a question of law to be determined by the court rather than the jury"); *accord United States v. Pugh,* 404 Fed. Appx. 21, 27 (6th Cir. 2010) ("whether an agency action constitutes a 'proceeding' is a question for the judge, not the jury"). Given the timing of the disclosures, the defense has indicated that they will not object to motions being filed after November 7, 2025.

## BACKGROUND

A grand jury in this district returned a two-count indictment charging the defendant with (1) concealing an individual for whom an administrative arrest warrant had been issued; and (2) endeavoring to influence, obstruct, or impede federal agency proceedings. The trial is scheduled to start on December 15, 2025.

This Court's "inherent authority" to manage the course of a trial includes the power to exclude evidence *in limine*. *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F.Supp. 2d 870, 873 (E.D. Wis. 2010) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)); *see also Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). A motion *in limine* is one made "at the outset" or "preliminarily." *Black's Law Dictionary,* 803 (8th ed. 2004). Such motions permit the Court to "eliminate from further consideration evidence that clearly should not be presented to the jury." *Fail-Safe*, 744 F.Supp.2d at 873 (citing *Jonasson v. Lutheran Child and Family Serv.,* 115 F.3d 436, 440 (7th Cir.1997)). Rulings on motions *in limine* may be adjusted as needed at trial. *Farfaras v. Citizens Bank & Tr.*, 433 F.3d 558, 565 (7th Cir. 2006).

## FACTS

The United States provides the following factual proffer as context for the current motions. On March 18, 2025, E.F.R. was charged with three domestic violence-related misdemeanors. On April 18, 2025, he was scheduled to appear before Judge Dugan. Agents from the Department of Homeland Security

("DHS"), Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE ERO") had identified E.F.R. as someone who previously had been ordered removed and who was not lawfully in the country. On April 17, 2025, an immigration official found probable cause to believe E.F.R. was removable and issued a warrant for his arrest.

On April 18, 2025, members of the ICE ERO Task Force sought to execute the warrant. The arrest team included an ICE Officer, a CBP Officer, two FBI Special Agents, and two DEA Special Agents. When arriving at the courthouse, members of the team advised the Milwaukee County Sheriff's Office of the planned arrest in a public hallway and agreed to wait until after E.F.R.'s hearing.

A little after 8:15 a.m., the FBI agents arrived on the 6th floor and advised Judge Dugan's courtroom deputy that they had a warrant for E.F.R. They agreed to wait until after the hearing and to arrest E.F.R. in the hallway. The remaining task force members arrived and also waited in the hallway. All members were in plain clothes, unmasked, and waiting quietly for E.F.R.'s hearing to conclude. The agents were noticed by members of the Public Defender's Office, who reported their presence to Judge Dugan's clerk.

Judge Dugan arrived at approximately 8:39 a.m. and took the bench shortly thereafter. She began addressing a case being handled by a private defense lawyer. Judge Dugan's clerk then advised her that "five ICE agents" were in the hallway.

4

Judge Dugan asked, "Five what?" and the clerk stated, "Five ICE agents. ICE." Judge Dugan responded, "Oh," and told the clerk to call various courthouse personnel, before eventually telling the clerk to hold off on any calls, remarking, "One second, just stay right there." Judge Dugan then left the courtroom through her chambers door.

Judge Dugan then used a non-public hallway to enter Judge 1's courtroom through the jury door. Judge Dugan directed Judge 1 to leave the bench. Judge 1 left the bench, entered chambers, started to unzip her judicial robe, and opened the door. Judge Dugan told Judge 1, "Keep your robe on" and "come with me." Judge Dugan then walked down the non-public hallway, stating ICE was there and that they needed to check for a warrant. Judge 1 was confused about why Judge Dugan had involved Judge 1 and asked, "Are you talking about someone on my docket?" Judge Dugan did not respond.

At approximately 8:43 a.m., Judge Dugan entered the public hallway and began confronting law enforcement. Judge Dugan first addressed the ICE Officer, who was seated on a bench with an FBI agent. When Judge Dugan asked if he was present for a hearing, the ICE Officer explained he was there to make an arrest. Judge Dugan asked if he had a judicial warrant, and the ICE Officer explained he had an administrative warrant. Judge Dugan stated multiple times that he needed a judicial warrant.

5

Judge Dugan then asked if the ICE Officer had the warrant with him. When the ICE Officer responded that he did, Judge Dugan told him he had to go to the Chief Judge's office. Judge 1 ended up escorting the ICE Officer to the Chief Judge's office. Judge 1 was uncomfortable with Judge Dugan's behavior and tone, which witnesses described as "heated," "visually upset," "yelling," "disgruntled," and "a mix of anger and irritation."

Judge Dugan then asked one of the FBI agents if he was there for a hearing. When the agent stated he was helping with the arrest, Judge Dugan told him that he could not be in the public hallway and directed him to the Chief Judge's office:



This was so even though only 10 days earlier, Judge Dugan thanked a colleague for emailing a detailed presentation (for which Judge Dugan also had tried to register) and a summary explaining that ICE can lawfully conduct enforcement actions in the public areas of the courthouse.

6

Judge Dugan initially started towards the Chief Judge's office, then turned and walked down the hallway, ordering other members of the arrest team to leave the public hallway:

  

At approximately 8:45 a.m., after all five of the arrest team members identified by Judge Dugan had entered or were walking towards the doors leading to the Chief Judge's office, Judge Dugan waved to her clerk, who had entered the hallway, and returned to her courtroom through the public entrance. Judge 1 was not aware of Judge Dugan's efforts to clear the hallway and was surprised that more than one agent had come to the Chief Judge's area.

As soon as Judge Dugan reentered her courtroom, she asked E.F.R.'s attorney, "Which client is it?" Judge Dugan then told the private defense lawyer whose case had been interrupted to "step back." Judge Dugan asked E.F.R's lawyer for her client's name and if he needed an interpreter. The clerk explained that he did. Judge Dugan repeatedly directed E.F.R.'s counsel to get a date off the record and to "stay right there." Then Judge Dugan told the attorney to "take your

7

client out and come back and get a date" before stating, "Oh wait, I'm sorry - Just give her a date." Judge Dugan then suggested taking E.F.R. out of the jury door and "down the stairs."

Another individual asked Judge Dugan, "You want me to show them? I don't think she knows. She might go out the wrong door," a reference the individual has explained was to the door to the public hallway. Judge Dugan responded, "I'll do it. I'll get the heat." Judge Dugan then instructed E.F.R.'s counsel to "come" with her. When counsel did not immediately go through the jury door, Judge Dugan asked aloud, "Where did she go?" Judge Dugan then waved to counsel and again directed her to "come" through the door. She also repeated that E.F.R. should appear by Zoom for his next hearing. Neither E.F.R.'s victims (who were present) nor the Assistant District Attorney were included in these events.

Judge Dugan pointed E.F.R. and his attorney down the hallway. The hallway has a door to a stairwell to the left that leads down to the fifth floor and a door straight ahead that leads to the public hallway on the sixth floor:



E.F.R.'s attorney was not aware of the entrance to the stairs and walked straight ahead. Approximately 2 minutes and 46 seconds after Judge Dugan had reentered her courtroom, E.F.R. entered the public hallway through this door (marked "JURY" and COURT STAFF"):



E.F.R. and his attorney walked past a set of elevators and entered an elevator at the bank located away from Courtroom 615. A DEA agent who had not been noticed by Judge Dugan and one who had left the Chief Judge's area saw E.F.R. and followed. E.F.R. left the building and was arrested outside after a short chase.

After Judge Dugan had directed E.F.R. through the jury door, she returned to the bench and told the private attorney whose case had been interrupted to "step up again." Although no interpreter was present, a member of Judge Dugan's staff asked if they should do other "interpreter cases first." Judge Dugan responded, "Is there anybody else that looks…" before the staff member interrupted with, "We aren't sure."

On April 21, 2025, Judge Dugan advised a colleague, "I'm in the doghouse because I tried to help that guy go through that hallway."

## DISCUSSION

### I. *Motion to preclude defendant from mentioning potential punishment or any collateral consequences flowing from conviction.*

Unless a jury has a sentencing role, as in cases involving capital offenses, it "should be admonished to reach its verdict without regard to what sentence might be imposed." *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quotations, footnotes, and citations omitted); *see also Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000); *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir. 1997) (noting that "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored"). Indeed, Seventh Circuit Pattern Jury Instruction 4.08 states, "[i]n deciding your verdict, you should not consider the possible punishment for the defendant."

10

Because the potential penalties and possible collateral consequences are irrelevant to the jury's responsibilities, mention of them only serves the improper purpose of jury nullification. *See, e.g., United States v. Reagan*, 694 F.2d 1075, 1080 (7th Cir. 1982) ("the authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial") (citation omitted). Defendant should, therefore, be precluded from making any references to the possible penalties she faces. Similarly, any argument based on potential penalties or collateral consequences, such as her current suspension or potential impeachment, should be precluded.

## II. *Motion to prohibit defendant from presenting evidence, argument, or remarks designed to induce jury nullification, including, but not limited to appeals for the jury to decide the case based on their personal views of immigration policy and enforcement.*

After some of the hearings in this case, members of the defense team conducted media sessions on the courthouse steps. In these sessions, the defense indicated, among other things, that this prosecution represents an "attack on the independent judiciary" and that the case is "politically charged."

Such claims if made in court essentially would allege governmental misconduct, which is not a proper subject for the jury. *See United States v. Conley,* 5 F.4th 781, 799 (7th Cir. 2021) (reaffirming that the Seventh Circuit has "repeatedly rejected the existence of an outrageous [government] conduct defense"); *see also*

*United States v. Bontkowski*, 865 F.2d 129, 131 (7th Cir. 1989) (explaining that even if such a doctrine existed, it would be for the court, not a jury, to assess).

Relatedly, the defendant should not have the opportunity to reargue before the jury, even indirectly, any version of the immunity and separation of powers arguments that the Court rejected when denying her motion to dismiss. Arguments of that kind do not bear on the defendant's guilt and so should not be permitted. *See United States v. Mosky*, 1990 WL 70823, *1 (N. Ill. May 7, 1990) (Williams, J.) (granting government's *motion in limine* barring the defense "from arguing that the government's motives" were "based on political factors").

All these claims, if made before the jury, could be interpreted as an appeal to jury nullification. Under long-settled law, a defendant may not suggest that the jury should acquit even if it finds that the United States has met its burden of proof. *See, e.g., Smith v. Winters*, 337 F.3d 935, 938 (7th Cir. 2003) (stating that "[a] defendant has of course no right to ask the jury to disregard the judge's instructions . . . [a] defense that the law he is charged with violating is a bad law that the jury should refuse to enforce is no defense at all"); *Gibbs v. VanNatta*, 329 F.3d 582, 584 (7th Cir. 2003) ("A defendant's lawyer is not permitted to argue to the jury that it should disregard the law; nor does the judge let on to the jury that it has the power to acquit in the teeth of the law"); *United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997) ("Jury nullification is 'not to be positively sanctioned by

12

instructions,' but is to be viewed as an 'aberration under our system'"); *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996).

It is also improper to suggest that jurors should acquit based on disagreement with current immigration policy and enforcement priorities. Immigration is the subject of intense media coverage and contentious debate, but this case must be resolved based upon its own facts and the applicable law. Indeed, it would be a violation of jurors' sworn duty to consider their own views of immigration policy and enforcement in determining guilt or innocence. Accordingly, the United States requests that the Court specifically forbid jury nullification arguments based on appeals to such views.

### III. Motion to bar discovery requests or commentary regarding discovery in the presence of the jury.

In the presence of the jury, it is inappropriate to request discovery from a witness or opposing counsel, move the Court for discovery, or otherwise comment on discovery matters. Discovery-related discussions may create the false impression that the United States has suppressed information in this case as a means of seeking an unfair advantage. Thus, the jury might get the wrong impression that the United States has somehow improperly withheld information that it has, in fact, already produced. These requests, if appropriate, can easily be made to the Court or opposing counsel outside the presence of the jury with no prejudice resulting to either side. *See generally Thompson v. Glenmede Trust Co.*, 1996

13

WL 529693 (E.D. Pa. 1996) ("Rather than focus on the issues in the case, the jury may instead be misled by the irrelevant side issues of the discovery process. Therefore, the Court will not permit either party to refer to the discovery process in the presence of the jury at trial.").

The United States thus respectfully moves to preclude the defendant from raising these types of issues in the presence of the jury.

### IV.     Motion to bar the defendant from defining "reasonable doubt."

Attempts to define reasonable doubt for the jury are improper. *Bruce*, 109 F.3d at 329. Indeed, the Seventh Circuit has held that the term "reasonable doubt" should not be defined by either counsel or the trial court. *E.g., United States v. Anderson*, 303 F.3d 847, 857 (7th Cir. 2002); *United States v. Reynolds*, 64 F.3d 292, 298 (7th Cir. 1995). That is because any attempt to define the term "presents a risk without any real benefit"—that is, any definition of the term often leans toward "misleading refinements" that "weaken and make imprecise the existing phrase." *Id.*; *see also Anderson*, 303 F.3d at 857 (government argument was proper because "it was invited by defense counsel's own improper attempt to define the reasonable doubt standard"); *United States v. Blackburn*, 992 F.2d 666, 668 (7th Cir. 1993) (definitions of reasonable doubt are likely to "confuse juries more than the simple words themselves").

14

For these reasons, the Seventh Circuit has held that it is improper for attorneys to attempt to define reasonable doubt. *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1999); *see also United States v. Clancy*, No. 96–3317, 1999 WL 265164, at *8 (7th Cir. 1999); *Bruce*, 109 F.3d at 329; *United States v. Alex Janows & Co.*, 2 F.3d 716, 722–23 (7th Cir. 1993) ("It seems simple enough; we admonish counsel, do not define 'reasonable doubt' to a jury.").

Given the above, the United States moves this Court to preclude the defendant from making any attempt to define reasonable doubt for the jury.

### V. Motion to preclude defendant from eliciting her own out-of-court statements, including a statement she made to MPD officers.

As a general matter, the circumstances are few under which a defendant may introduce her own out-of-court statement at trial. Fed. R. Evid. 801(c) & (d)(1). When offered by the government, a defendant's out-of-court statement is that of a party opponent and thus not hearsay. When offered by the defense, however, such statements are generally hearsay. *United States v. Pulliam*, 973 F.3d 775, 783 (7th Cir. 2020), *as amended* (Sept. 8, 2020) (citation omitted).

One out-of-court statement that the defense may seek to introduce is a recorded statement the defendant gave to an MPD officer on April 22, 2025, several days after E.F.R.'s hearing. Judge Dugan had contacted police on an unrelated matter and began making self-serving statements about her interaction with E.F.R.

When the officers asked if this was related to why she had called police, Judge Dugan repeatedly indicted that there was no relation.

This self-serving statement is hearsay, if offered by the defendant for its truthfulness, and the "rule of completeness" does not require its admission. Federal Rule of Evidence 106, which codifies the rule, provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Although the government does anticipate eliciting testimony about some of the defendant's admissions in other contexts, the April 22, 2025, interview would not correct or clarify any of them, nor does fairness require the jury to hear the defendant's after-the-fact denial of wrongdoing. As the Seventh Circuit observed, "[d]efendants often try to justify their actions when speaking with . . . law enforcement officials by disclaiming criminal intent. Such an exculpatory statement has nothing to do with Rule 106." *United States v. Smith*, 150 F.4th 832, 849 (7th Cir. 2025) (noting that defendant was "free to take the stand and testify that he did not think he was doing anything wrong.").

Accordingly, the government asks for a pre-trial ruling that the defense is presumptively barred from introducing any of her own out-of-court statements at trial, including the April 22, 2025, statement to MPD officers.

## VI. Motion to bar argument or questioning concerning the motives of law enforcement.

As noted above, the defense team has claimed to reporters that that this case was as an attack on the independent judiciary and is politically charged. The defense team also told reporters that the government "rushed to judgment" in issuing charges and then was "stuck" going forward.

Evidence bearing on the United States' decision to prosecute is "extraneous and collateral" and should be excluded from trial. *See United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming exclusion of evidence offered to show that the "indictment was a political instrument"); *United States v. Berrigan*, 482 F.2d 171, 174-76 (3rd Cir. 1973) (affirming exclusion of evidence relating to "discriminatory prosecution"). Such evidence is not relevant to the jury's determination of a defendant's guilt or innocence. *United States v. Goulding*, 26 F.3d 656, 667 (7th Cir. 1994) (noting, even in the context of an entrapment defense, it was proper for the trial court not to "allow the defense to mount an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant"). The defendant, therefore, should be prevented from advancing forms of argument or questioning designed to inject issues of law enforcement's purported motivation or bias into this trial.

17

**VII.** *Motion to bar testimony, argument, or commentary to the effect that a judicial warrant is required for the arrest of an alien under the immigration laws.*

As explained above, while in the hallway on April 18, 2025, the defendant repeatedly informed ICE agents that they needed a judicial warrant to arrest E.F.R. Although the jury is entitled to hear that the defendant made this statement, the Court should not permit any suggestion from the defense that the statement is correct. There can be no dispute that the warrant for E.F.R.'s arrest was a valid and enforceable administrative warrant, issued pursuant to a provision of the Immigration and Nationality Act that authorizes the Attorney General, who has delegated her authority to the Secretary of Homeland Security, to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a); *see also* 8 C.F.R. §236.1(b) ("At the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed, the respondent may be arrested and taken into custody under the authority of Form I–200, Warrant of Arrest."). There is no authority for the proposition that a *judicial* warrant is needed to procure the arrest of an alien such as E.F.R. in a public hallway. Indeed, the evidence will show that the defendant had reason to know that an administrative warrant was sufficient. Just prior to the events of April 18, 2025, the defendant thanked a colleague for providing information about ICE enforcement activities in

18

courthouses, specifically that "ICE can legally conduct enforcement (i.e., take people into custody) in public areas of the courthouse," subject to certain limits, none of which applied to the circumstances of April 18, 2025.

## VIII. *Motion to bar evidence or argument concerning the arrest of the defendant or alluding to alternative means of bringing her to Court for an initial appearance.*

The defendant's arrest on April 25, 2025, was covered extensively by news media, prompting commentary about whether the government should have requested a summons or notice to appear. However, this debate is immaterial to the charges, which address the events of April 18, 2025. Evidence about how authorities secured the defendant's appearance and how she was transported to court, like evidence bearing on the decision whether to charge the defendant, should be excluded from trial as "extraneous and collateral." *Johnson*, 605 F.2d at 1030. The only purpose served by introducing such evidence would be to invite jurors to find fault with the government or conclude that she already has been punished for her wrongful conduct, encouraging jury nullification. Thus, in addition to being irrelevant, such evidence could potentially prejudice the government. *See Conley*, 5 F.4th at 799.

## IX. *Motion to bar evidence or comment concerning the duration of the investigation.*

For similar reasons, the duration of the investigation into the events of April 18, 2025, is not relevant to whether the government has proven its case beyond a

19

reasonable doubt. Members of the defense team have told the media that this case was a "rush to judgment." The evidence will speak for itself, and the jury will either agree or disagree that it establishes the defendant's guilt. Evidence or comment about the relatively short interval between the alleged crime and the issuance of charges is not relevant. *See United States v. Estell*, 641 Fed. Appx. 552, 556 (7th Cir. 2016) (". . . trial judges have discretion to limit argument on tangential issues that could confuse the jury, and that includes a defendant's complaints about the adequacy of the government's investigation."); *United States v. Robbins*, 197 F.3d 829, 845 (7th Cir. 1999) (affirming the trial court's refusal to have the "trial become a trial of the investigation."). *As* set forth above, argument or evidence regarding law enforcement's motivation is also not relevant to the jury's determination of a defendant's guilt or innocence. *Goulding*, 26 F.3d at 667.

## X. *Motion to bar argument that the defendant should not be convicted because she did not succeed in preventing E.F.R.'s arrest.*

In various filings, the defense has stressed that E.F.R. reentered the public hallway a "few feet," "at most 15 feet," or "15 feet or less" from the door to Courtroom 615. The defense also stressed that agents saw this and followed him. In addition, the defense team has advised government counsel that it believes that whether the agents could have called off the arrest or arrested E.F.R. elsewhere, including at his home, may be relevant to the case. The defense may also seek to draw attention to the fact that E.F.R. was eventually arrested despite defendant's

20

alleged actions. In other words, the defense may attempt to argue "no harm; no foul." Such comment should be disallowed because neither of the statutes charged in the indictment requires that the defendant succeed to be convicted or that law enforcement could have changed the location of the arrest.

As to concealment under 18 U.S.C. § 1071 (Count One), although some "affirmative, physical action" is required to harbor or conceal, "any physical act of providing assistance ... to aid the [wanted individual] in avoiding detection and apprehension will make out a violation of section 1071." *United States v. Lockhart*, 956 F.2d 1418, 1423 (7th Cir. 1992) (quoting *United States v. Stacey*, 896 F.2d 75, 77 (5th Cir.1990), and *United States v. Yarbrough*, 852 F.2d 1522, 1543 (9th Cir.1988)); *see also United States v. Biami*, 243 F.Supp. 917, 918 (E.D. Wis. 1965) (the word "conceal" in section 1071 means to "hide, secrete, or keep out of sight").

Because the focus is on the defendant's conduct, not law enforcement's knowledge or action, there is no requirement that the concealment succeed in delaying the arrest. *See, e.g., United States v. Hash*, 688 F.2d 52 (8th Cir.1982) (per curiam) (section 1071 does not require that the concealment last for any minimum amount of time); *Biami*, 243 F.Supp. at 918 (noting that because "the statute is directed at the conduct of the defendant," section 1071 can be violated even if law enforcement at all times knew the location of the wanted individual).

The same is true of endeavoring to obstruct proceedings under 18 U.S.C. § 1505 (Count Two). The crime is complete with the endeavor, which need not achieve its desired result. *See, e.g., United States v. Senffner*, 280 F.3d 755 (7th Cir. 2002) ("In order to prove that Senffner "endeavored" to obstruct an SEC proceeding under section 1505, the government need only show that Senffner's actions had the 'natural and probable' effect of interfering with that proceeding.").

Thus, for the defense to invite the jury to acquit the defendant on the basis that she did not succeed in preventing E.F.R.'s arrest would be improper.

## XI. Motion to bar evidence of other ICE enforcement actions in the Milwaukee County Courthouse or elsewhere.

The defense may seek to introduce evidence of other ICE enforcement actions in the Milwaukee County Courthouse or elsewhere. However, except to impeach a witness or show bias, such collateral evidence has no relevance to the events of April 18, 2025, and should be excluded from the jury's consideration.

## XII. Motion to bar evidence of defendant's alleged "good motives."

The defendant may argue that she acted with "good motives." Such arguments have the potential to mislead the jury, because they suggest the defendant was privileged to break the law because of her moral beliefs or "good motives." *United States v. Bissonette*, 586 F.2d 73, 76 (8th Cir. 1978) (Section 1505 defendant's "belief that she acted with a 'noble purpose' does not negative the

existence of the requisite statutory intent; the law does not permit the private luxury of determining if and when federal custody of a fugitive shall commence.").

### XIII. Motion to bar evidence of defendant's "prior good acts."

The defendant may seek to introduce evidence of her past law-abiding conduct. Regardless, evidence of "good" prior conduct is inadmissible under Federal Rule of Evidence 404(b) and should be disallowed. *See United States v. Hill*, 40 F.3d 164, 168 (7th Cir. 1994) (prohibiting admission of "good acts" to prove that a defendant "had a good character and acted in conformity therewith"). *See also United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012) ("Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment."); *United States v. Santos*, 65 F. Supp. 2d 802, 845-46 (N.D. Ill. 1999) ("A defendant may not seek to establish his innocence through proof of the absence of criminal acts on specific occasions.").

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court grant each of the United States' motions *in limine*.

Respectfully submitted on November 7, 2025.

/s/ Richard G. Frohling
Acting United States Attorney
State Bar No.: 1021952
Email: richard.frohling@usdoj.gov

23

/s/ Keith Alexander
Criminal Division Chief
State Bar No.: 1053000
Email: keith.alexander@usdoj.gov

/s/ Kelly B. Watzka
Deputy Criminal Division Chief
State Bar No.: 1023186
Email: kelly.watzka@usdoj.gov

/s/ Timothy W. Funnell
Green Bay Branch Chief
State Bar No.: 1022716
Email: tim.funnell@usdoj.gov

/s/ Jonathan H. Koenig
Appellate Chief
State Bar No.: 1045517
Email: jonathan.h.koenig@usdoj.gov

Attorneys for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Rm. 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738