UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *v.*                                  Case No. 25-CR-0089-LA

HANNAH C. DUGAN,

    *Defendant.*

## DEFENDANT'S RENEWED MOTIONS
## FOR JUDGMENT OF ACQUITTAL
## AND FOR NEW TRIAL

## I.

## INTRODUCTION

Hannah C. Dugan, by counsel, now moves again for judgment of acquittal on Count Two of the Indictment, pursuant to FED. R. CRIM. P. 29(a) and 29(c). Alternatively, she moves for a new trial on Count Two in the interests of justice, pursuant to FED. R. CRIM. P. 33(a), (b)(2).

As used and interpreted in this case, 18 U.S.C. § 1505 improperly permitted the conviction of any public official otherwise engaged in legal acts, so long as a "motive" for those legal acts was to impede ICE from executing an administrative warrant. Moreover,

ICE had no lawful right to execute the warrant in a state courthouse against a party with a court appearance that day. That conviction cannot stand, as a matter of law.

Dugan files this motion as the first and only judge in United States history to stand trial on an indictment for wholly official, good-faith acts untainted by graft, corruption, or self-dealing and that violated no individual constitutional right that the Reconstruction Amendments protect. A Massachusetts judge was the first to face such a criminal charge, in 2019. The Justice Department later dismissed her case, though. That leaves Hannah Dugan the first American judge ever to face trial and a guilty verdict on a felony charge for acts that all were "part of a judge's job," in the Magistrate Judge's words, that this Court later adopted. R43 at 30, adopted by R48, *United States v. Dugan*, 797 F. Supp.3d 855, 871, 890 (E.D. Wis. 2025).

## II.

## SUMMARY OF ARGUMENT

**A.** *No Crime Because Civil Arrests of Parties in Courthouses Violate a Privilege, Recently Applied Four Times to ICE Arrests in Courthouses.* The verdict on Count Two leaves Dugan convicted on grounds that four federal district courts from California to New York since 2020 have sought to prevent: ICE (Immigration and Customs Enforcement) agents cannot lawfully execute administrative warrants against parties in a county courthouse. Since 1894, Wisconsin has joined many other courts—including the U.S. Supreme Court—in establishing a common law privilege against the execution of civil process or civil arrest warrants (*e.g.* an ICE administrative warrant) on a party appearing in

a courthouse. This privilege specifically precludes ICE courthouse arrests for deportations or removal: so four district judges have held in just the last five-plus years, most recently in the month prior to the trial in this case. *See United States v. New York*, ___ F. Supp. 3d ___, 2025 WL 3205011 at *10 (N.D.N.Y 2025). Under the privilege, ICE had no legal authority to act on an administrative warrant within the Milwaukee County Courthouse on April 18, 2025. As to E.F.R. (Eduardo Flores Ruiz), Hannah Dugan therefore did not unlawfully impede the execution of a civil warrant in that building. The agents themselves violated a longstanding privilege barring exactly such civil arrests or service of process on parties and witnesses in courthouses.

   **B.** *No Proof of Required Nexus Between Conduct and Knowledge; Constructive Amendment Expanding the Indictment.* Counts One and Two charged essentially the same acts. Yet the jury returned a verdict of acquittal on the lesser, misdemeanor charge and a verdict of guilty on the more serious felony charge. Inconsistent verdicts are not inherently wrong or even unusual, but here the discrepancy is directly traceable to the Court giving opposing answers to two almost identical questions from the jury on the required knowledge needed for conviction. For Count Two, the Court improperly permitted a felony conviction on a weaker factual basis than the misdemeanor—and on conduct different from what the indictment actually charged. The Court's diluted explanation of the "nature of the proceeding" eliminated the required elements of knowledge and nexus, and improperly amended and expanded the indictment in the midst of jury deliberations.

**C.** *Felony Conviction on Misdemeanor Conduct at Most.* Similarly, the inconsistency of the verdicts underscores the incongruity and impermissibility of how the government and Court applied 18 U.S.C. § 1505 to Dugan in this case: conduct otherwise constituting a misdemeanor was converted into a felony with an overbroad reading of the "omnibus clause" of the statute. The United States Supreme Court has repeatedly (and recently) cautioned federal courts against such constructions. *See Fischer v. United States*, 603 U.S. 480, 486–98 (2024); *United States v. Marinello,* 584 U.S. 1, 9 (2018); *Fowler v. United States*, 563 U.S. 668, 672–78 (2011); *see also United States v. Aguilar*, 515 U.S. 593, 598–602 (1995); *United States v. McDonnell,* 579 U.S. 550, 562-54 (2016).

In 1948, Congress enacted a revised criminal code under which obstruction of or interference with an arrest consistently is a misdemeanor. *See, e.g.,* 18 U.S.C. § 1071 (concealing or harboring person for whom a warrant has been issued); 18 U.S.C. § 1501 (obstructing any legal process or officer attempting arrest); *see also* Act of June 25, 1948, chs. 49 & 73, 645, Pub. L. No. 80-772, 62 Stat. 683, 755, 769-70. At the same time, Congress enacted 18 U.S.C. § 1505 as a felony prohibiting "Influencing or Injuring Witness Before Agencies or Committee." *Id.* It concerns pending proceedings before agencies, not arrests. Nothing in the text or history of § 1505 demonstrates a congressional intent to expand § 1505 into a felony offense for the same conduct labeled a misdemeanor under §§ 1071 and 1501.

**D.** *All Lawful Acts.* The government's theory and theme were that a judge like Hannah Dugan had "no more right" than anyone else to impede an ICE arrest in the Milwaukee County Courthouse. The indictment alleged and the government argued a theory by which legally-authorized judicial acts were "corrupt" solely because of the

"improper motive" of impeding an (unlawful) ICE arrest. Such a construction subverts a pattern jury instruction in this circuit—legal acts are not obstruction—and the necessary proof of a corrupt endeavor as the United States Supreme Court explained it in *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005). "Innocent acts" of obstruction, whatever the motive, cannot form the basis of conviction. *Arthur Andersen*, 544 U.S. at 706–07. Here, the jury instructions mistakenly gave no guidance to the jury on how to consider Dugan's legal right to act as she did.

## III.

## STANDARD OF REVIEW

Rules 29 (a) and (c) of the Federal Rules of Criminal Procedure require a district court to enter a judgment of acquittal where the evidence is insufficient to convict. A court's role is not to substitute its view for the jurors' findings, but the court also cannot rubber-stamp a conviction simply because a jury returned a guilty verdict. *United States v. Garcia*, 919 F.3d 489, 496-98 (7th Cir. 2019). That is true particularly where proof is lacking on a specific element of the offense or where conviction was obtained on an erroneous interpretation of the law. *See, e.g. Aguilar*, 515 U.S. at 598–602.

Rule 33(a) of the Federal Rules of Criminal Procedure permits the district court to vacate any judgment and to grant a new trial if the interest of justice requires. *See, e.g., United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) (Rule 33 relief is available where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial"); *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) ("Rule 33's 'interest of justice'

standard allows the grant of a new trial where substantial legal error has occurred"); *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004) ("[A]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial;" (quoting CHARLES ALAN WRIGHT, FEDERAL PRACTICE & PROCEDURE § 556 (3d ed. 2004)).

A district court has broad discretion to grant a new trial. *United States v. Sabaini*, 161 F.4th 1036, 1043 (7th Cir. 2025); *see also United States v. Vicaria,* 12 F.3d 195, 198 (11th Cir. 1994) ("The basis for granting a new trial under Rule 33 is whether it is required 'in the interest of justice.' That is a broad standard. It is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous").

## IV.

## FACTUAL ALLEGATIONS RELATING TO COUNT TWO

Count Two of the Indictment listed five acts supporting the contention that Judge Dugan corruptly endeavored to obstruct an ICE administrative proceeding.

a. confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

b. upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c. addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d. directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e. advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

R6 at 2. The ICE administrative proceeding was specifically described as "the administrative arrest of E.F.R. [Eduardo Flores Ruiz] for purposes of removal proceedings conducted by the United States Department of Homeland Security." *Id.*

### Administrative Proceedings

The arrest warrant at issue was an ICE administrative warrant that did not identify a "pending proceeding" as a basis for the arrest:

Date: _____

**To: Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that ___FLORES-RUIZ, EDUARDO___ is removable from the United States. This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☑ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

ANTHONY M NIMTZ

Digitally signed by ANTHONY M NIMTZ
Date: 2025.04.17 15:04:46 -05'00'

Ex. 1A, Tr. 387-89.

Nonetheless, the ICE agent issuing the warrant described the internal ICE procedures in straightforward terms; they wanted to arrest E.F.R.:

Q. And what is – we've been talking about an enforcement.

What is an enforcement action?

A. An arrest.

Tr. 193.

The warrant itself was a "probable cause" determination—nothing more. Tr. 210. In fact, the internal determination regarding the issuance of this warrant consisted of the work of a single ICE agent, reviewing file information, and conversing with a

8

supervisor, who then signed the warrant. *See* Tr. 192, 387-89. The warrant was described as a first step to the "goal" of removal. Tr. 192, 211.

### *False Statement to ICE Task Force*

    a.  confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

None of the agents whom Dugan confronted in the hallway outside her courtroom testified that she told the agents they needed a judicial warrant to arrest E.F.R.

Joseph Vasconcellos, the lead ICE agent coordinating the arrest, testified that when Dugan approached him, she asked if he had judicial warrant. When he responded that it was an administrative warrant, she sent him to the Chief Judge's chambers.

> Q. Did she ask if you had a warrant?
>
> A. She asked if I had a signed judicial warrant.
>
> Q. And what did you say?
>
> A. I said no, I had an administrative warrant.
>
> Q. So after you told her that you had an administrative
>
> warrant, you said that she -- where did she direct you to go?
>
> A. To the chief judge -- to the chief judge's chambers.

Tr. 403-04. Vasconcellos never testified that Judge Dugan said he needed a judicial warrant to effectuate the arrest. *Id.*

Phillip Jackling, the FBI agent sitting with Vasconcellos in the courthouse hallway, testified similarly.

> Q. Okay. What do you recall hearing Judge Dugan say when she

first addressed Officer Vasconcellos?

A. She asked him why he was there.

Q. Okay. And how did he respond?

A. He said to make an arrest.

Q. Okay. And was Judge Dugan satisfied with that response?

A. No. She asked him if it was a judicial warrant.

Q. Okay. And did Officer Vasconcellos respond to that?

A. He said it was not a judicial warrant.

Tr. 319. Jackling never testified that Dugan said they needed a judicial warrant to effectuate the arrest. *Id.*

None of the other agents testified that they heard Dugan say they needed a judicial warrant to arrest, either. Tr. 257-59; 363-67; 536-39. Only Judge Kristela Cervera, testifying for the prosecution, said that Dugan made such a statement. But Judge Cervera added that she herself also told the agents, "I think she's right about that." Tr. 457.

### *Direction to Chief Judge's Office*

    b. upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

As the Court can recall, the reasons were very much contested by the parties at trial, with the prosecution contending that Dugan sent the agents to the Chief Judge's office as a ruse to clear the hall and the defense responding that her actions were consistent with the draft policy prepared by the Chief Judge and a separate suggestion from fellow

10

Judge Laura Gramling Perez. *See, e.g.,* Ex. 9 (draft policy at Bates 1393); Tr. 791. Further, government agents offered no evidence that Dugan "learned" that the warrant was for E.F.R. To the contrary, the agents testified that they did not show Dugan the warrant, much less tell her the name of the person to be arrested. Tr. 319, 403-04.

### Off-the-Record Hearing

    c.  addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

The defense did not dispute that the E.F.R. matter was addressed off-the-record. Instead, the defense elicited testimony that Milwaukee County judges, particularly Dugan, called "hundreds" of cases off-the-record as a matter of expediency. Tr. 747, 680-83. On April 18, 2025, alone (the date of the offense in Count Two) Dugan addressed at least nine matters off-the-record. Tr. 681-82. Milwaukee County judges possess independent authority to decide whether to hear a case off-the-record. Tr. 475-76. Although the E.F.R. matter was addressed off-the-record, it still took place in open court with the participants speaking into microphones. Tr. 729.

### Exit Through Non-Public Jury Door

    d.  directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

The bare fact that E.F.R. and his counsel left the courtroom through the jury door was not contested. The prosecution contended that Dugan wanted E.F.R. to leave unseen "down the stairs" by the fifth-floor stairwell and that she would "get the heat" for such actions. *See e.g.* Tr. 752, 761. The defense noted that Dugan never mentioned the fifth-

floor stairwell to defense counsel or her client, whether in the courtroom or in private. Tr. 729 (testimony of counsel Mercedes De La Rosa). Instead, when in the non-public corridor, through express words and gestures, Dugan directed defense counsel and her client to go straight ahead to the sixth-floor public hallway. Tr. 729. The defense further elicited testimony that Milwaukee County judges possess the authority to let counsel and their clients leave through a non-public door of the courtroom, particularly where issues of public safety may arise. Tr. 476-77, 509-11; *see also* 723-24, 730, 745.

In closing arguments, the prosecution repeatedly told the jury that guilt did not hinge on whether Dugan intended E.F.R. to turn left to the stairwell to the fifth floor; rather, the offense was "complete" as soon as Dugan allowed E.F.R. and his attorney to leave through the jury door at all. Tr. 822, 881, 892. In fact, E.F.R. re-entered the public hallway just under 12 feet from the main courtroom door and well within view of two federal agents—indeed, the agents did not even realize which door the defense lawyer and E.F.R. had used. Tr. 522-23.

### *Zoom Hearing*

e. advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

The defense did not dispute that Dugan told counsel for E.F.R. that "everybody can use Zoom." Tr. 725. Milwaukee County judges possess authority to hold hearings by Zoom. Tr. 476.

*Judge Dugan's Knowledge of E.F.R. Administrative Proceeding*

Dugan had no way to know the name of the person ICE was seeking. In particular, agents never showed the warrant to Dugan; never told her that E.F.R. was the person sought; and never told her that an administrative deportation proceeding involving E.F.R. was the intended goal. Tr. 319, 403-04. The ICE agents did not in any way communicate the existence or details of an ICE deportation proceeding, other than the general statement that they were in the Milwaukee County Courthouse to execute an administrative warrant. *Id*. Judge Dugan never told E.F.R. or his lawyer that ICE agents were there to arrest him. Tr. 727.

# V.

## ARGUMENT

A.     *On these Facts, No Crime Occurred Because Executing Administrative Arrest Warrants in a Courthouse Violates a Longstanding Common Law Privilege.*

On April 18, 2025, Hannah Dugan, in her role as a judicial officer, acted consistently with an established privilege barring civil arrests of parties in courthouses. Federal and state courts long have recognized that common-law privilege preventing civil arrest or service of civil process for parties and witnesses who are in, entering, or leaving courthouses for a hearing or other proceeding. Four well-reasoned district court opinions since 2020 (one as recent as November 2025) have applied that privilege to ICE arrests like this one in state courthouses.

This privilege specifically precludes ICE courthouse arrests for deportations or removal. *New York v. U.S. Immigration and Customs Enforcement*, 431 F. Supp. 3d 377, 391 (S.D.N.Y. 2019) (Rakoff, J.) (later vacated by agreement when ICE consented to the relief sought, 2023 WL 2333979 (2d Cir. Feb. 28, 2023)).

Soon after Judge Rakoff's decision, Judge Alison Nathan agreed with him on reasoning she explained at length and on the basis of New York's state privilege. *Doe v. U.S. Immigration and Customs Enforcement*, 490 F. Supp. 3d 672, 679–81, 689–94 (S.D.N.Y. 2020) (relying only on this privilege under New York law and declining to decide whether federal law provides a similar privilege). Judge Nathan noted that her decision was not even necessarily in tension with *Ryan v. U.S. Immigration & Customs Enforcement*, 974 F.3d 9 (1st Cir. 2020), a case that might at first seem inconsistent. There, the First Circuit did not decide whether federal immigration statutes reflect Congress's clear and manifest purpose to pre-empt state common law, because the district court had not addressed that argument. *Doe*, 490 F. Supp.3d at 692 n.3.

Similarly, in *Velazquez-Hernandez v. U.S. Immigration and Customs Enforcement*, the Southern District of California granted non-citizen plaintiffs a temporary restraining order barring ICE from civil arrests in courthouses. 500 F. Supp. 3d 1132, 1136–37 (S.D. Cal. 2020). It concluded that "[t]he common-law rule against civil courthouse arrest is incorporated in the [Immigration and Nationality Act] and ensures that courts everywhere are open, accessible, free from interruption, and able to protect the rights of all who come before the court." *Velazquez-Hernandez*, 500 F. Supp.3d at 1137; *see* 8 U.S.C. § 1357(a)(2).

And that court rejected the argument that the privilege does not apply against the federal government. *Id.* at 1145 (declining to follow *Ryan*). *Ryan* is a an outlier. It is the only court that has concluded the federal government's interests in immigration enforcement override the purposes underlying the privilege. "As we already have made pellucid," Judge Selya wrote for that panel, "civil immigration arrests implicate uniquely sovereign interests. Consequently, the purposes underlying the common law privilege comprise too frail a foundation for an assumption that the privilege would have applied to civil immigration arrests." *Ryan*, 974 F.3d at 27.

The *Velazquez-Hernandez* court correctly recognized, though, that *Ryan* ignored something basic and settled: the purpose of the privilege is to protect the court, an independent branch of government. "The Executive may have sovereign power over immigration enforcement," it explained, "but the Executive does not have sovereign power over the court." 500 F. Supp. 3d at 1145.

Neither can the federal executive branch extend its grasp to state courts in this way, by abrogating the privilege; so held the most recent of the four district court cases lined up against *Ryan*. *See United States v. New York*, 2025 WL 3205011 at *10 (declining to extend *Ryan* to civil arrests in New York state courthouses). Courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.*, quoting *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 316 (1981). The Supreme Court itself continues to include "'due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy.'"

*City of Milwaukee*, 451 U.S. at 362, quoting *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243 (1959).

The Southern District of California and the Northern District of New York were right. *Ryan* did not consider carefully *whose* "uniquely sovereign interests" rightly are at stake when federal agents operate in state courthouses. Yes, of course the Supremacy Clause, U.S. CONST. art. VI, cl. 2, applies everywhere. But courts do not seek to create conflicts between state and federal laws; they seek to avoid those where they can. For all the lengthy exposition of the privilege and its common law roots, the *Ryan* court never identified what law enacted by Congress meant to, or unavoidably did, preempt state constitutions and statutes governing state courthouses and their operation.

Perhaps of more concern, the *Ryan* court flipped non-derogation doctrine on its head. Rather than looking for clear evidence that Congress meant a given Act to override or *exclude* common law, it sought and did not find clear evidence that Congress meant, with the 1952 Immigration & Nationality Act, to *include* the common law privilege that *Ryan* itself acknowledged. *Ryan*, 974 F.3d at 23. That was upside down, especially in an area that affects the constitutional balance of powers between state and federal governments. *See, e.g.,* *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (a case also concerning the states' sovereign power to define their judges' powers; "[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute;'" quoting and citing earlier cases); *City of Milwaukee*, 451 U.S. at 316; *Doe*, 490 F. Supp.3d at 692 ("The INA does not contain the

requisite clear and manifest congressional purpose to preempt the New York state common law privilege against civil courthouse arrests").

In this setting, as in *United States v. Illinois*, 796 F. Supp.3d 494, 512–24 (N.D. Ill. 2025), the Tenth Amendment is at stake. The default position is to assume that Congress did not act in derogation of common law or other state law, rather than to assume it did and make a challenger prove otherwise.

In the end, the district courts that have upheld the privilege against civil arrest or service of civil service as to litigants in courthouses are more persuasive. *See New York v. ICE*, 431 F. Supp.3d at 389–92; *Velazquez-Hernandez*, 500 F. Supp.3d at 1137; *United States v. New York*, 2025 WL 3205011 at *10; *Doe*, 490 F. Supp.3d at 691–92 (federal law does not preempt state privilege against state courthouse arrests).

Indeed, no court to date has followed the labored reasoning in *Ryan*. To the contrary, four well-reasoned, careful federal district court decisions explicitly or implicitly reject it. And in Judge Rakoff's case, the government in the end acceded to his view.

This privilege against civil arrest of parties in courthouses, or service of civil process, is alive broadly under federal law and in Wisconsin. It is well settled across the country. *See, e.g., Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *Page Co. v MacDonald*, 261 U.S. 446, 447 (1923); *Stewart v. Ramsay*, 242 U.S. 128, 129–30 (1916) (all three concerning federal law); *Lyf-Alum, Inc. v. C&M Aluminum Supply Corp.*, 29 Wis. 2d 593, 596–98, 139 N.W.2d 601, 603–04 (1966); *Harvey v. Harvey*, 199 Wis. 212, 225 N.W. 703 (1929); *Rix v. Sprague Canning Mach. Co.*, 157 Wis. 572, 144 N.W. 1001, 1002 (1914) (all three concerning Wisconsin law);

*Durst v. Tautges, Wilder & McDonald*, 44 F.2d 507, 508–09 (7th Cir. 1930) (citing both federal and state cases, including but not limited to Wisconsin cases).

The privilege also is longstanding. An 1894 Wisconsin Supreme Court decision describes well both Wisconsin law on this privilege and the common-law privilege more generally. It involved a judge who was served civil process in the courthouse. *Cameron v. Roberts*, 87 Wis. 291, 58 N.W. 376, 376–77 (1894). The Court concluded that the service was improper. It observed that "[i]t has long been settled that parties and witnesses attending in good faith any legal tribunal are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning." *Id.* (alteration accepted), quoting *Larned v. Griffin*, 12 Fed. 590 (D. Mass. 1882). And for good reason, as the Court noted. "The reasons for the rule are manifest. No court should be subject to such interruptions. Parties necessarily in attendance upon court should be free to attend to their duties without disturbance or fear of it. The rule is made to subserve the best interests of the public, and the due and speedy administration of justice." *Cameron*, 58 N.W. at 377.

The United States Supreme Court, too, long has recognized the privilege. The Court explained in *Stewart* in 1916, "The true rule, well founded in reason and sustained by the greater weight of authority, is that suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going." 242 U.S. at 129. Again, for good reason: "[T]his great object in the administration of justice would in a variety of ways be obstructed if parties and witnesses were liable to be served with process while actually attending the court." *Id.*

If useful, this Court can turn to an academic summary as well. Just eight years ago, an article explained both the roots of this privilege, tracing to the fifteenth century, and its renewed relevance now with ICE arrests in courthouses. Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 YALE L.J. FORUM 410 (2017).

This is not a privilege of the party or witness directly or exclusively. Instead, it "is the privilege of the court, rather than of the defendant." *Stewart*, 242 U.S. at 130. As the Seventh Circuit put it over ninety years ago, "It is not simply a personal privilege, but it is also the privilege of the court, and is deemed necessary for the maintenance of its authority and in order to promote the due and efficient administration of justice." *Durst*, 44 F.2d at 508–09.

Here, Dugan's actions were on behalf of the court itself. This is part of why Dugan and her fellow judge properly donned their robes in the hallway. They were engaged as judicial officers, acting and speaking for the court. Dugan directed the federal agents to the Chief Judge's office to address there the questions of where, and whether, they could execute a civil arrest warrant in the Milwaukee County Courthouse. As a matter of the chain of judicial authority, that was well within her authority, and probably her most appropriate course of action.

While some of the Wisconsin cases and others, contrary to *Durst* and *Stewart v. Ramsay*, extend this privilege only to non-residents, that helps the government not at all. Its underlying point all along, the very reason for his civil arrest, was that E.F.R. was a non-resident—an unwelcome one at that—of both this state and the whole country.

Application of the privilege is straightforward here, then. Immigration generally and removal proceedings specifically are civil, not criminal. *See Demore v. Kim*, 538 U.S. 510, 515 (2003) (noting that no-bail provision of immigration statute is "civil detention"); *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038–39 (1984) (immigration proceedings are civil). The process occurs in administrative courts and under civil burdens of persuasion. The goal of removal is deporting an alien, not incarcerating or punishing him. Here, the government was seeking only to deport E.F.R., not to charge him with a crime. Tr. 192, 211. That civil arrest could not occur lawfully in a courthouse, then, if the person sought was a party or litigant there. E.F.R. indisputably was. He was a defendant in a misdemeanor case pending in Dugan's own courtroom.

Further, where there is no valid legal basis to arrest, there is no unlawful obstruction of that arrest. *United States v. McDonald*, 26 F. Cas. 974, 976 (E.D. Wis. 1879) (federal officers must be acting in good faith and lawfully in order to be obstructed); *Dovel v. United States*, 299 F. 948, 949 (7th Cir. 1924) (no crime of obstructing a search unless government proves it had a valid warrant); *United States v. Dentice*, 289 F. Supp. 799, 800 (E.D. Wis. 1968) ("If the statute making it a crime to resist an officer in the performance of his official duties did not require that the officer in fact be acting in an official capacity—*i.e.*, pursuant to valid authority—then criminal sanctions could be imposed upon a citizen for asserting his constitutional rights. Such a result would clearly not be consonant with our system of constitutional safeguards and protections").

Throughout this case, the government's claim has been that executing the arrest warrant in the Milwaukee County Courthouse was a step in a "pending proceeding,"

as it and the Court defined that term broadly. The prosecution theory, then, was that Dugan obstructed or impeded that pending proceeding corruptly by her acts that morning.

That is not tenable, as a matter of law. E.F.R., like any party with a pending case, enjoyed the privilege to come and go from his court appearance that day without execution of a civil arrest warrant or service of civil process. Whatever the accuracy of the government's claim that there was a pending proceeding against E.F.R., he was out of reach in that courthouse on that day. Even if Dugan had prevented his arrest altogether, which she did not on the undisputed evidence, there could have been no obstructing or impeding. In that place and on that day as to E.F.R., federal agents had no right to execute that civil warrant or otherwise serve civil process at all.

**B.** ***The Government Failed to Prove the Required Nexus Between the Conduct and Knowledge of the Specific, Charged Administrative Proceeding, and the Jury Instructions Constructively Amended the Indictment to Permit Conviction Without Proof of the Charged Conduct.***

**1.    Indictment and Answer to Jury Question on Count Two.**

Count Two alleged a violation of 18 U.S.C. § 1505 through five specific acts that Judge Dugan undertook, all tied to the same particularly identified pending administrative proceeding: "the administrative arrest of E.F.R." R6 at 2. In fact, the indictment left no doubt that the government was bound to prove that Dugan acted with specific knowledge that the administrative warrant was for E.F.R.:

     a.  confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

     b.  upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

*Id.*

During deliberations, when jurors not surprisingly inquired as to Dugan's required level of knowledge regarding the identify of E.F.R. as the subject of the arrest or proceeding, the government backtracked, repeatedly arguing that knowledge of "a" warrant not tied to a specific name was sufficient for conviction. *See* Tr. 920-23 (prosecutor arguing, "You don't have to know the specific identity of someone for a pending proceeding;" "She doesn't have to know who the arrest warrant is for to impede"). Over defense objection, the Court adopted the government's position and instructed the jury as follows:

> To know of, and the word "of" is underlined, the pending proceeding the defendant needed to have sufficient knowledge about the nature of the proceeding.

Tr. 926.

The sequence of events leading to the question and answer on Count Two demonstrates the significance. The Court received two near-identical questions posed by the jury, one as to each count. First, as to Count One, the jury asked the Court "whether or not Judge Dugan needed to know the identity of the subject of the arrest warrant, for example, his specific name." Tr. 909. To answer the question, the Court looked to the grand jury indictment and language of element two of the charged offense. Tr. 909-18. The Court

ultimately responded correctly, "in order to commit the offense charged in count 1, the defendant needed to know the identity the subject of the warrant." Tr. 918.

The jury then asked the next substantive question, this time related to the second element of Count Two: "whether or not Judge Dugan needed to know the identity of the subject of the pending proceeding." Tr. 919. In arguing how that question should be answered, the defense asserted that the answer should be yes, like the answer for Count One. To support its position, the defense pointed to the language of the grand jury's indictment, which specifically alleged that Dugan endeavored to "influence, obstruct, and impede the due and proper administration of law under which a pending proceeding, . . . namely the administrative arrest of E.F.R. . . ." R6 at 2. It followed, the defense argued, that the government had to prove beyond a reasonable doubt that Dugan knew of "the administrative arrest of E.F.R," the pending proceeding specifically listed in the indictment. *Id.*

As noted above, the government shifted away from its own indictment and repeatedly contended that no such knowledge was needed. Tr. 919-26. The Court took the matter under advisement and considered it in chambers for nearly thirty minutes before answering the question on Count Two. Its answer was different from the prior response on Count One: "To know <u>of</u> the pending proceeding, the defendant needed to have sufficient knowledge about the nature of the pending proceeding." Tr. 926.

That response to the jury on Count Two was error. When responding to a jury question, a court must state the law correctly and answer the question specifically. *United States v. Zhao,* 141 F.4th 833, 845 (7th Cir. 2025). Knowledge of the particular proceeding is

the required element under 18 U.S.C. § 1505, principally since that knowledge must provide the required "nexus" of the defendants' obstructive actions to the identified and charged proceeding. The answer also betrayed the indictment, at the government's urging. Merely to have "sufficient knowledge" (whatever that meant) of the "nature of the pending proceeding" does not establish guilt under § 1505.

### 2. Section 1505 Must Be Construed Narrowly.

Why? The Supreme Court's recent decisions on obstruction of justice offenses, a group of crimes in 18 U.S.C. Ch. 73 that includes § 1505, and public corruption crimes have narrowed them, not expanded them. *See Fischer*, 603 U.S. at 486–98 (narrowing § 1512(c)(2) to acts impairing the availability or integrity of evidence used in a proceeding); *see also id*. at 504 (Jackson, J., concurring) ("The Government's interpretation of § 1512(c)(2), by contrast, exhibits all the generality of these catchall misdemeanor obstruction provisions while displaying none of their restraint"); *Marinello,* 584 U.S. at 9 (IRS obstruction statute narrowed so as to prevent misdemeanors from being converted into felonies); *Fowler*, 563 U.S. at 672–78 (in prosecution for witness tampering, 18 U.S.C. § 1512(a)(1)(C), by killing a witness, government must prove a reasonable likelihood that the witness would have provided information to a federal law enforcement officer); *Aguilar*, 515 U.S. at 598–602 (federal judge charged under 18 U.S.C. § 1503 for disclosing wiretap information and endeavoring to obstruct justice; conviction reversed in part because no "nexus" of time, causation, or logic where there was no evidence that judge knew his false statements to FBI would be presented to grand jury); *see also Snyder v. United States*, 603 U.S. 1, 10–18 (2024) (a gratuity after the fact is not a "bribe" covered by 18 U.S.C. § 666). The Court has cautioned

that these types of broad statutes cannot be converted into catch-all provisions where inadequate notice is given as to what does and does not constitute a criminal offense. *Aguilar,* 515 U.S. at 599; *United States v. McDonnell,* 579 U.S. 550, 562–54 (2016).

>   **3.** **The Government Should Have Been Held to Prove that Dugan Had Knowledge of "The" Charged Proceeding, not "A" Proceeding or the "Nature" of Some Proceeding.**

The Seventh Circuit pattern jury instructions that this Court relied upon to explain § 1505 required the government to prove that the defendant knew of "the" pending proceeding. R55 at 23; R94 at 21. In fact, the Seventh Circuit requires that the jury unanimously agree on which proceeding is being obstructed, even if only one proceeding has been charged. *See* PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT, 713-14 (Definition of Official Proceeding), including Committee Comment citing to *United States v. Kaplan*, 490 F.3d 110, 126–27 (2d Cir. 2007) (a case involving section 1512 in which the court said, "it would surely have been more prudent, even where the evidence only points to one federal proceeding, for the district judge to identify the 'particular' federal proceeding that the defendant intended to obstruct"). Unanimity would not be needed if the obstruction statutes required only a general knowledge of *any* pending administrative proceedings, as opposed to requiring that a defendant's actions be knowingly directed towards a specific identified agency proceeding that the indictment charged.

Other circuit courts have held likewise: that the defendant's conduct must have contemplated obstruction of a known, "particular" proceeding. *See United States v. Abdullahi*, 144 F.4th 1034, 1041-44 (8th Cir. 2025) (reversing § 1512 witness tampering charge); *United States v. Sutton,* 30 F.4th 981, 983-84 (10th Cir. 2022) (§ 1512 conviction

25

Case 2:25-cr-00089-LA    Filed 01/30/26    Page 25 of 46    Document 109

overturned where defendant intended to obstruct state proceeding, but had no knowledge of pending federal proceeding).[1]

> **4.  The Government Needed to Prove Knowledge of the Particular Proceeding and the "Nexus" of that Knowledge to Acts Constituting Obstruction.**

This knowledge requirement is no mere technicality, since the government must prove that a defendant's knowledge and conduct have a direct, contemplated "nexus" to the charged proceeding. A general, ill-intent is not sufficient. *See Aguilar,* 515 U.S. at 601 (false statement to federal agent did not support knowledge that false statement would be conveyed to grand jury in violations of 18 U.S.C. § 1503, even where defendant was aware that grand jury proceedings were possible). As *Aguilar* held:

> The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority. Some courts have phrased this showing as a "nexus" requirement—that the act must have a relationship in time, causation, or logic with the judicial proceedings. In other words, the endeavor must have the "natural and probable effect" of interfering with the due administration of justice.

515 U.S. at 599.

On the other hand, "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *Id.* Without proof of knowledge of the specific administrative proceeding, the necessary nexus is severed. That is exactly what happened here. Judge Dugan never was told that the administrative proceeding (or even the warrant) concerned E.F.R.

---

[1] Section 1505 further requires that the proceeding be "pending," not simply "foreseeable" as section 1512 permits.

### 5. The Court's Improper Response to the Jury Constructively Amended the Indictment.

"A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Rogers*, 44 F.4th 728, 735-736 (7th Cir. 2022) (citing *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1988) (additional citations omitted)). Where an improper broadening of the indictment occurs, a subsequent conviction must be overturned. *See also United States v. Muresanu*, 951 F.3d at 839 (jury instruction improperly "altered the substance of the indictment" by changing the offense charged from an attempt to a completed offense).

The "nature of the proceeding" language is found nowhere in the actual criminal statute, 18 U.S.C. § 1505, and runs specifically contrary to *Aguilar*, which analyzed the similar terms of § 1503. There, a judge was convicted of obstructing the grand jury by lying to an FBI agent assisting a grand jury investigation. The judge knew of the grand jury investigation because he was specifically told that a grand jury was investigating. *Id.* at 600. Yet the conviction was overturned because it was not enough that the judge understood the general nature of the existing proceeding and a possible connection of his interview to it. He needed to know that his conduct was specifically directed toward the grand jury proceeding; needed to know that his false statement would be provided by the FBI agent to the grand jury. *Id.* at 601.

The use of the words "nature of" relieved the government of proving beyond a reasonable doubt that Dugan knew that the administrative arrest warrant at issue in this

case was specifically for E.F.R., the particular proceeding alleged in the grand jury indictment. As outlined above, that was the specific knowledge necessary for conviction.

> **6.** **The Government Failed to Prove Dugan's Knowledge of the Particular Proceeding and Further Failed to Establish the "Nexus" to the Acts Constituting Obstruction.**

The error was not just in the Court's response to the jury, but in the evidence presented. As the question and verdict on Count One demonstrate, Tr. 917, 927, the government failed to prove beyond a reasonable doubt that Dugan's actions were undertaken with specific knowledge that the administrative proceeding involved E.F.R. Again, for Count One the Court instructed the jury that, "In order to commit the offense charged in Count 1, the defendant needed to know the identity of the subject of the warrant." Tr. 917. Once receiving this guidance, the jury returned a verdict of not guilty. Tr. 927. For Count Two, though, the jury was told only to find that Dugan had "sufficient knowledge," an empty tautology, of the "nature" of the administrative proceeding. Tr. 926. A guilty verdict followed. Tr. 927. Logically, had the jury been instructed on Count Two as it was appropriately instructed on Count One, a not guilty verdict would have followed. Either acquittal or a new trial must follow now.[2]

> **C.** **Congress Did Not Intend 18 U.S.C. § 1505 to Convert Misdemeanors Into Felonies.**

On June 25, 1948, Congress enacted a revised criminal code, including a series of misdemeanor offenses for obstructing or interfering with arrests or other legal process. *See, e.g.,* 18 U.S.C. § 1071 (concealing or harboring person for whom a warrant has been

---

[2] An order granting a new trial could be in addition to, and in the alternative to, an acquittal.

issued); and 18 U.S.C. § 1501 (obstructing any legal process or officer attempting arrest); *see also* Act of June 25, 1948, chs. 49 & 73, 645, Pub. L. No. 80-772, 62 Stat. 683, 755, 769-70.[3]

On the same day, Congress enacted 18 U.S.C. § 1505 to prohibit "Influencing or Injuring Witness Before Agencies or Committee." *Id.*[4] Section 1505 included an omnibus provision prohibiting conduct that obstructed the administration of justice "under which such proceeding is being had before such department or agency" of the United States. *Id.* Nothing in the text or history of § 1505 demonstrates congressional intent to make § 1505 a felony offense for the precise conduct labeled a misdemeanor under §§ 1071 and 1501.

Since its enactment, courts have sought to put sensible limits on § 1505, preventing the broad omnibus clause in the statute from encompassing every slight disruption of any federal agency action. One such limit has been the distinction between law enforcement activity and adjudication or rulemaking, the former being outside the scope of the statute. *See United States v. Higgins,* 511 F. Supp. 453, 455 (W.D. Ky. 1981) ("It is significant to the Court that in the eighty-two years this statute or its predecessor has been on the books, it has apparently never been applied to a criminal investigation by a federal law enforcement agency").

Another distinction, more recent, is that "omnibus clauses" should not be construed to supersede statutes addressing more specific, distinctly described conduct. *See Fischer v. United States,* 603 U.S. at 492-93 (reversing conviction of January 6 defendant under

---

[3] Other misdemeanor obstruction provisions included 18 U.S.C. § 1502 (resistance to extradition agent) and 18 U.S.C. § 1504 (improper influencing a juror by writing).

[4] A similar version to § 1505 had been enacted in 1940 as 18 U.S.C. § 241a and was repealed by the 1948 statute.

omnibus obstruction clause of 18 U.S.C. § 1512(c)(2)), and *Marinello,* 584 U.S. at 9 (similarly

limiting reach of 26 U.S.C. § 7212(a) IRS omnibus obstruction clause).

In *Fischer*, the Court looked to the several obstruction statutes and the variety

of penalties applied to each. It held that "an unbounded" interpretation of the omnibus

clause would make superfluous most of the other congressional enactments delineating

different punishments for defendant levels of conduct. 603 U.S. at 492-93.

Justice Jackson's concurrence in *Fischer* is particularly helpful on this point.

She surveyed broadly drafted state *misdemeanor* obstruction statutes as a basis to narrow the

application of federal *felony* obstruction:

> Here, it beggars belief that Congress would have inserted a breathtakingly broad, first-of-its-kind criminal obstruction statute (accompanied by a substantial 20-year maximum penalty) in the midst of a significantly more granular series of obstruction prohibitions without clarifying its intent to do so— not in the text of the provision itself, nor in the surrounding statutory context, nor in any statement issued during the enactment process.

603 U.S. at 505. In rejecting the government's broad interpretation of obstruction statutes,

she noted, "The Government's interpretation of § 1512(c)(2), by contrast, exhibits all the

generality of these catchall misdemeanor obstruction provisions while displaying none of

their restraint." *Id.* at 504.

Likewise, in *Marinello,* the Court similarly explained, "To interpret the

Omnibus Clause as applying to all [IRS] Code administration would transform many, if not

all [Title 26] misdemeanors into felonies, making the specific provisions redundant, or

perhaps the subject matter of plea bargaining." The Court specifically pointed to § 1505 as

logically doing likewise:

Indeed, as the dissent notes [opinion of Thomas, J.], Marinello's preferred reading of § 7212 potentially overlaps with another provision of federal law that criminalizes the obstruction of "the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States." 18 U.S.C. § 1505. But we have not found any case from this Court interpreting a statutory provision that would create overlap and redundancy to the degree that would result from the Government's broad reading of § 7212—particularly when it would render superfluous other provision in the same enactment.

*Marinello*, 584 U.S. at 9 (internal quotation and citations omitted).

Here, the indictment plainly charged Dugan with obstructing the arrest of a particular person, namely E.F.R. R6 at 2. Notably, the arrest warrant itself specifically declined to identify a "pending proceeding" as a basis for the arrest:

Date: _____

To:     **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that ___FLORES-RUIZ, EDUARDO___ is removable from the United States. This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☑ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

ANTHONY M NIMTZ          Digitally signed by ANTHONY M NIMTZ
                         Date: 2025.04.17 15:04:46 -05'00'

31

Ex. 1A, Tr. 387-89. The ICE agent issuing the warrant likewise described the "enforcement action" at issue in straightforward terms:

> Q. And what is – we've been talking about an enforcement.
> What is an enforcement action?
> A. An arrest.

Tr. 193.

The warrant itself was a "probable cause" determination—nothing more. Tr. 210. In fact, the internal determination regarding the issuance of this warrant consisted of the work of a single ICE agent, reviewing file information, and his conversation with a supervisor, who then signed the warrant. *See* Tr. 192, 387-89.[5]

Apparently recognizing this deficiency, the government at trial took pains to link the arrest as a first step to the "goal" of removal. Tr. 192, 211. In short, it turned misdemeanor obstruction of an arrest into felony obstruction of a pending proceeding.

But on that proposition, the potential eventual arrests of all 10 million-plus illegal immigrants in this country would become separate *pending* administrative proceedings protected by § 1505 from innumerable acts that conceivably might slow or affect those arrests.[6] Moreover, that illogic comes on top of the expansive definition of "pending proceeding before" described above and in the pretrial motions. Reading "before" out of the statute allows ICE to inflate into a felony any of the misdemeanor charges for non-

---

[5] The government also introduced evidence that the ICE agents could arrest on probable cause even without the existence of a warrant. Tr. 492-93.

[6] The estimated number of illegal immigrants in this country comes from the U.S. Department of Homeland Security, "Estimates of the Illegal Alien Population Residing in the United States," ohss.dhs.gov/topics/immigration/illegal/population-estimates.

violent obstruction of an arrest since, as the agents claimed at trial, all such arrests are linked to administrative proceedings and potential deportation. Tr. 193-94, 209-13. Nothing in the text or history of § 1505 supports such a broad reading or application of the statute to the facts at issue.[7]

Based on the reasoning of *Fischer* and *Marinello*, the guilty verdict on Count Two should be set aside. A new trial, with proper jury instructions, would be the alternative remedy.

**D.    *The Verdict on Count Two Was Based Solely on Legal Steps that Judge Dugan Undertook and Cannot Support a Jury Finding of Corrupt Endeavor.***

**1.    Overview.**

The Indictment charged five specific acts of Judge Dugan as obstructing the ICE administrative arrest of E.F.R., and only those acts.

---

[7] The issue of whether a post-removal ICE warrant constitutes a "proceeding" under § 1505 is pending before the Fourth Circuit with oral argument scheduled for January 30, 2026. *See* R76, *citing United States v. Hernandez*, No. 24-4665, R41, at 10, 24 (4th Cir.) ("Post-order removal operations are not 'pending proceeding[s]" and "The government's interpretation elides deeply-established boundaries on the meaning of § 1505 excluding 'mere police' activity").

a. confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

b. upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c. addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d. directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e. advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

None of those steps were "inherently illegal" or corrupt: no bribe, kickback, falsification of documents, or similar act of graft. Instead, Dugan faced criminal culpability solely based on acts that all were "part of a judge's job," in the Magistrate Judge's words that this Court later adopted. *Dugan*, 797 F. Supp.3d at 871, 890.

To establish guilt, the government unabashedly based culpability on the "improper motive" of impeding ICE arrests in the county courthouse.

> She is a state court judge. She has no more authority over what
> federal law enforcement officers do in a public place than you
> or I do.

Tr. 839.

With that assumed motive, any act—legal or illegal—was presented as sufficient for guilt. *See* Tr. 822, 881, 892 (prosecution argument that offense was "complete" simply because of exit through jury door). Further, the "endeavor" became synonymous

with the motive. *See* Tr. 828 (prosecution: "So what was the endeavor that the defendant was trying to obstruct? The arrest team's ability to execute the I-200 warrant").

As in *Arthur Andersen,* "it is striking how little culpability" then was necessary to convict Dugan of Count Two under the jury instructions provided. *Arthur Andersen, LLP*, 544 U.S. at 706.

Also as in *Arthur Andersen,* this conviction must be vacated. "When a verdict may have rested on any of several grounds, one of which was improper, the conviction cannot be upheld." *United States v. Feldman*, 711 F.2d 758, 764 (7th Cir. 1983), citing *Stromberg v. California,* 283 U.S. 359, 368 (1931); *United States v. Baranski,* 484 F.2d 556, 560–61 (7th Cir.1973).

### 2.    Culpability Based on Legal Acts.

As listed above, Count Two charged that Dugan obstructed the ICE arrest by, among other things, holding E.F.R.'s hearing off-the-record, allowing E.F.R. and his lawyer to leave through a non-public door, and offering that the next court hearing could be held by Zoom. R6 at 2. The evidence on these acts, essentially undisputed through government witnesses, was that Milwaukee County judges, particularly Dugan, held "hundreds" of hearings off-the-record as a matter of expediency. Tr. 747, 680-83. On April 18, 2025, alone, the day of the charged conduct, Dugan held at least nine matters off-the-record. Tr. 681-82. Milwaukee County judges possess authority to decide whether to hear a case off-the-record. Tr. 475-76. Similarly, Milwaukee County judges possess authority to hold hearings by Zoom, Tr. 476, and to let counsel and their clients leave through a non-public door of the courtroom. Tr. 476-77, 509-11; *see also* Tr. 723-24, 730, 745.

The government's theory and theme were that Dugan had "no more right" than anyone else to impede an ICE arrest in the county courthouse. Yet Dugan certainly did have the legal right to take multiple legal steps, regardless of motive or impact on ICE's predetermined arrest plan. She had statutory authority that others, not judges, lacked.

In *Arthur Andersen*, records were shredded despite explicit knowledge of an SEC investigation and that those records may be helpful to the government. 544 U.S. at 698-700. The Supreme Court nonetheless went on to hold:

> "Document retention policies," which are created in part to keep certain information from getting into the hands of others, including the Government, are common in business. See generally Chase, To Shred or Not to Shred: Document Retention Policies and Federal Obstruction of Justice Statutes, 8 Ford. J. Corp. & Fin. L. 721 (2003). It is, of course, not wrongful for a manager to instruct his employees to comply with a valid document retention policy under ordinary circumstances.

*Id*. at 704.

The Court in this case allowed no similar leeway for the jury to consider the legality of Dugan's acts. The indictment alleged and the government argument supported a theory by which legally authorized judicial acts (holding off-the-record hearings, offering Zoom appearances, and allowing exit through non-public doors) were "corrupt" solely because of the "improper motive" of impeding an ICE arrest. Such a construction subverts the necessary proof of a corrupt endeavor and reads out from *Arthur Andersen LLP* the required safe harbor for "innocent acts" of obstruction, regardless of the motive. *Id*. at 708.

The Court's jury instructions (and the government's theory of prosecution) gave no consideration at all to Dugan's lawful power to act as she did. WIS. STAT. § 753.03. This was contrary to *Arthur Andersen* and the jury instructions submitted by the defense

based on *Arthur Andersen*. R57, at 19. The only justification the government (or the Court) ever has offered is that the prosecution would prove that she acted corruptly.

The term "corruptly" appears in the charged statute, 18 U.S.C. § 1505, as follows: "Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States" violates the statute. The term "corruptly," then, is designed to limit—not expand—culpability to those situations where a defendant had no "legal right" to act. *United States v. Matthews,* 505 F.3d 698 (7th Cir. 2007) (*citing Arthur Andersen*). The limitation is necessary because regardless of motive, a party can undertake legal steps to accomplish the same result. *See Arthur Andersen,* 544 U.S. at 703-04 (lawyer or relative can counsel another to refuse to produce documents or answer questions).

The term "corruptly" is set among inherently evil conduct: threats, force, menacing letters or statements. All of these acts are *mala in se* (acts wrong in themselves). So, too, is corruption in its ordinary meaning. Corruption, rightly understood like the other acts § 1505 includes, is inherently bad; it is not bad because it violates some technical statute that may or may not have any obvious or inherent moral grounding, like a speed limit, or a record-keeping requirement, or a chemical emissions standard set in parts per million. "Corruptly" is not *malum prohibitum* (wrong because prohibited by law), in other words.

As a comparison, 18 U.S.C. § 1515(b) defines "improper purpose" within a delineated list of inherently bad acts, things *mala in se*. That subsection provides, "As used

in section 1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." Lying, deception, and misuse or even destruction of evidence: they all are evil or wrong in themselves.

The applicable congressional definitions of the term for purposes of § 1505 require ordinary corruption: extortion, bribery, blackmail, lying, or falsifying or destroying evidence. All of that is consistent with the common and quite serviceable way that people understand the term "corrupt" or "corruptly." *Cf. Fischer*, 603 U.S. at 486–91 (applying this same canon of construction, *noscitur a sociis*, to limit the scope of § 1512(c)(2)).

But there was no evidence at all that Dugan acted "corruptly" in this ordinary sense or in the way that Congress defined the term. 18 U.S.C. § 1515(b). There was not even any evidence supporting the diluted way that the Seventh Circuit explained "corruptly" in *United States v. Edwards*, 869 F.3d 490, 499 (7th Cir. 2017), let alone in the more accurate way that the D.C. Circuit and Supreme Court approved in *Fischer. See United States v. Fischer*, 64 F.4th 329, 361–62 (D.C. Cir. 2023) (Walker, J., concurring in part) ("When used as a criminal mental state, 'corruptly' is a term of art that requires a defendant to act with an 'intent to procure an unlawful benefit either for himself or for some other person'"), *vacated on other grounds*, 603 U.S. 480 (2024) (with Chief Justice Roberts, for the majority, quoting Judge Walker's description of "corruptly" approvingly, 603 U.S. at 485).

Further, the instructions to the jury left no room for good faith. Judicial good faith is what this Court paused to note pointedly in its earlier ruling denying Dugan's motion to dismiss. R48 at 15, 19–20, citing and quoting *United States v. Hastings*, 681 F.2d

706, 711 n.17 (11th Cir. 1982); *see also Braatelien v. United States*, 147 F.2d 888, 895 (8th Cir. 1945) (no judicial immunity for conciliation commissioner charged with defrauding federal program; "It is true that as a general rule a judge cannot be held criminally liable for erroneous judicial acts done in good faith. [Citation omitted]. But he may be held criminally responsible when he acts fraudulently or corruptly. Judicial title does not render its holder immune to crime even when committed behind the shield of judicial office. The sufficient answer to this defense is that Braatelien was not indicted for an erroneous or wrongful judicial act. * * * The crime charged is distinct from his official acts. It might have been consummated without the performance of a single judicial act on his part").

*Hastings* relied on *Braatelien*, as did this Court. R48 at 20 & 20 n.15. In the end here, the government offered nothing that impugned Dugan's good faith. Again, acquittal or a new trial with accurate jury instructions is right; this conviction is wrong.

### 3.      Endeavor as any act, large or small, legal or illegal.

The Court's separate instruction to the jury on "endeavor" magnified the error: without defining "wrongful purpose," any act became an endeavor as long as it was directed toward that otherwise undefined purpose. *See* Tr. 881 (prosecutor arguing, "Eduardo Flores-Ruiz is out into the public hallway. The endeavor to obstruct his arrest has taken place. The concealment has taken place. It's over at that point"). With this Court's expansive instruction on an endeavor, the government could and did argue that the crime of obstruction was "complete" as soon as Dugan allowed E.F.R. and his lawyer to leave through the jury door, regardless that they then went to the public hallway and awaiting agents. Tr. 822, 881, 892.

The legality of her acts became irrelevant. The crucial question of whether Dugan wanted E.F.R. to go back to the public hallway or to the stairs to the fifth floor became irrelevant. The effect, if any, on the ICE agents and the pending administrative proceeding became irrelevant. The government secured conviction on an isolated and specific "act" so far removed from the administrative proceeding that the ICE agents did not even realize the act had taken place. Tr. 552-53 (agents did not know whether E.F.R.'s exit was through the main courtroom door; just that he was in the hallway in front of them).

E.F.R. and his lawyer walked out into the public hallway through the non-public corridor at the same time and not quite twelve feet from where they otherwise would have re-entered the hallway had he left through the main door. E.F.R. was in full view of two federal agents just as if he had used the main courtroom doors. He did that because that is the door that Dugan, exercising her judicial authority to control her courtroom, permitted him and his lawyer to use. The government's case, as well as the jury instructions, made that undisputed reality irrelevant.

As discussed above, 18 U.S.C. § 1503 requires that an "endeavor" to obstruct have a "nexus" to the administrative proceeding. "The act must have a relationship in time, causation, or logic with the judicial proceeding." *Aguilar*, 515 U.S. at 599. In *Aguilar*, it was not enough that the defendant made a false statement to an FBI agent who later might have testified before a grand jury or at trial. *Aguilar*, 515 U.S. at 600. All the more there is no nexus here to obstructing a proceeding by words and acts in the courtroom *before* Dugan physically pointed E.F.R. and his lawyer to the public hallway. *See also Arthur Andersen,* 544 U.S. at 708 (reaffirming *Aguilar* on this point as to acting "corruptly" under § 1512(b)(2)).

Here it is worth revisiting the Court's rejection of a materiality instruction that the defense proffered. Immaterial obstructing or impeding logically is no obstruction or impediment at all, certainly when someone's liberty and reputation are at stake on a criminal charge. Just as a general proposition, American courts do not convict people of felonies for acts with immaterial effect. *See generally Neder v. United States*, 527 U.S. 1, 20–25 (1999) (finding that materiality is an essential element of several federal fraud offenses that do not explicitly include it, in part because "the common law could not have conceived of 'fraud' without proof of materiality").

Even in the civil setting of patent infringement, a defendant must sell or supply a component that forms a "significant" part of a plaintiff's invention. SEVENTH CIRCUIT PATTERN CIVIL JURY INSTRUCTIONS 11.2.13 at 282 (with the advisory committee comment explaining that "'significant' effectively is the definition of materiality"). Likewise in the setting of employment discrimination, a plaintiff must prove that an adverse employment action was material. SEVENTH CIRCUIT PATTERN CIVIL JURY INSTRUCTIONS 3.01, Committee Comment e, at 61. That committee comment includes the following proposed wording that applies just as well here:

> Plaintiff must prove that his [alleged consequence of Defendant's conduct] was a "materially adverse employment action." Not everything that makes an employee unhappy is a materially adverse employment action. It must be something more than a minor or trivial inconvenience. For example, a materially adverse employment action exists when someone's pay or benefits are decreased; when his job is changed in a way that significantly reduces his career prospects; or when job conditions are changed in a way that significantly changes his work environment in an unfavorable way. Citing *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742 (7th Cir. 2002); and *Crady v.*

*Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

That is, not everything that changes an ICE arrest plan is obstruction or impeding; that, too, should require more than "minor or trivial inconvenience." This logically should be even more true in a criminal case than in a civil one.

Once more, Dugan no more obstructed federal agents by allowing E.F.R. and his counsel to walk through a non-public corridor to the public hallway than she would have by sending him out the usual courtroom doors. He emerged into the same public hallway in full view of the agents at the same time he would have emerged in any event; again, one agent did not even know then which door E.F.R. had used. The only difference is that he re-entered the public hallway less than twelve feet from the courtroom doors, still flanked by two agents who saw him return to that hallway. That difference was wholly immaterial to the agents' duties and efforts that morning. At most, it was a "minor or trivial inconvenience." SEVENTH CIRCUIT PATTERN CIVIL JURY INSTRUCTIONS 3.01, Committee Comment at 61.

### 4. The Jury Was Offered No Context or Guidance for How to Consider Dugan's Legal Right to Act.

Again, the government took the position that Dugan had no legal right to take any action in opposition to the ICE arrest plan. And this Court rejected jury instructions that would have provided guidance, even in limited fashion. R57 at 21 (proposed Instruction No. 12: "A defendant who has a legal right to act does not corruptly endeavor . . .") .

On the indictment's own allegations, the only acts Dugan did all were within the ambit of her state statutory powers as a judge. All five of them were "part of a judge's

job," as this Court held in adopting the magistrate judge's recommendation on Dugan's motion to dismiss. R43 at 30, adopted by R48, R43, 797 F. Supp.3d at 871, 890. At least three of the acts were routine. No act in the indictment and none that the government's case-in-chief arguably proved, in the light most favorable to the prosecution, fell outside her state judicial powers. *See* WIS. STAT. § 753.03 (giving Wisconsin circuit court judges "all the powers, according to the usages of courts of law and equity, necessary to the full and complete jurisdiction of the causes and parties and the full and complete administration of justice, and to carry into effect their judgments, orders and determinations, subject to review by the court of appeals or the supreme court as provided by law"). Once more, what a defendant has a right to do does not violate 18 U.S.C. § 1505, the statute at issue in Count Two, or logically any of the other obstruction offenses. *See Matthews*, 505 F.3d at 705–06 (concerning offenses under 18 U.S.C. § 1512). Even if *some* acts could be construed as non-judicial, the lack of clarity caused sufficient error to warrant a new trial.

But more importantly, nothing in the case law limits the legal right to do something to the exercise of a constitutional right or assertion of a recognized privilege, as this Court sought to limit this concept. R97 at 6 (limiting "legal rights" to those such as "taking the Fifth or asserting a valid privilege"). The Court cited no authority for that limitation.

There likely is none. People have innumerable rights to do something lawfully that neither the Constitution nor a privilege define. Freedom would be vanishingly narrow if every legal right had to find explicit support in the Constitution or in a legal or evidentiary privilege. Not incidentally, the Constitution itself assures that freedom does not

43

slip away like that. U.S. CONST. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people").

On this Court's reasoning, a judge who accepts a plea agreement that has the effect of altering immigration removal status runs afoul of the law. Likewise, any public official runs afoul of § 1505 by using his or her position to prevent ICE from executing a warrant or otherwise performing their duties in a manner predetermined by ICE. Simply advocating that such arrests should not take place would suffice if others acted on such advocacy, whether in legal or illegal fashion.

In short, this Court erroneously permitted conviction for acts that Dugan, as a state judge, had a legal right to do, only because that legal right was not enshrined in the Constitution or within ambit of a recognized privilege. But a state statute did empower her legally to act as she did, WIS. STAT. § 753.03, and even the government never has contended otherwise.

### 5.    Judicial Immunity and the Tenth Amendment.

These arguments flow naturally from the prior motions raising judicial immunity and the Tenth Amendment. In denying the motions, the Court held, "While it would be improper to consider facts outside the four corners of the indictment on a motion to dismiss, viewing the facts that are alleged in the light most favorable to the government, as I must at this stage, and accounting for the indictment's allegation that defendant 'knowingly concealed' E.F.R. and acted 'corruptly,' I cannot say as a matter of law that defendant's alleged conduct falls within even this more limited version of immunity." R48 at 20, 797 F. Supp.3d at 870–71.

44

With the full trial record now available, Dugan incorporates and relies again on her judicial immunity arguments and respectfully requests that the Court reconsider its prior rulings in light of that record. The Court certainly can say as a matter of law now, after hearing the government's case, that Dugan was entitled to immunity from this prosecution.

## VI.

## CONCLUSION

For all of the reasons she explains here and those she addressed in her earlier motion to dismiss, in her motions *in limine*, proposed jury instructions, and in briefs supporting those motions, Dugan again asks the Court to enter a judgment of acquittal on Count Two. Additionally and alternatively, she asks the Court to order a new trial on that count. At very least, a new trial would serve the interest of justice, which is the explicit standard that Rule 33(a) applies to such a motion.

Dated January 30, 2026.

Respectfully submitted,

HANNAH C. DUGAN, *Defendant*

s/ Steven M. Biskupic
Steven M. Biskupic
 Wisconsin Bar No. 1018217

STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com

_s/ Jason D. Luczak, Nicole M. Masnica_
                                              Jason D. Luczak
                                                Wisconsin Bar No.  1070883
                                              Nicole M. Masnica
                                                Wisconsin Bar No. 1079819

GIMBEL, REILLY, GUERIN & BROWN LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
(414) 271-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com

                                              _s/ Dean A. Strang, R. Rick Resch_
                                              R. Rick Resch
                                                Wisconsin Bar No. 1117722
                                              Dean A. Strang
                                                Wisconsin Bar No. 1009868

STRANGBRADLEY, LLC
613 Williamson Street, Suite 204
Madison, Wisconsin 53703
(608) 535-1550
rick@strangbradley.com
dean@strangbradley.com