UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                Plaintiff,

    v.                                    Case No. 25-CR-89 (LA)

HANNAH C. DUGAN,

                Defendant.

## GOVERNMENT'S RESPONSE TO DUGAN'S RENEWED MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL

On December 18, 2025, a jury found defendant Hannah C. Dugan guilty of corruptly endeavoring to influence, obstruct, or impede federal agency proceedings, in violation of 18 U.S.C. § 1505. On January 30, 2026, Dugan filed motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and for a new trial pursuant to Federal Rule of Criminal Procedure 33.

The United States, by its counsel, hereby responds to Dugan's motions. For the reasons set forth below, Dugan's motions fail to satisfy the legal standards set forth in Rule 29 and Rule 33 and instead rely on arguments that she has waived or which the Court already has rejected. Accordingly, the Court should deny both motions.

## FACTUAL BACKGROUND

Because a Rule 29 motion is an attack on the sufficiency of the evidence, and because the Court must view the evidence in the light most favorable to the government,

the United States provides the following overview of the trial evidence to place Dugan's motions in context.

**Eduardo Flores-Ruiz**

On March 14, 2025, Eduardo Flores-Ruiz was arrested for felony strangulation and suffocation as well as misdemeanor battery offenses. *See* Tr. 187, 239, 393.[1] On March 18, 2025, he was charged in Milwaukee County Circuit Court with three domestic violence-related misdemeanors. *See* Tr. 50, 631. His case was scheduled for a pretrial conference before Dugan at 8:30 a.m. on April 18, 2025, in Courtroom 615. *See* Exs. 11, 12; Tr. 630.

Officers from the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE ERO") identified Flores-Ruiz as someone who previously had been removed and who was not lawfully in the country. Accordingly, Deportation Officer Joseph Vasconcellos prepared a field operations worksheet (FOW) and a draft administrative arrest warrant (I-200). *See* Exs. 1A, 1B, 45. On April 17, 2025, an authorized immigration official reviewed the FOW and related materials and found probable cause to believe Flores-Ruiz was removable. *See* Tr. 197, 215-17, 391. As such, he signed the arrest warrant, directing that Flores-Ruiz be taken into custody for removal proceedings before DHS. *Id*. These proceedings included all steps from identification of Flores-Ruiz to his actual removal, all of which occurred between April and November 2025 and included his arrest. *See* Ex. 47; Tr. 208-2, 525-27.

---

[1] In this response, "Tr." refers to the trial transcript, and "Ex." refers to a trial exhibit. Because the Court must view the evidence in the light most favorable to the government, this response does not cite every exhibit and excerpt of testimony that supports each fact. Rather, the United States has included one or more cites sufficient to support each fact.

Officer Vasconcellos planned an arrest operation at the courthouse for April 18, 2025. The courthouse was considered a safe location, as Flores-Ruiz and others present would have been through security. *See* Tr. 245-46. The members of the ICE ERO Task Force assigned to assist Officer Vasconcellos were CBP Officer Zuraw, FBI Special Agents Baker and Jackling, and DEA Special Agents Spitaletto and Ayers. *See* Tr. 54.

**Prior Courthouse Enforcement Actions**

Before April 18, 2025, the ICE ERO Task Force had made two arrests of criminal defendants at the Milwaukee County courthouse. *See* Tr. 278-80, 308. Each arrest was made after notifying a courtroom deputy of a warrant and was done in the public hallway after the individual's hearing. *Id*. Although other counties make private spaces available for ICE arrests at their courthouses to minimize any disruption, Milwaukee County does not cooperate with ICE or honor ICE detainers. *See* Tr. 205-06, 515-17.

Dugan paid close attention to ICE's enforcement actions in the courthouse. On April 1, 2025, she tried to register for a virtual training session on "Minimizing Impact of Courthouse Enforcement Consistent with 2025 ICE Policies." *See* Ex. 5. Because the registration was closed, Dugan asked anyone who attended to share information. *Id.* On April 2, 2025, Judge Laura Perez sent Dugan a link to materials from the presentation. Judge Perez explained that ICE was permitted to conduct immigration enforcement actions in public spaces at courthouses against specifically targeted individuals (like criminal defendants). *See* Ex. 39. In the same email chain, Judge Perez suggested to Chief Judge Carl Ashley and others that a court-wide protocol might be helpful to "ensure that we all are following federal law and allowing ICE to conduct lawful enforcement . . ." *Id.*

3

On April 3, 2025, Chief Judge Ashley sent an email to all Milwaukee judges and others advising that ICE had made two arrests in public hallways in the courthouse as of that date.[2] He indicated that although he wasn't sure that state or local officials had any authority to intervene in the public hallways, detentions in the courtrooms would disrupt court operations. *See* Ex. 6.

This led to a discussion of the need for a courthouse policy. On April 4, 2025, Judge Perez provided the recipients of Chief Judge Ashley's email with the training materials noted above, explaining that "ICE can legally conduct enforcement (i.e., take people into custody) in public areas of the courthouse," a view shared by Chief Judge Ashley. *Id.*; Tr. 597. Judge Perez also explained that the courts could consider making private space available for arrests or could limit arrests to public areas. *Id.* On April 8, 2025, Dugan responded, thanking Judge Perez for the information she had provided about ICE being able to make arrests in public hallways. *Id.*

Chief Judge Ashley scheduled a Zoom meeting for the next day and circulated ICE's policy regarding courthouse enforcement. *See* Ex. 7. During the meeting, he advised his colleagues that the judiciary did not have the ability to control ICE activities in the public hallways. *See* Tr. 601. He circulated a draft courthouse policy and then a revised

---

[2] Chief Judge Ashley indicated that one of the arrests took place before a hearing. Although not material to the Rule 29 analysis, this reflects a mistaken understanding as to what had happened on April 3, 2025, in *State v. Bustamante-Sierra*, Case No. 24-CF-5251. CCAP records make clear that the matter was adjourned off the record and the defendant was in court. Agent Baker testified that the arrest took place in the public hallway after the case was adjourned. *See* Tr. 279-80, 308. Mr. Bustamante-Sierra's attorney has separately confirmed these facts.

4

draft policy to his colleagues and others. *Id*. at 600. Both drafts recognized ICE's ability to make arrests in public spaces. *See* Exs. 8, 9; Tr. 602-03. As of April 18, 2025, no official or interim policy was in effect that mandated how courthouse staff should respond to ICE activity at the courthouse. *Id*. at 585-86, 602-04.

**Events at the courthouse on April 18**

Upon arriving at a security screening station on the morning of April 18, 2025, members of the ICE ERO Task Force advised the Milwaukee County Sheriff's Office (MCSO) of the planned arrest of Flores-Ruiz in a public hallway outside Courtroom 615 and agreed to wait until after his hearing. *See* Tr. 399. Officer Vasconcellos spoke with MCSO Sergeant David DeSmet, who explained that Dugan wanted arrests to be made outside – rather than inside – her courtroom. Tr. 493-95. Agents Baker and Jackling advised Dugan's courtroom deputy that they had a warrant for Flores-Ruiz and agreed to wait until after his hearing to arrest him in the hallway. Tr. 317. Chief Judge Ashley was also advised of the planned arrest by an MSCO supervisor. Tr. 607. All Task Force members were in plain clothes, unmasked, and waiting quietly in the hallway for Flores-Ruiz's hearing to conclude. Tr. 247, 344.

Members of the Office of the State Public Defender (SPD) had a strong reaction to the presence of the Task Force officers on the 6th floor. The SPD attorneys discussed ICE's presence, number, and location among themselves and with Alan Freed, Dugan's clerk. *See, e.g.*, Tr. 80-81, 660, 710-12.

Dugan arrived on the 6th floor at approximately 8:40 a.m. and took the bench shortly thereafter. *See* Ex. 50L; Tr. 449-50. She began addressing *State v. Hruska*, a case

5

being handled by Attorney Walter Piel. *See* Tr. 661-63; Ex. 42. Freed interrupted the proceedings to advise Dugan that "five ICE agents" were in the hallway. *Id.* Freed offered to call the Chief Judge or even "walk" there, but Dugan told him to hold off, remarking, "One second, just stay right there." *Id.* Dugan then left the courtroom through the door behind her bench. *Id.*

Dugan then used a non-public hallway to enter the adjacent courtroom of Judge Kristela Cervera, through Judge Cervera's jury door. Dugan summoned Judge Cervera off the bench in a manner that embarrassed her. *See* Tr. 451. Dugan met Judge Cervera at her chamber's door, directed her to, "leave your robe on," and stated "ICE is here. We need to check a warrant." Tr. 452-53. Dugan then walked down a restricted hallway that leads to the public hallway. Dugan, who had a copy of the day's calendar when on her bench, mentioned the name "Flores." Tr. 452, 658. Judge Cervera was confused and asked if Dugan was talking about someone on Judge Cervera's docket, but Dugan did not respond. *See* Tr. 452-53.

At approximately 8:43 a.m., Dugan entered the public hallway and began confronting agents. Tr. 453. Judge Cervera was hesitant to enter the hallway in her robe, and witnesses explained that it was highly unusual to see judges in the hallway in their robes outside of ceremonial functions. Tr. 100-01, 367, 454-55, 503, 538, 567, 703, 738.

Dugan first asked Officer Vasconcellos if he was present for a hearing or a trial. When Officer Vasconcellos said no, Dugan stated he needed to "leave." Tr. 403. Officer Vasconcellos stated that he was there to make an arrest of someone not lawfully present in the United States. Tr. 403, 456. Dugan asked if he had a judicial warrant. Tr. at 457.

6

After Officer Vasconcellos explained he had an administrative warrant, Dugan became angry and stated that type of warrant was not good enough, telling him multiple times that he needed a judicial warrant to make an arrest in a public hallway. *Id.*

Dugan's statements to Officer Vasconcellos about his ability to be present in the hallway and the validity of the warrant were false. The public hallways in the courthouse are accessible to everyone, including law enforcement. Tr. 443-44. In addition, arrests at the courthouse are a common practice and can be made in a public hallway with or even without a warrant based on probable cause. Tr. 445, 492, 495. Dugan not only was aware that arrests took place in the public hallways but had advised MCSO Sergeant DeSmet that arrests needed to take place in public spaces because she believed that they could not take place in courtrooms. Tr. 494-95. As noted above, Dugan also received information regarding ICE's ability to act in public spaces from Judge Perez on April 2 and 4, 2025, and Dugan thanked Judge Perez for that information. *See* Ex. 6. In addition, because she knew ICE could operate in the hallways, Dugan prepared a sign for her courtroom door, stating that if any attorney, witness coordinator, or court official felt unsafe coming to court in person, they could request to appear by Zoom. *See* Exs. 10, 29, 30; Tr. 473.

Dugan did not ask to see the warrant or give Officer Vasconcellos an opportunity to show it to her. *See* Tr. 404. Rather, Dugan directed him to go to the Chief Judge's office. *Id.* Because he did not know where to go, Judge Cervera offered to escort Officer Vasconcellos. Judge Cervera was uncomfortable with Dugan's behavior and tone. Tr. 457, 484. When asked to describe Dugan's demeanor, multiple witnesses testified that she was "upset," "irritated," "stern," and "angry." Tr. 259, 319, 364, 404, 457.

7

Dugan also ordered Agent Jackling to go to the Chief Judge's office. Tr. 320. She then approached Officer Zuraw and, after confirming that he was with the other officers, angrily gestured at him and told him to "Get out!" Tr. 366; Ex. 53-K. Dugan ultimately ordered all members of the arrest team she had identified to leave the public hallway. Dugan did not accompany them to the Chief Judge's office to check the warrant, a fact that surprised Judge Cervera who felt "abandoned" by Dugan. Tr. 460, 466. Judge Cervera was also surprised by the number of arrest team members who arrived at the Chief Judge's office, as she only expected Officer Vasconcellos to accompany her, and no policy was in effect that required everyone to report to that area. Tr. 462-63.

Instead, Dugan's focus was on helping the individual wanted by ICE leave her courtroom quickly and discreetly while the agents were occupied in the Chief Judge's office. At approximately 8:44 a.m., Dugan gestured to Freed, who had entered the hall, and they both headed towards her courtroom. *See* Tr. 107-08. As they left the public hallway, they had a short period of time together before entering a second set of doors to her courtroom. Dugan told Freed that the ICE agents had an administrative warrant. Tr. 687, 692-93. Freed learned the warrant was for Flores-Ruiz shortly thereafter, before or while Flores-Ruiz's matter was being addressed off the record. Tr. 687.

Flores-Ruiz and his attorney, Mercedes de la Rosa, were inside Courtroom 615. Attorney de la Rosa's colleagues had alerted her to ICE's presence. *See* Tr. 710. She was concerned and wanted to get her client out of the area as soon as possible. Tr. 711, 727, 733. Dugan asked Attorney de la Rosa, "Which client is it?" *See* Ex. 42B. Dugan then stated that she would take the case "right away." *Id*. She then told Attorney Piel, the defense

8

lawyer whose case (*Hruska*) had been interrupted, to "step back" from the defense table. *See* Tr. 737. Dugan asked Attorney de la Rosa for her client's name and if he needed an interpreter. *See* Ex. 42B. The clerk quickly answered that an interpreter was required, which would have required a wait of minutes to an hour. *See* Tr. 667. Dugan then repeatedly directed Attorney de la Rosa to get a date off the record "right now" and directed Flores-Ruiz to "stay right there." *See* Ex. 42B. Dugan even told Attorney de la Rosa to "take your client out and come back and get a date." *Id*. That was a very unusual and potentially problematic directive. Tr. 669, 740-41, 760. Dugan then changed her mind, stating, "Oh wait, I'm sorry - Just give her a date." *See* Ex. 42B.

Dugan and her court reporter, Joan Butz, began to whisper to each other. *See* Tr. 760. Dugan suggested taking Flores-Ruiz out through the jury door and "*down the stairs*." Tr. 761; Ex. 42B. There are stairs accessible from a restricted hallway behind the jury door that lead down to the 5th floor. Tr. 761-62. After Dugan brought up the stairs, Butz asked, "You want me to show them?" Tr. 761-62; Ex. 42B. Butz added, "I don't think she knows. She might go out the wrong door." *Id*. Butz explained that by "wrong door," she meant the door to the public hallway because ICE was in that area. Tr. 764. Dugan declined Butz's offer, and instead responded, "I'll do it. I'll get the heat." Ex. 42B. Dugan then left the bench, opened the jury door, and instructed Attorney de la Rosa and Flores-Ruiz to "come" with her. *See id*. When Attorney de la Rosa did not immediately go through the jury door, Dugan asked aloud, "Where did she go?" *Id*. Dugan then gestured for Attorney de la Rosa to follow and directed her to "come" through the jury door. Tr. 654, 741, 768.

9

Dugan also repeated that Flores-Ruiz should appear by Zoom for his next hearing (confirming that Dugan believed Flores-Ruiz would be successful in evading arrest and available for another hearing). *See* Ex. 42B. Neither Flores-Ruiz's victims (who were present and ended up waiting for over an hour not knowing what had happened with the case) nor the Assistant District Attorney were included in these events. *See* Tr. 632-33, 639-40. This was so even though Dugan's practice was to call victim cases on the record or at least have the defense attorney confirm with the DA's office that a new proposed date worked for them. Tr. 138, 678-79.

Dugan pointed Flores-Ruiz and his attorney down the restricted hallway towards the exit sign next to the door to the stairs. Tr. 719. Attorney de la Rosa had never been in this hallway before. She was nervous and "freaking out." Tr. 724. Her "brain was spinning," she was not listening well, and she ended up going out the wrong door and into the public hallway. *Id*.

After Dugan had directed Flores-Ruiz down the restricted hallway, she returned to the bench and told Walter Piel and his client to "step up again." Tr. 768-69; Ex. 42. Although no interpreter was present, Freed asked Dugan if they should do other "interpreter cases first." Ex. 42. Dugan asked if there was "anybody else that looks…" before Freed interrupted with, "We aren't sure." *Id.* Butz then asked what if ICE was on other floors, which led Dugan to loudly sigh. *Id*.

Only 2 minutes and 48 seconds transpired between the time Dugan reentered her courtroom and the time Flores-Ruiz and his attorney exited through the restricted hallway. *See* Tr. 104, 122. Dugan's handling of the Flores-Ruiz matter was unusually

10

quick, and Freed, who had been present for thousands of cases in Dugan's courtroom, had never seen a defendant use the door through which Dugan brought Flores-Ruiz. *See* Tr. 346, 669-71, 674. Allowing a criminal defendant to utilize the restricted hallway was not only highly unusual, it also presented a safety concern. Tr. 496.

**Flores-Ruiz flight/arrest.**

After Attorney de la Rosa and Flores-Ruiz entered the public hallway, they walked past a set of elevators and entered an elevator at the bank located away from Courtroom 615. *See* Tr. 725. Special Agent Spitaletto, who had not been noticed by Dugan, and Special Agent Ayers, who reentered the hallway after being advised that Dugan was rushing Flores-Ruiz's case, saw Flores-Ruiz and followed. Tr. 540-43. Special Agent Ayers, who did not believe it was safe to arrest Flores-Ruiz alone, was able to get on the elevator with Flores-Ruiz, but Special Agent Spitaletto did not catch up in time. *Id.* As Flores-Ruiz left the building, Special Agent Ayers relayed his location and movements to other Task Force members. *Id.* at 543-44. Agents eventually got close enough to announce their presence, causing Flores-Ruiz to run. *Id.* He led them on a foot chase in the rain, crossing in front of a moving vehicle. Special Agent Ayers was able to catch Flores-Ruiz and push him to the ground in the mud. Tr. 545.

**Activities inside Chief Judge Ashley's office**

Meanwhile, inside the Chief Judge's office, Officer Vasconcellos presented his credentials and the administrative warrant to Judge Cervera. Tr. 405-06. The other members of the Task Force were split up between the vestibule area just outside the Chief Judge's office and the public hallway outside of Courtroom 615, where Special Agent

Spitaletto had remained undetected. Tr. 407-08. District Court Administrator Stephanie Garbo arranged for Chief Judge Ashley to speak to Officer Vasconcellos using her cell phone and they moved to a conference room. Tr. 409-10. As soon as this happened, Judge Cervera left to get back to her busy docket. Tr. 464. By this time, Flores-Ruiz and Attorney de la Rosa were already off the 6th floor and on their way out of the courthouse. As Judge Cervera left, Officer Vasconcellos waved for Officer Zuraw to join him behind the second set of glass doors to listen to the conversation with Chief Judge Ashley. Tr. 406. Chief Judge Ashley explained that he was working on a draft policy that he wanted to send to ICE. *Id.* at 410-11. He never told the officers that they could not make immigration arrests in the public hallway. *Id.*; Tr. 587-88. District Court Administrator Garbo also verified that they could make arrests in the public hallways. Tr. 588.

### Judge Cervera's return to her courtroom.

The SPD attorneys who witnessed the events on the 6th floor were left with the impression the Dugan and Judge Cervera had attempted to help Flores-Ruiz avoid arrest. Later that morning, an SPD attorney approached Judge Cervera's bench and told her, "Just so you know, our client was arrested on 10th Street." Tr. 466-67. The attorney added, "Because we know what you were trying to do." *Id.* Another SPD attorney pumped his fist and stated, "Go Judge!" *Id.* A third told Judge Cervera that she was the G.O.A.T. (greatest of all time). *Id.* These comments puzzled Judge Cervera, who was not aware that Dugan had rushed Flores-Ruiz's case through, that Dugan had directed him through the restricted hallway, or that the arrest had not taken place in the courthouse. When she learned the context for these comments, Judge Cervera was "mortified." Tr. 470.

The following Monday, Dugan ran into Judge Cervera. Although Judge Cervera tried to avoid the topic, Dugan stated that she was "in the doghouse" with Chief Judge Ashley, "[b]ecause I tried to help that guy." *See* Tr. 475. Dugan then demonstrated that she had directed Flores-Ruiz to go through the restricted hallway to exit her courtroom. *Id*. Dugan made the "doghouse" comment even though she had not had any conversation with the Chief Judge about the incident. *See* Tr. 614-15.

## ARGUMENT

### I.      Legal Standards Governing Post-Verdict Motions

When faced with a challenge under Rule 29, the Court must assess "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). "Great deference is owed to the jury's verdict" under this "highly demanding standard," which is "characterized as imposing a nearly insurmountable burden." *United States v. Hofschulz*, 105 F.4th 923, 931-932 (7th Cir. 2024).

Under Rule 33, the Court may grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Courts have interpreted Rule 33 to require a new trial … in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). However, the "exercise of power conferred by Rule 33" is reserved for "extreme cases" in which consideration of the evidence "leaves a strong doubt as to the defendant's guilt." *United States v. Peoples*, 119 F.4th 1097, 1101–02 (7th Cir. 2024) (cleaned

up). "The ultimate inquiry is whether the defendant was deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713–14 (7th Cir. 2020) (quotation omitted).

## II. Because the jury's verdict was fully supported by the evidence, the Court should deny Dugan's Rule 29 motion.

Applying the above standards, a rational juror could conclude that Dugan corruptly endeavored to influence, obstruct, or impede a pending proceeding before DHS. As the jury instructions made clear, Section 1505 has four elements: (1) a proceeding was pending before a department or agency; (2) the defendant knew of the pending proceeding; (3) the defendant endeavored to influence, obstruct, or impede the pending proceeding; and (4) the defendant did so corruptly, that is, with the purpose of wrongfully impeding the proceeding. Dkt. 94 at 21. In addition, "endeavored" means "acting purposefully, with knowledge that an action would have the natural and probable effect of obstructing the proceeding," and "pending proceeding" means "any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such an action from its inception to its conclusion." *See id.* at 22.

The trial evidence satisfied each of these elements. After being made aware of ICE's presence and the administrative warrant, a step in Flores-Ruiz's pending removal proceeding before DHS, Dugan undertook a series of actions intended to undermine that proceeding. These included: (1) commandeering Judge Cervera to unwittingly demonstrate a show of force to the Task Force members and later to occupy their attention in the Chief Judge's office; (2) falsely telling Task Force members that they couldn't be in

14

the public hallway and telling one of them to "Get out!"; (3) falsely stating that an administrative warrant was not good enough to effectuate the arrest in a public place in the courthouse; (4) directing all Task Force members she had identified to go to an area behind a set of double doors and away from her courtroom; (5) rushing Flores-Ruiz's case in a highly unusual manner so that he could leave before the agents returned to the hallway; (6) formulating a plan to usher Flores-Ruiz out a private door and down the stairs; and (7) directing Flores-Ruiz and his attorney into the restricted hallway and towards the exit to the stairwell. Perhaps most significantly, Dugan's own words (i.e., "I'll do it. I'll get the heat," and "I'm in the doghouse with Carl for trying to help that guy") clearly demonstrated that she knew what she was doing was wrong, but she did it anyway. Accordingly, a rational juror could find her guilty, and the Court should deny her Rule 29 motion.

### III. Dugan belatedly and incorrectly argues that she committed "no crime" under Section 1505 "as a matter of law" because Flores-Ruiz was privileged against arrest in the Milwaukee County Courthouse

Dugan raises, for the very first time, an argument that the arrest of Flores-Ruiz was unlawful and therefore cannot form the basis for an obstruction charge under Section 1505. Dugan argues that Flores-Ruiz enjoyed a "longstanding" common law privilege to come and go from his court appearance on April 18, 2025, without being subject to civil process, including arrest on an administrative warrant. There are several reasons to reject the privilege as a basis for acquitting Dugan or granting her a new trial. First, the argument has been waived. These types of motions must be made before trial. Beyond that, for the reasons articulated by the First Circuit in *Ryan v. U.S. Immigration and Customs*

15

*Enforcement*, 974 F.3d 9 (1st Cir. 2020), the privilege does not shield against civil immigration arrests. Lastly, even if the privilege does apply, Dugan is the wrong party to assert it and cannot credibly claim to have asserted it on behalf of the Milwaukee County Circuit Court.

### A.  Dugan's privilege argument is untimely and therefore waived.

Federal Rule of Criminal Procedure 12(b)(3) sets forth a list of motions that must be made before trial, and provides in subsection (B) that "a defect in the indictment or information" including failure to state an offense, "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). "Because indictment defects go to the merits of the case—not the court's power to hear it—an objection to a defective indictment can be waived." *United States v. Muresanu*, 951 F.3d 833, 839 (7th Cir. 2020); *United States v. Maez*, 960 F.3d 949, 956 (7th Cir. 2020).

Dugan did not argue, in her voluminous pretrial motions to dismiss, that the indictment failed to state an offense because Flores-Ruiz was privileged from arrest in the courthouse, even though the facts necessary to make such an argument were alleged in the indictment. *See* Dkt. 6. Thus, Dugan cannot now invoke a "longstanding" privilege to argue that there was "no crime" "as a matter of law" unless she can show good cause for her earlier failure to object on this ground. *United States v. Aron*, 98 F.4th 879, 882 (7th Cir. 2024) (citing Fed. R. Crim. P. 12(c)(3)). Dugan makes no attempt to show good cause, which would be impossible under the circumstances. Compare *Maez*, 960 F.3d at 956

(intervening legal decision that overturns settled law can provide good cause). As such, she has waived this claim.[3]

## B. Dugan is wrong about the scope of the privilege; it does not apply to actions by the sovereign that address uniquely sovereign interests, as in the immigration context.

Even if Dugan had not waived her argument, her motion would fail on the merits. Dugan relies upon a privilege, sometimes described as "process immunity," that exempts non-residents from service of process while in a forum for the purpose of attending court proceedings. *See* 4A Wright & Miller, Fed. Prac. & Proc. Civ. § 1076, "Immunity from Service of Process—In General" (4th ed.). "This rule is intended to 'promote the due and efficient administration of justice' by ensuring that a court will not be hampered by wary, non-resident witnesses and parties who refuse to attend the court's proceedings for fear that they will be served in another suit while attending the proceedings." *Haan Corp. Korea v. Sparkling Drink Sys. Innovation Ctr. Hong Kong*, 2017 WL 8186998, at *1 (N.D. Ill. Dec. 15, 2017) (citing *Durst v. Tautges, Wilder & McDonald*, 44 F.2d 507, 508-11 (7th Cir. 1930)); *see also Stewart v. Ramsay*, 242 U.S. 128, 130 (1916).

Dugan's delineation of the privilege is incomplete. She treats all civil arrests alike and fails to account for the unique nature of civil immigration enforcement, which seeks the physical removal of the subject from the United States. As Judge Selya observed when

---

[3] While Dugan could have raised her privilege argument pre-trial as a motion to dismiss, it is a poor fit with either Rule 29 (sufficiency of the evidence) or Rule 33 (new trial). Although a new trial can be granted for a variety of reasons, *Kuzniar*, 881 F.2d at 470, Dugan's argument is that the indictment does not state an offense because there was no crime "as a matter of law." If that were accurate, the proper remedy would have been dismissal pretrial, not a new trial.

17

writing for the First Circuit, an arrest in such a proceeding more closely resembles a criminal arrest than civil process in a dispute between private litigants.[4] *See Ryan*, 974 F.3d at 26-27. Two key passages from *Ryan* explain why Congress did not incorporate the privilege when in 1952 it created the arrest power at issue in this case, 8 U.S.C. § 1226(a):

> [I]t is luminously clear to us (and it would have been luminously clear to Congress in 1952) that civil immigration arrests differ from arrests in private civil suits in a key respect. Civil immigration arrests are initiated by the sovereign in order to vindicate uniquely sovereign interests rather than private or proprietary interests. Controlling immigration and the presence of noncitizens within the country are duties and powers vested exclusively in the sovereign. See *Dep't of Homeland Sec. v. Thuraissigiam*, ––– U.S. ––––, 140 S. Ct. 1959, 1982, 207 L.Ed.2d 427 (2020) ("[T]he power to admit or exclude aliens is a sovereign prerogative." (quoting *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982))); *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government."). It is too abecedarian a proposition to warrant citation of authority that a private party cannot initiate proceedings to remove a noncitizen from the country. Nor does removal remotely resemble any type of civil remedy available to private litigants.
> …
> Just as criminal arrests implicate the uniquely sovereign interests in enforcing the penal laws and protecting the public, so too do civil immigration arrests seek to vindicate similar kinds of interests in controlling immigration and the presence of noncitizens in the country. And just as the common law privilege was not applied to criminal arrests because of these overriding sovereign interests, one would think (for the same reason) that the privilege would not shield civil immigration arrests.

*Ryan*, 974 F.3d at 26-27.

Although Dugan argues that the privilege extends to civil immigration arrests across the country, her support consists only of a few district court opinions from

---

[4]Agents could have executed a probable cause arrest of Flores-Ruiz for the crime of illegal reentry. Tr. 238. Even under Dugan's theory, Flores-Ruiz would not have been privileged from *criminal* arrest while attending court for another criminal matter.

18

California and New York[5] and a law review article whose author submitted an amicus brief in *Ryan*. While some lower courts outside of the First Circuit have indeed disagreed with *Ryan*, others (not mentioned by Dugan) have cited it with approval. *See, e.g., United States v. Fernandez*, 2020 WL 6363684, at *2 (S.D. Cal. Oct. 29, 2020) ("the common law privilege against courthouse arrests does not apply to civil immigration arrests"); *Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362 (S.D.N.Y. 2025).

Ryan is the only circuit-level opinion on point, and its reasoning is not – as Dugan claims – "labored." *See* Dkt. 109 at 17. Rather, *Ryan* remains persuasive precisely because, unlike the cases cited by Dugan, it reckons with "[t]he fact that civil immigration arrests," like their criminal counterparts, "are initiated by the sovereign to vindicate uniquely sovereign interests." 974 F.3d at 26. Therefore, even if Dugan could show good cause for failing to make this claim before trial, the Court should follow Judge Selya's reasoning in *Ryan* and hold that the privilege does not extend to civil immigration arrests under Section 1226(a).

### C. Any common law privilege does not belong to Dugan and cannot be asserted by her in this criminal case.

Even assuming the privilege applied, Dugan's argument raises additional questions; namely, who may assert the privilege and in what context? Dugan argues that

---

[5] These cases touch upon the privilege and disagree with *Ryan* as to its scope, but they are unlike Dugan's case in various ways, including the nature of the parties, the nature of the litigation, and the legal issues involved. One of the New York cases, for example, involved a conflict between state legislation and ICE's authority to arrest under Section 1226. *United States v. New York*, 2025 WL 3205011, at *1 (N.D.N.Y. Nov. 17, 2025). Wisconsin has no such legislation.

the privilege against civil arrest "is not a privilege of the party or witness directly or exclusively," but instead belongs to the Milwaukee County Circuit Court. *See* Dkt. 109 at 19. Her support for this proposition is largely rhetorical. Admittedly, courts have articulated the policy justification for the privilege in terms of promoting access to the courts and the efficient administration of justice. But even in the cases cited by Dugan, the privilege was asserted by—or for the benefit of— a party or witness who was subject to civil process while attending court. *See*, *e.g.*, *Ramsay*, 242 U.S. 128; *Durst*, 44 F.2d 507.

Even assuming Flores-Ruiz was privileged to "to come and go" from court without being arrested, the privilege belonged to *Flores-Ruiz*. It was not *Dugan's* privilege to assert for the first time after trial in her criminal case. At the risk of stating the obvious, Flores-Ruiz is not a party to this litigation. Nor is this a civil action in which parties who arguably have standing to assert the privilege invoke it in support of injunctive relief. Compare *Velazquez-Hernandez v. ICE*, 500 F.Supp. 3d 1132 (S.D. Cal. 2020) (suit for injunctive relief by noncitizens faced with civil arrest in federal courthouse). Rather, Dugan is asserting the privilege – which she apparently discovered after trial – derivatively, to avoid her own personal criminal liability. The government has been unable to locate any precedent for such an attenuated assertion of the privilege. The Court should reject this unusual, belated attempt to escape criminal liability based on a privilege which, even if it applied in the immigration context, belongs to someone else.

Dugan's argument fully collapses when she maintains that her actions were, in fact, "on behalf of the court itself." Dkt. 109 at 19. According to Dugan, she and her fellow judge – *i.e.*, the colleague she commandeered to join her in the hallway – were "acting

and speaking for the court." *Id.* Apparently, the theory here is that Dugan had the power to confer "process immunity" on Flores-Ruiz on behalf of the court, although she never did so – for example, by mentioning it or even making a record to that effect in Flores-Ruiz's proceeding.

Moreover, as the evidence at trial established, her actions were not sanctioned by official court policy. Milwaukee County was in the process of formulating a policy concerning ICE arrests in the courthouse. In discussions about this, which included Dugan, there had been no mention of a privilege against ICE arrest. Indeed, the operating assumption of the participants in this discussion was that ICE arrests based on administrative warrants were lawful in public areas of the courthouse. Tr. 596. This was certainly the view of the Chief Judge and was reflected in the draft policy he circulated. Tr. 595-97, 602-03, 612. How, then, could Dugan have been acting "on behalf of the court" in insisting that the agents were required to have a judicial warrant (for public areas of the courthouse) or in gesturing unmistakably for them to "get out" of the hallway (among other actions she took to obstruct or impede)? Why would she "take the heat" for her actions, Tr. 673, if she were acting on behalf of the court? As the government explained in response to claims of judicial immunity and throughout this case—Dugan was acting on her own and for her own reasons. As such, even if the privilege applied to immigration arrests, it would not allow Dugan to escape liability for her actions.

## IV. The Court correctly answered the jury's question as to Count Two.

Dugan next makes a series of arguments focused on the Court's answer to a jury question as to Count Two. Although split into six subheadings, Dugan's arguments are

21

that: (1) the jury was allowed to convict despite "no proof of required nexus" between her conduct and her knowledge; and (2) the Court's answer "improperly amended" the indictment. Contrary to Dugan's claims, the Court properly instructed the jury, correctly answered the jury's question, and did not constructively amend the indictment.

### A. The jury's question as to Count Two and the Court's answer.

The jury instructions place the question and the Court's answer in context. As the Court's instructions explained, Section 1505 requires proof of four elements: (1) a proceeding was pending before a department or agency; (2) the defendant knew of the pending proceeding; (3) the defendant endeavored to influence, obstruct, or impede the pending proceeding; and (4) the defendant did so corruptly, that is, with the purpose of wrongfully impeding the proceeding. Dkt. 94 at 21. The Court also explained that "endeavored" meant acting purposefully and with knowledge that an action would have the natural and probable effect of obstructing the proceeding, and that the term "pending proceeding" meant "any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such an action from its inception to its conclusion." *Id.* These instructions were consistent with the statutory text of Section 1505, Seventh Circuit case law, and pattern instructions from other jurisdictions. *See Dkt.* 55 at 23-46; Dkt. 68 at 8-17 (collecting authorities); *see also* Section V-A below.

In its question as to Count Two, the jury referenced the second element (that "the defendant knew of the pending proceeding") and asked, "whether or not Judge Dugan needed to know the identity of the subject of the pending proceeding." Tr. 919. This

question followed a question on Count One, in which the jury indicated that by "identity," it meant "his specific name." *See* Tr. 909. After hearing arguments and taking sufficient time in chambers to ensure it answered correctly, the Court declined to instruct the jury that Section 1505 required Dugan to know Flores-Ruiz's specific name. Instead, the Court explained, "To know <u>of</u> the pending proceeding, the defendant needed to have sufficient knowledge about the nature of the proceeding." Tr. 926.

**B.    The Court's answer was correct and did not undermine the "nexus" between Dugan's knowledge and her conduct.**

Dugan claims that the Court's answer was incorrect and allowed the jury to convict her without a "nexus" between her conduct and her knowledge of the pending proceeding. *See* Dkt. 109 at 21-26. Dugan insists that by not requiring the jury to find that she knew Flores-Ruiz's name, the jury could have found that she just had knowledge of "any" proceeding – including one not linked to the administrative arrest of Flores-Ruiz *See id*. As "support" for her claim, Dugan cites *United States v. Aguilar*, 515 U.S. 593 (1995).

Dugan's argument is meritless. As an initial matter, *Aguilar* provides no support for her position. In *Aguilar*, a judge lied to FBI agents who were investigating the improper disclosure of a wiretap. *Id.* at 597. The judge was indicted for endeavoring to obstruct a grand jury investigation, in violation of the "catchall" provision of § 1503. *Id.* at 599-600. The Supreme Court found there was no evidence that the judge knew his false statement would be provided to the grand jury. As such, there was not sufficient evidence of intent to obstruct the grand jury proceeding. The Court noted that there must be a "nexus" between the wrongful conduct and the proceeding, namely that the defendant's

"endeavor must have the 'natural and probable effect' of interfering" with the proceeding. *Id*.

Even though Dugan was not prosecuted under the omnibus clause of § 1503, the Court's instructions in this case nonetheless included *Aguilar's* nexus language. Although ignored in Dugan's motion, the Court's instructions made clear that to find that Dugan "endeavored" to obstruct the pending proceeding, the government had to prove that she acted purposefully and – using the very words of *Aguilar* – "with knowledge that her action would have the natural and probable effect of obstructing the proceeding." Dkt. 94 at 22. But that's not all. The Court instructed the jury that to have acted with corrupt intent, Dugan must have acted "with the purpose of wrongfully impeding the pending proceeding." *Id*. These instructions – separately and together – ensured that the jury had to find a "nexus" between Dugan's conduct and her knowledge.

The Court's answer to the jury's question did not change that fact. Rather, the question related to what level of detail was needed for the jury to find – as required by the second element – that the defendant "knew of" the pending proceeding. The jury's question essentially asked whether Dugan had to know E.F.R's "specific name."

As the Court correctly concluded, the answer to that question was "no." To "know of" the proceeding, Dugan did not need to know Flores-Ruiz's name. Rather, she had to have sufficient knowledge of the nature of the proceeding. The "nexus" requirement Dugan describes in her brief did not relate to the jury's question as to the second element. That issue is instead is covered in the third and fourth elements – instructions that Dugan's does not mention. That makes her nexus argument a complete non-starter. Put

in practical terms, based on the evidence, the jury was entitled to find that Dugan knew that the person whose arrest she sought to prevent was the same person subject to the pending removal proceeding – regardless of whether she knew his name.

These instructions similarly doom Dugan's claim that the Court's answer allowed the jury to convict based on knowledge of just "a" proceeding or the "nature" of "some proceeding." *See* Dkt. 109 at 25. As the instructions made clear, the jury had to find that Dugan not only knew of the proceeding but also that her actions would have "the natural and probable effect of obstructing ***the*** proceeding" and that she acted "with the purpose of wrongfully impeding ***the*** pending proceeding." *See* Dkt. 94 at 22 (emphasis added).

Moreover, there was only one "pending proceeding" at issue: the proceedings to remove Flores-Ruiz from the country. Dugan agrees that there was only one proceeding at issue. However, as she did in pretrial motions and during jury instruction litigation, she suggests that the only proceeding alleged in the indictment was "the administrative arrest of E.F.R." However, as the United States repeatedly explained, the indictment alleged that Dugan took action to obstruct "removal proceedings conducted by the Department of Homeland Security." *See* Dkt. 6 at 2. The indictment also specifically identified the stage in the proceedings at which Dugan took her obstructive conduct, namely the administrative arrest of Flores-Ruiz *Id.*

When addressing the "proceeding" issue in the context of the jury instructions, the Court agreed with the government, explaining that "'pending proceeding' simply means any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such

25

action from its inception to its conclusion." Dkt. 94 at 22. As is discussed in detail in Section V-A below, this instruction accurately tracked well-established case law.

Nor was the proceeding at issue a surprise to Dugan. As she conceded in another section of her motion, "Throughout this case, the government's claim has been that executing the arrest warrant… was a step in a 'pending proceeding, as it and the Court defined that term broadly." Dkt. 109 at 20-21.

Simply put, both before and after the Court's answer to the question on Count Two, the instructions required proof beyond a reasonable doubt that: (1) Dugan knew her actions would have the natural and probable effect of obstructing the *only* pending proceeding at issue; and (2) she acted with the purpose of wrongfully impeding that same proceeding. As such, the Court should deny her motions.

### C. Dugan's position would have added an element not found in the law and would lead to absurd results

For the reasons set forth above, the Court's answer to the jury's question as to Count Two was correct. In contrast, Dugan's proposed answer would have required the Court to misstate the law by adding an element. It would have been the equivalent of an instruction along the lines of "to know of the pending proceeding, the defendant must have known that the specific name of the person subject to that proceeding was Eduardo Flores-Ruiz."

Requiring such an element would lead to absurd results. Under Dugan's view, a defendant could intentionally obstruct the arrest of an individual but escape liability because she knew the person only by an alias or because she avoided learning the

<div align="center">26</div>

person's name at all. For example, suppose a driver of a car sees an agent seeking to arrest an individual and asks what is happening. In response, the agent says he is a federal agent and is executing a warrant for the subject to appear for pending removal proceedings. Upon hearing this, the driver opens his door, yells to the wanted individual to get in, and successfully drives the subject away. Under Dugan's view, the driver could not have obstructed a pending proceeding because she did not at the time of her conduct know the name of the person she helped avoid arrest. That result would make no sense and require more than the statute provides.[6]

### D. The Court did not constructively amend the indictment.

Dugan next claims that the Court's answer to the jury's question constructively amended the indictment. Dkt. 109 at 27. This doctrine applies when actions at trial broaden the possible bases for conviction beyond those set forth in the indictment to the extent that "it is impossible to know whether the grand jury would have indicted for the crime actually proved." *United States v. Turner*, 836 F.3d 849, 863 (7th. Cir. 2016) (quoting *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014)). If the evidence did not result in proving a "different offense," there has been no constructive amendment. *United States v. Chaoqun*, 107 F.4th 715, 727 (7th Cir. 2024) (citing *United States v. Rogers*, 44 F.4th 728, 735–36 (7th Cir. 2022)). Specifically, Dugan claims there has been an amendment because the phrase "nature of the proceeding" used in the Court's answer is "found nowhere" in

---

[6] For similar reasons, the United States submits that in response to the jury's question on Count One, the Court should have answered that Dugan did not need to know Flores-Ruiz's specific name to conceal him from arrest. Rather, she only needed to know that the individual she was concealing was the same individual named in the warrant.

Section 1505, runs "contrary to *Aguilar*," and "relieved the government of proving beyond a reasonable doubt that Dugan knew that the administrative arrest warrant …was specifically for E.F.R." Dkt. 109 at 27-28.

Dugan's constructive amendment claim is nothing more than a recasting of her flawed "nexus" argument. As such, it fails for the same reasons, namely that: (1) the jury's question and the Court's answer related only to the second element – whether she knew of the pending proceeding; and (2) the "nexus" requirement was satisfied by the instructions on the third and fourth elements, which included *Aguilar's* language and required proof that Dugan acted "with knowledge that her action would have the natural and probable effect of obstructing the proceeding" and that she acted with the purpose of "impeding the pending proceeding." Because there is no danger that the Court's answer allowed the jury to convict on a "different offense" than the one presented to the grand jury, there was no "constructive amendment." *See Chaoqun*, 107 F.4th at 727. Accordingly, the Court should decline to acquit Dugan or order a new trial on this basis.

## V.    The Court did not construe Section 1505 too broadly nor did its jury instructions render superfluous other federal crimes.

Dugan also argues that the Court's jury instructions for Count Two were too broad and were inconsistent with history and precedent. She also claims, for the first time, that they rendered superfluous other federal crimes. Her arguments fail for several reasons.

### A.    As used in Section 1505, "proceeding" is construed broadly.

Dugan claims that Section 1505 "must be construed narrowly." Dkt. 109 at 24. However, she neglects to address Seventh Circuit precedent to the contrary. *See United*

*States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002) ("proceeding" is "a term that is defined rather broadly…for the purpose of section 1505"). Nor does Dugan acknowledge the seminal case analyzing Section 1505, in which the Eighth Circuit concluded that "proceeding" is as "a comprehensive term meaning the action of proceeding – a particular step or series of steps, adopted for accomplishing something." *See Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966). That is, "proceeding" as used in Section 1505 "simply mean[s] proceeding in the manner and form prescribed for conducting business before the department or agency, including *all* steps and stages in such an action from its inception to its conclusion." *Id.* (emphasis added). In other words, "proceeding" is "a term of very broad scope." *Id.* at 715.

Other circuits likewise have recognized the broad nature of "proceeding" as used in Section 1505. *See United States v. Leo,* 941 F.2d 181, 199 (3d Cir. 1991) ("[g]iven the broad meaning of the word 'proceeding' . . ."); *United States v. Rainey*, 757 F.3d 234, 245 (5th Cir. 2014) (Section 1505 "should be broadly construed"); *United States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir. 1970) ("'proceeding' is a term of broad scope"); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (an "administrative investigation is a 'proceeding' within the meaning" of § 1505); *United States v. Browning, Inc.*, 572 F.2d 720, 723 (10th Cir. 1978) (the term "proceeding" in § 1505 is "broad"); *see also United States v. Schwartz*, 924 F.2d 410, 423 (2d Cir. 1991) (the "term 'any proceeding' as used in § 1505 has been defined broadly"); *Senffner,* 280 F.3d at 761. Dugan, when claiming the opposite, addresses none of these precedents.

**B.      Any overlap between Section 1505 and other statutes does not negate its plain meaning.**

Dugan also contends that the Court's instructions were improper because they rendered other statutes superfluous. Dugan claims that "[n]othing in the text or history of § 1505 [that] demonstrates congressional intent to make § 1505 a felony offense for the precise conduct labeled a misdemeanor under §§ 1071 and 1501." *See* Dkt. 109 at 29.

However, there is no overlap at all between Sections 1501 and 1505. Section 1501 criminalizes the obstruction of someone serving legal process from "any court of the United States, or United States magistrate judge." Despite Dugan's unsupported claim to the contrary, there is no redundancy between Sections 1501 and 1505.

Similarly, Section 1071 criminalizes harboring or concealing any person for whose arrest a warrant or process has been issued under federal law. Interestingly, the very next section criminalizes those who "willfully harbor or conceal any prisoner after his escape from [federal] custody," which Congress made a felony. *See* 18 U.S.C. § 1072. If there is a warrant for an escapee's arrest, one who would conceal that person from arrest potentially could violate both statutes. Yet, the United States has found no court decision that narrowed the meaning of either statute out of concern over this overlap.

Regardless, there is little overlap between Sections 1071 and 1505. Unlike Section 1071, one who violates Section 1505 must do so "corruptly," a term that is defined by statute to mean "acting with an improper purpose." 18 U.S.C. § 1515(b). Unlike Section 1071, Section 1505 requires that the defendant *knew* of the pending proceeding she endeavored to obstruct. "Endeavor," moreover, requires that the defendant acted

30

"purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding," which is a state of mind not required for the misdemeanor crime under Section 1071. In other words, the purpose of Section 1505 is to protect any *proceeding* before a federal agency or department and punish those who knowingly endeavor to obstruct such a proceeding. Section 1071, on the other hand, punishes those who conceal a *person* from discovery or arrest, and not those who act corruptly or act purposefully with knowledge that her act would have the natural and probable effect of wrongfully obstructing a federal *proceeding*.

Even if there were some overlap between the two statutes, one statute does not necessarily narrow or negate the meaning of the other. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws, a court must give effect to both.") (citations omitted). Ironically, the Supreme Court made that point in a case upon which Dugan relies: *United States v. Marinello*, 584 U.S. 1 (2018).

In *Marinello*, the defendant was convicted of violating 26 U.S.C. § 7212(a), which makes it a felony to "corruptly or by force" to "endeavo[r] to obstruct or imped[e], the due administration of [the Internal Revenue Code]." *Id.* at 4. Rather than adopting the government's view that the statute applied even without a nexus to a particular proceeding, the Supreme Court held that a nexus between the defendant's conduct and a particular proceeding was required; it also held that the proceeding had to be pending or reasonably foreseeable at the time of the obstructive conduct. *Id.* at 13. It came to that conclusion, in part, because when viewing the broader statutory context of the full

31

Internal Revenue Code, the Supreme Court noted that the government's reading would potentially transform many, if not all, misdemeanor provisions within the Internal Revenue Code into felonies, and make those specific provisions redundant. *Id.* at 9.

Dugan suggests that the Supreme Court's opinion also relied upon its conclusion that the government's interpretation would make Section 1505 redundant. *See* Dkt. 109 at 30-31. Yet, the Supreme Court's point when referencing Section 1505 was the *opposite*. The majority acknowledged the dissent's claim that the *defendant's* interpretation of Section 7212(a) potentially overlapped with Section 1505. Yet, instead of claiming that was a problem, the Supreme Court stated, "Some overlap in criminal provisions is, of course, *inevitable.*" *Id.* at 9 (citing *Sansone v. United States*, 380 U.S. 343, 349 (1965) (affirming conviction for tax evasion despite overlap with other provisions)) (emphasis added). In other words, the reference to Section 1505 in *Marinello* was an acknowledgement that overlap with another statute is to be expected, not a singular basis for rejecting a particular interpretation of a statute.

The Supreme Court rejected the government's reading of the statute because the degree of redundancy within the Internal Revenue Code would "render superfluous other provisions in the same *enactment*." *Marinello*, 584 U.S. at 9 (citations omitted) (emphasis added). Attempting to align that reasoning to hers, Dugan suggests that Sections 1071 and 1505 were also part of the same enactment by Congress. Dugan's suggestion, though, is misleading.

C.     **The history of Section 1505's enactment supports a broad interpretation of the term proceeding.**

On June 25, 1948, Congress reorganized the entire criminal code, the purpose of which "was to revise and systematically codify in [titles 18 and 28] *all the current laws relating to crimes*, the judiciary and judicial procedure . . . and a great number of other statutes . . . to present all this material in the two titles in a logical and consistent way." *See Miranda v. United States*, 255 F.2d 9, 13 (1st Cir. 1958) (emphasis added). That reorganization placed Section 1071 in chapter 49 and Section 1505 in chapter 73. To suggest that their enactments in 1948 were akin to the enactment of the Internal Revenue Code that was the subject of the Supreme Court's analysis in *Marinella* is inaccurate.

Rather, the portion of Section 1505 under which Dugan was convicted was enacted in its original form in 1940. *See United States v. Adams*, 472 F. Supp. 2d 811, 815 (W. Va. 2007) (citing Pub. L. No.76-401; 54 Stat. 13, 13). The law enacted in 1940 contained the "catchall" provision concerning obstruction, which criminalized those who would "corruptly. . . endeavor to influence, obstruct, or impede the due and proper administration of the law under which such proceeding is being had before such department . . . or other agency of the United States." *Id*. That language is largely unchanged in its current form.

The history of the 1940 statute indicates that Congress intended to extend the protection from obstruction that then applied to court proceedings to proceedings before administrative agencies. *Id.* at 816. Unlike the "catchall" provision of the original obstruction statute (now codified in Section 1503), which focused on the "justice [that]

33

was being administered in [a] Court," the "catchall" provision of the 1940 statute focused on the "law under which [any pending proceeding] is being had" before a department or agency of the United States. *Id.* (citations omitted). That history suggests that a judicial proceeding under Section 1503 is different from a proceeding before a department or agency of the United States under Section 1505 "because courts and agencies proceed differently, and work to accomplish different things." *Id.* The judicial power is limited to deciding cases and controversies, while "the power of federal agencies is, in many respects, far broader." *Id.* at 816-17. Agencies "investigate, enforce, cajole, publicize, spend, hire, fire, contract, collect information and disseminate information." *Id.* at 817 (citing 1 Kenneth Cul Davis & Ricard J. Pierce, Jr., ADMINISTRATIVE LAW TREATISE § 1.1 (3d ed. 1994)). Consistent with that history, "courts have rejected the argument that the word 'proceeding' as used in §1505 refers only to those steps before a federal agency which are juridical or administrative in nature." *Adams*, 472 F. Supp. 2d. at 817. Rather, "proceedings" are within the purview of Section 1505 "if they are dependent on a department or agency's authority." *Id.* (citing *Rice*, 356 F.2d at 712).

The history of Section 1505, therefore, does not support Dugan's claim that it "must be construed narrowly." Rather, the history suggests the opposite, which is also consistent with courts' interpretation of Section 1505, all of which Dugan ignores.

**D.      The cases Dugan cites construing other statutes are inapposite.**

Instead of addressing cases that construe Section 1505, Dugan relies upon cases construing other crimes. For instance, Dugan cites *United States v. Fischer*, 603 U.S. 480 (2024), in which the Supreme Court decided how to interpret a catchall phrase in Section

34

1512(c)(2). The Court focused on subsection (c)(1), which described particular types of criminal conduct in specific terms. The Supreme Court reasoned that an "unbounded" definition of subsection (c)(2) would render meaningless subsection (c)(1) and other obstruction laws in chapter 73 of Title 18. *Id.* at 487-94.

None of that has anything to do with how to define "proceeding" in Section 1505. First, the statutory scheme in Section 1512 is absent from Section 1505, which includes only one relevant obstruction provision. Second, in *Fischer*, the Supreme Court did not overturn, question, or even address the decades of precedent, including from the Seventh Circuit, that defined "proceeding" in Section 1505 broadly; it was not even an issue in *Fischer*. And finally, *Fischer* itself recognized that Sections 1505 and 1512 have different functions and penalties. *Id.* at 497. Obstructing an "official proceeding" in Section 1512 carries a 20-year maximum penalty in prison, doing so in the way described in Section 1513 carries a 30-year maximum, while obstructing "any proceeding" in Section 1505 carries only a 5-year maximum penalty. Congress may have intended to impose harsher penalties on those who obstruct "official proceedings" rather than "any proceeding." Either way, the distinction between the two types of "proceedings" as used in those sections is one that the defendant continues to leave unaddressed.[7]

---

[7] The only case Dugan cites to support her contention that "courts have sought to put sensible limits on § 1505" is *United States v. Higgins*, 511 F. Supp. 453 (W.D. Ky. 1981). In *Higgins*, a district court held that obstructing a criminal investigation by the FBI did not violate Section 1505 because the FBI lacked rule-making or adjudicative authority. *Id.* at 454. DHS has that authority, so *Higgins* is easily distinguishable. *See also Adams*, 472 F. Supp. 2d at 817 n. 8 (DEA investigation was a "proceeding" under Section 1505 because, in part, the DEA has rule-making and adjudicative authority).

### E. "Any proceeding" as used in Section 1505 must be construed differently than the term "official proceeding" as used in Sections 1512 and 1513

The term "any pending proceeding" used in Section 1505 stands in contrast to the term "official proceeding" used in Sections 1512 and 1513. The term "official proceeding" has a definition set forth in Section 1515(a)(1) that applies *only* to Sections 1512 and 1513. Citing cases, therefore, that interpret the meaning of "official proceeding" in those two sections to interpret "proceeding" in Section 1505 ignores that express statutory framework. In fact, the definition of "official proceeding" in Section 1515 "provides an express basis for treating the term 'proceeding' differently in § 1512(c)(2) than one might in § 1505." *United States v. Guertin*, 581 F. Supp. 3d 90, 99 (D.D.C. 2022), *overruled on other ground by Kousisis v. United States*, 145 S. Ct. 1382 (2025)). Even "more to the point," the court in *Guertin* added, "the two provisions *are* textually distinct – § 1505 contains none of the [] indicia limiting its applicability to formal tribunals." *Guertin*, 581 F. Supp. 3d at 99; *see also United States v. Sutherland*, 921 F.3d 421, 425 (4th Cir. 2019) (holding that "official proceeding" under Section 1512 "implies some formal convocation of the agency in which parties are directed to appear.") (internal quotes and citations omitted).

Following that logic, the court in *United States v. Hernandez* held that the term "proceeding" in Section 1505 includes the step of executing a final order, including ICE's execution of the final removal order of the defendant. *Hernandez*, 2024 WL 23147, at *4. In so holding, the court reasoned that "cases interpreting § 1512 are no help here because 18 U.S.C. § 1512 covers only obstruction of '*official* proceedings,' whereas 18 U.S.C. § 1505 covers "*any* pending proceeding." *Id.* at *5 (emphasis in original). It found that "Congress

36

intended for § 1512 to require a certain formality that § 1505 does not." *Id.* (citing *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013) ("the descriptor 'official' indicates a sense of formality.")). Cases interpreting § 1512 are thus "inapposite because none purport to define the operative, standalone term 'proceeding' as found in § 1505." *Hernandez*, 2024 WL 23147, at *5.

Dugan correctly notes that the defendant in *Hernandez* currently is appealing his conviction to the Fourth Circuit; but Dugan does not address any of the court's reasoning, nor the reasoning of other courts that follow the express statutory distinction between the use of "proceeding" in Section 1505 and that of "official proceeding" in Sections 1512 and 1513. Dugan simply has no answer to it.

Simply put, courts have universally construed the term "proceeding" broadly in Section 1505. The Court's jury instructions followed that precedent, and Dugan cites no authority holding otherwise. The Court, therefore, should reject her request for a new trial based on arguments grounded on such a flimsy basis.[8]

## VI. Dugan's remaining challenges to the jury instructions also lack merit.

Dugan's remaining challenges to the Court's instructions for Count Two merely repeat arguments she has previously raised and lost. Summarized, Dugan claims: (1) the

---

[8] Dugan also claims that the Court read the word "before" out of the statute. This refers to her (rejected) proposal that the jury be instructed that a proceeding must include a "second, outside party integrally involved...for it to be 'before' the agency." Dkt. 57 at 14. Dugan's proposal relied on *United States v. McHugh*, 583 F. Supp. 1 (D.D.C. 2022). However, as this Court correctly observed, *McHugh* "concerned a different statute, § 1512, which refers to an 'official proceeding.'" Dkt. 97 at 5. Dugan's proposed instruction would have created error, and in any event there was a second party to the removal proceedings referenced in the indictment, namely Flores-Ruiz. *See id.*

jury should have been instructed that she had a legal right to act as she did; (2) "corruptly" was improperly defined and did not allow for the jury to consider her good faith; (3) "endeavor" was improperly defined and did not require the jury to find a nexus to the administrative proceeding; and (4) the instructions should have included a "materiality" requirement. These arguments are meritless and should be rejected.

### A.    Dugan did not have a legal right to obstruct.

Dugan asserts that the Court should have adopted her proposed jury instruction No. 12, which read, "A defendant who has a legal right to act does not corruptly endeavor." *See* Dkt. 57 at 21. She continues to insist that the indictment charged her with nothing more than acts she was lawfully entitled to undertake pursuant to Wis. Stats. § 753.03. However, nothing in that statute or in the cases cited by Dugan authorizes a Wisconsin judge to interfere with the enforcement of federal immigration law, provided she does so using the means at her disposal by virtue of her position. Dugan's claim that she had the right "to take multiple legal steps, *regardless of motive*" is absurd. *See* Dkt. 109 at 36 (emphasis added).

As this Court previously held, it is irrelevant that the indictment described conduct that could be considered "part of a judge's job" because "a judge may use judicial acts or tools as the means to accomplish an unlawful end." Dkt. 48 at 21. That finding is entirely consistent with circuit precedent. *See United States v. Cueto*, 151 F.3d 620, 631 (7th Cir. 1998) ("Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids."). Dugan's arguments regarding the legality

38

of her conduct are concerning. As a lawyer and judge, she had a better understanding than the average defendant of the type of conduct that constitutes obstruction. Nevertheless, she insists there is virtually no limitation on the use of her robe, position, and access to restricted areas, even if she acted with the purpose of thwarting federal law enforcement officers executing a lawful warrant as part of an agency proceeding.

This Court has repeatedly and appropriately rejected Dugan's "legal right" argument. *See* Dkt. 48 at 21, Dkt. 72 at 13-24, Dkt. 97 at 4. Instructing the jury otherwise not only would have misstated the law, it would have also directed the jury to ignore evidence of her corrupt intent.

### B.    The instructions accurately defined "corruptly."

Congress has explicitly defined "corruptly" for purposes of section 1505. Section 1515(b) provides:

> As used in section 1505, the term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.

The Court tracked that language when it instructed the jury that to convict Dugan it must find that she "acted corruptly, that is with the purpose of wrongfully impeding the proceeding" and that corruptly means "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement." *See* Dkt. 94 at 21-22.

Dugan's motions resurrect her proposed definition of "corruptly," which relies on her flawed analysis of *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). The Court

39

properly declined to define "corruptly" as Dugan proposed. First, *Arthur Andersen* interpreted what it means to "*knowingly ... corruptly persuade*" pursuant to 18 U.S.C. § 1512(b), which has no bearing on § 1505, a statute that does not include knowingly as a second modifying *mens rea* term. Second, the "legal right" at issue in *Arthur Andersen* (i.e. a valid privilege against self-incrimination) actually exists, contrary to Dugan's manufactured "right" discussed above. Third, inclusion of the word "wrongfully" adequately "performs the 'limiting work' discussed in *Arthur Andersen*." *United States v. Matthews,* 505 F.3d 698, 706 (7th Cir. 2007) (further noting that by including "wrongfully," the jury was directed to convict only those who have no legal right to impede justice).

Dugan's argument that the instructions left no room for a finding of good faith is simply wrong. There was no danger that she could have been convicted of violating Section 1505 without a corrupt intent. At trial, the defense theory included arguments that Dugan's conduct was a legitimate exercise of her judicial authority and that she merely intended to comply with the expectations of Chief Judge Ashley. The government argued that there was no evidentiary support for that position and that the opposite was true, that is - Dugan committed a series of acts, including making false statements, to corruptly undermine federal agency proceedings with which she disagreed. The instructions required the jury to conclude Dugan acted "wrongfully" and "with an improper purpose," findings which necessarily required them to reject any arguable evidence that she acted in good faith. For the reasons discussed in Section II above, the jury was well-warranted in rejecting that theory of defense.

**C.     The instructions properly defined "endeavored."**

Although there is no Seventh Circuit pattern instruction defining "endeavored" for purposes of Section 1505, the instruction given by the Court was adapted from the Seventh Circuit Pattern Instructions for the same term in Section 1503. It was also consistent with case law interpreting endeavor under Sections 1505 and 1503. *See Senffner*, 280 F.3d at 762 (the government need only show defendants actions had the "natural and probable" effect of interfering with the proceeding for purposes of § 1505); *Cueto*, 151 F.3d at 633 ("a defendant's actions need not be successful" to violate § 1503).

The Court appropriately rejected Dugan's proposed jury instruction No. 9, which indicated that "endeavor" is "more than just an attempt to obstruct" and that "the government must prove Ms. Dugan took a substantial step toward influencing, obstructing, or impeding a federal proceeding." *See* Dkt. 57 at 16. None of the cases upon which she relied supported inclusion of her proposed language and instead confirmed that "endeavor" should be broadly construed. *See e.g.*, *Mitchell*, 877 F.2d at 299 ("any endeavor" when done with the requisite corrupt intent violates § 1505).

Yet, Dugan claims that the Court's "endeavor" instruction was overly expansive because it allowed the government to argue that her crime was complete as soon as she secreted Flores-Ruiz into the restricted hallway. Her argument reflects a fundamental misapprehension of the law and the evidence. Provided the evidence satisfied all of the elements of the offense at the time Dugan escorted Flores-Ruiz into the restricted hallway, it is wholly irrelevant what happened next. It matters not whether Flores-Ruiz exited into a public hallway less than twelve feet – or even six feet – from Courtroom 615. The only

41

thing that mattered was Dugan's intent, namely whether she corruptly endeavored to influence, obstruct, or impede federal proceedings, and the Court correctly instructed the jury in that regard.

Lastly, as discussed in Section IV-B above, Dugan's claim that the instructions failed to require a nexus between her endeavor to obstruct and the pending proceeding is patently false. The jury could not have found that Dugan endeavored to obstruct without also concluding that she acted "with knowledge that her action would have the natural and probable effect of obstructing the proceeding."

###    D.    "Materiality" is not an element of Section 1505.

Despite previously conceding that neither the Supreme Court nor the Seventh Circuit has construed Section 1505 as including materiality as an essential element (Dkt. 57 at 12), Dugan now argues there is support for such a requirement in *Neder v. United States*, 527 U.S. 1, 20-25 (1999), and Seventh Circuit Pattern Civil Jury Instructions 11.2.13 and 3.01.

Neither is persuasive authority. *Neder* is inapposite, as it discussed materiality in the context of a "scheme or artifice to defraud" under the federal mail fraud, wire fraud, and bank fraud statutes. Civil jury instructions regarding whether a litigant has established a patent infringement or an adverse employment action similarly have no bearing on the elements of a criminal obstruction statute.

Section 1505 contains no reference to materiality, and the Seventh Circuit has explicitly rejected materiality as an element of obstruction under Section 1512(c). *See United States v. Burge*, 711 F.3d 803, 812 n.4 (7th Cir. 2013). As the Seventh Circuit

42

explained, materiality is not an element of these offenses "because the relevant intention is directed at making the government's job harder . . . not at actually succeeding in that effort." *United States v. McKibbins*, 656 F.3d 707, 712 (7th Cir. 2011) (rejecting materiality as an element of 1512(c)); see also *Cueto* 151 F.3d at 633 ("a defendant's actions need not be successful" to be prosecuted under § 1503).

The Court's rejection of the defendant's proposed materiality instruction was consistent with these cases, as well as pattern instructions from the Fourth Circuit, other model instructions, and instructions approved in the Western District of Wisconsin. *See* Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina § 1505 (2024 Online Ed.): https://www.scd.uscourts.gov/pji; 2 Modern Federal Jury Instructions-Criminal ¶ 46.04 (2023) (Instructions 46-22 et seq.); *United States v. Clark*, Case No. 22-CR-55 (W.D. Wis.) (Peterson, J.) at Document 504.

Dugan argues that the difference between what happened as a result of her conduct, and what would have otherwise happened, was "wholly immaterial to the agents' duties and efforts that morning." Dkt. 42 at 109. Her characterization of Flores-Ruiz's re-entry into the public hallway less than twelve feet from Courtroom 615 as a "minor or trivial inconvenience" not only misses the point, it ignores the reality of what transpired. First, as noted above, materiality in the context of an endeavor to influence, obstruct, or impede is irrelevant because Dugan need not have succeeded in helping Flores-Ruiz escape arrest. Second, there is a stark difference between the planned low-key arrest of Flores-Ruiz by the entire Task Force team following his court appearance and an arrest outside of the courthouse following a foot chase through moving traffic by

43

only a portion of the team. Here, the evidence established that Dugan was actually successful in her endeavor to obstruct and impede the agents as they were engaged in an agency proceeding. Put another way, a proceeding can be obstructed or impeded, as it was here, without being thwarted altogether.

### VII. Dugan provides no reason to revisit, post-trial, the Court's sound rulings on judicial immunity and the Tenth Amendment.

Without additional authority or analysis, Dugan invites the Court to reconsider its rulings rejecting her claims that judicial immunity and the Tenth Amendment bar her prosecution. *See* Dkt 109 at 44-45. The Court should decline that request for all of the reasons previously articulated in its Decision and Order denying Dugan's motion to dismiss (Dkt. 48), and the arguments and authority relied upon by the United States. Dkt. 28, 46, 67.

## CONCLUSION

The trial evidence was sufficient to allow a rational juror to convict Dugan on Count Two. In addition, her Rule 29 and Rule 33 motions rely on arguments that have been waived, are unpersuasive, or previously have been rejected by the Court. As such, the Court should deny her motions and schedule this matter for sentencing.

Respectfully submitted on February 20, 2026.

<div style="margin-left:40%">

BRAD D. SCHIMEL
United States Attorney

By:

/s/ Richard G. Frohling
First Assistant United States Attorney
State Bar No.: 1021952
Email: richard.frohling@usdoj.gov

</div>

44

/s/ Keith Alexander
Criminal Division Chief
State Bar No.: 1053000
Email: keith.alexander@usdoj.gov

/s/ Kelly B. Watzka
Deputy Criminal Division Chief
State Bar No.: 1023186
Email: kelly.watzka@usdoj.gov

/s/ Jonathan H. Koenig
Appellate Chief
State Bar No.: 1045517
Email: jonathan.h.koenig@usdoj.gov

Attorneys for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Rm. 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738