UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *v.*                                    Case No. 25-CR-0089-LA

HANNAH C. DUGAN,

    *Defendant.*

# DEFENDANT'S REPLY
SUPPORTING POST-VERDICT MOTIONS

## I.

## INTRODUCTION

Before all else, Hannah Dugan notes this: the government's response admits or brooks no principled limitation at all—none—on its power to prosecute state government officials criminally for reacting to ICE enforcement efforts. Not state and federal privileges against civil arrests in courthouses that are themselves long established; not state statutes authorizing judges to control their courtrooms and take every action that Dugan took here; not the allegations in an indictment itself; not any of the consistent narrowing interpretations of federal obstruction statutes that the Supreme Court has adopted in recent years, before and including *Fischer v. United States*, 603 U.S. 480 (2024); not immateriality; not lack of any actual corruption, as opposed to strained legal fiction that everything

"improper" or "wrongful" is corrupt; not federal-state comity—even in state courthouses—let alone the Tenth Amendment. As the government presses the evidence and the statutory terms here, ICE agents can do what they want, when, where, and how they want, and any knowing effort to challenge that by state or local officials is a felony.

As recent events suggest to many observers, though, there has to be some principled limit. The government pointedly leaves no room for that.

From this perspective, the opening two paragraphs of the government's response are telling. First, the government contends in its lead sentence that the jury found Hannah Dugan guilty of "corruptly endeavoring to influence, obstruct, or impede federal agency proceedings, in violation of 18 U.S.C. § 1505." That is, the government now admits that the jury convicted on a crime broader and more general than the crime the indictment charged.

Second, in the very next paragraph, the government sets out its lead argument: waiver. That is a tacit concession that Dugan is right on the merits, wrapped in a protest that she is too late to say so.

## II.

## REPLY

### A.    The Actual Indictment.

Count Two of the indictment, as distinct from the government's recasting of it, reads in full:

THE GRAND JURY FURTHER CHARGES THAT:

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

HANNAH C. DUGAN

did corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings being conducted by the United States Department of Homeland Security, by committing affirmative acts to assist E.F.R. to evade arrest, including:

a.      confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them that they needed a judicial warrant to effectuate the arrest of E.F.R.;

b.      upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c.      addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d.      directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e.      advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

In violation of Title 18, United States Code, Section 1505.

Hannah Dugan uses the actual indictment, verbatim, as her reference point in this reply brief. That, not the government's rendition in its response brief, is faithful to the Fifth Amendment's grand jury clause.

3

### B. The Privilege Against Civil Arrests in Courthouses Applies, and Dugan did Not Waive that Argument.

#### 1. *The problem was not a defect in the indictment; it was a failure of proof.*

As it promised, the government's main argument is waiver. Specifically, the government contends that Dugan now[1] is asserting a defect in the indictment itself that she was obliged to raise before trial, under FED. R. CRIM. P. 12(b)(3)(B). Gov't. Response (ECF 113) at 15–17 (Feb. 20, 2026).

The government is not just tardy; it is wrong. The basic reasons are two, and simple. One, Count Two was not defective in any of the four ways that Rule 12(b)(3)(B) posits. It was not duplicitous (charging two or more offenses in the same count). It was not multiplicitous (charging the same offense in more than one count). It did not lack specificity. And it did not involve improper joinder. *See* FED. R. CRIM. P. 12(b)(3)(B)(i)–(iv). More broadly, Dugan never has argued—and does not argue now—that the indictment itself failed to charge a federal crime in Count Two. It cited a specific federal statute and adequately alleged all of the essential elements of that crime. It was, in these respects, sufficient on its face; not defective in the sense that Rule 12(b)(3)(B) concerns.

Two, the factual basis of the motion relating to the civil arrest privilege was not "then reasonably available" before trial and it could not have been determined "without a trial on the merits," FED. R. CRIM. P. 12(b)(3), or at least without hearing the

---

[1] More accurately, Dugan raised this issue as to both counts in her motion for judgment of acquittal when the government rested its case-in-chief, under FED. R. CRIM. P. 29(a). ECF 88 at 5–10, 18–20 (Dec. 17, 2025). The government never sought to respond, orally or in writing, to that motion. The Court has not ruled on it, either. As to the government's failure to respond in any way to the civil arrest privilege issue before this case went to the jury, forfeiture or waiver here really is the government's, not Dugan's.

prosecution's case-in-chief in full.[2] While a privilege is a legal rule, privileges also are disfavored and narrowly construed. *See*, *e.g.*, *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997); *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). Relatedly, the applicability of a legal privilege always turns on facts. Was the defendant in fact compelled to be a witness against himself? Was the purported marital communication private as between the spouses at the time, or made during the course of the marriage? Was this the kind of communication between lawyer and client (other than, say, one just concerning fees) that the attorney-client privilege protects, and was the communication also made without the client voluntarily inviting the presence of third persons?

But until the government rested its case-in-chief, Dugan was confined to the four corners of the indictment. Recall that, on the motion to dismiss on immunity grounds, both the government and the Court insisted on that four-corners limitation repeatedly. *See*, *e.g.*, R46 at 15–16 (government); R48 at 20 (district judge). While she never has argued, and does not argue now, that the indictment failed on its face other than as to

---

[2] Consider an irony. Dugan's immunity challenge before trial raised a bar to prosecution, not just a defense. Such a bar can be decided before trial. *United States v. Trump*, 91 F.4th 1173, 1187–88 (D.C. Cir.), *vacated and remanded on other grounds*, 603 U.S. 593 (2024) (as to presidential immunity, but the logic of a bar is the same as to any immunity claim; the Supreme Court agreed with appealability of the issue before trial, *Trump*, 603 U.S. at 635); *United States v. Claiborne*, 727 F.2d 842, 845–48 (9th Cir. 1983) (per curiam), *stay denied sub nom. Claiborne v. United States*, 465 U.S. 1305 (1984) (Rehnquist, C.J., in chambers); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982) (*Claiborne* and *Hastings* both were limited judicial immunity claims that were reviewed on appeal before trial under the *Cohen* collateral order doctrine because, if correct, they would have barred a trial until after impeachment); *Gravel v. United States*, 408 U.S. 606, 615–16 (1972) (immediate appeal as to legislative immunity under Speech & Debate Clause); *Mitchell v. Forsyth*, 472 U.S. 511, 525–30 (1985) (holding generally that denials of both absolute and qualified immunity claims are immediately appealable before trial under the collateral order doctrine). Her immunity bar argument, then, was exactly the kind of challenge that did not require a trial on the merits; indeed, that should have precluded one. Yet there, the government contended—and this Court agreed—that judges had to defer to the indictment's bare allegations before trial and that the motion was premature. Now in the context of a defense (not a bar) that *is* dependent on factual development, the government instead contends that this issue had to be resolved before trial and was waived by raising it only when the government rested.

immunity, the wording of the indictment did not foreclose *additional* evidence and facts that the government well might have offered. The indictment did not establish the privilege's application factually. It also easily permitted the government to offer a more expansive factual case, which is exactly what it in fact did. This trial was replete with testimony and recordings relating to Judge Kristela Cervera's courtroom, to Chief Judge Carl Ashley's office, and to other communications that occurred outside Hannah Dugan's presence.

Dugan had no obligation, then, to raise this defense before trial—or even before her case-in-chief at trial. The indictment did not cabin the government's proof at trial, despite its one reference to a planned arrest in a public hallway outside Dugan's courtroom. It easily could have offered evidence that might have taken E.F.R. outside the scope of the privilege, either by timing, by his own waiver of the privilege, by converting to a criminal arrest, or by location of his intended arrest.

Dugan was not required to alert the government in advance to those factual issues, or to any deficiency in its proof. She was free to await government testimony at trial that execution of administrative warrants by ICE at the courthouse were "civil immigration enforcement." Tr. 200–05. It was useful, even essential to the privilege, that an ICE agent admitted at trial that the warrants there were issued within ICE and did not involve a judicial officer. Tr. 289–92. And for that matter, an agent's admission that E.F.R. was not a legal resident of Wisconsin removed one possible obstacle to application of this privilege. Tr. 389.

In fact, on this record, where the government insisted through trial that an administrative (and thus civil) immigration arrest was lawful and that it could happen

in a state courthouse, and presented the case factually that way, the privilege does apply. The government cannot relitigate that now. And it cannot avoid the argument by wishing that waiver applied. The trial evidence itself, not the indictment, provided the factual basis for the civil arrest privilege.

   2.   Ryan *is wrong*.

On the merits, the government has nothing new to add. *Ryan v. ICE*, 974 F.3d 9 (1st Cir. 2020), is its only support.[3] Every district court to decide the question the Court faces here has rejected *Ryan* or its reasoning. While Dugan can concede that the federal government's executive branch has "sovereign interests" in immigration enforcement, that alone does not mean that *state* judicial branch's sovereign interests should yield in every possible place or at every possible time that ICE agents may want to arrest someone. This was a state courthouse, where state governmental interests in the free and unintimidated appearance of victims, defendants, and witnesses are very strong. *See Velazquez-Fernandez v. ICE*, 500 F. Supp.3d 1132, 1145 (S.D. Cal. 2020) (the purpose of the privilege is to protect the court itself; the federal executive has sovereign power over immigration enforcement, but "does not have sovereign power over the court").

---

[3] Dugan did not cite the other two district court cases the government mentions briefly because they did not concern this context. That seems why the government gives them little attention, too. *See United States v. Fernandez*, 2020 WL 6363684 (S.D. Cal. Oct. 29, 2020) (defendant with pending immigration misdemeanor in federal court and granted bond, seeking to enjoin a civil arrest there; magistrate judge ruled he had no authority to grant requested relief; appeal to district court dismissed for lack of jurisdiction), and *African Communities Together v. Lyons*, 799 F. Supp.3d 362 (S.D.N.Y. 2025) (injunctive action relating only to federal immigration courthouses). Obviously, interests might be materially different as to federal courthouses, rather than state courthouses, and especially as to federal immigration courts only. For one distinction, states have no relevant sovereign interests at stake in federal courthouses or in immigration courthouses. In any event, note that a more recent case thoroughly rejected the reasoning in *African Communities Together*, without ever citing that case (which had been decided some three months earlier). *See Pablo Sequen v. Albaran*, 2025 WL 3724878, *1–20 (N.D. Cal. December 24, 2025). *Pablo Sequen* did cite *Ryan* and raise doubt about that case, *Pablo Sequen*, 2025 WL 3724878, at *13–14, but did not rule on *Ryan's* persuasiveness in the end.

For that matter, the federal government could have vindicated its sovereign interests here, or in the next case, by obtaining a judicial warrant and making a criminal arrest, thus taking its action out of the scope of the privilege. If the federal sovereign interest in removing immigrants is as strong as *Ryan* and the government contend, that would not be too much to ask at all. But that is not how the government tried this case.

3.    *Judges have standing to speak for, and as, the court.*

Finally, the government contests Dugan's standing to assert or rely on the civil arrest privilege. It mocks her claim that she, as a sitting judge, could speak for the court as a whole. ECF 113 at 20. And it contends that her actions "were not sanctioned by official court policy," *id*. at 21, only because Milwaukee County then had no policy at all.

Judges speak for, and speak as, "the court" all the time; almost invariably. Why the government thinks it extraordinary that a judge could or would act in support of the proper operation of a courthouse and the interests and safety of people appearing in that courthouse, especially given the authority that WIS. STAT. § 753.03 expressly confers, remains a mystery.[4] The response brief does not resolve it.

The government's response also ignores both the Supreme Court and the Seventh Circuit, both of which have noted that this "is the privilege of the court, rather than of the defendant." *Stewart v. Ramsay*, 242 U.S. 128, 130 (1916); *see also Durst v. Tautges, Wilder & McDonald*, 44 F.2d 507, 508–09 (7th Cir. 1930) ("It is not simply a personal privilege, but it is also the privilege of the court, and is deemed necessary for the maintenance of its

---

[4] Note that the statute itself seems to use "circuit courts" and "judges" interchangeably, because an inanimate circuit court can act only through its human judges. At one point the statute also refers expressly to, "The courts and the judges thereof." WIS. STAT. § 753.03.

authority and in order to promote the due and efficient administration of justice"). A judge certainly can assert, or defend and protect, a privilege that belongs to the court. The government makes no serious effort to argue otherwise.

Instead, it ends with a rhetorical question: "Why would she 'take the heat' for her actions . . . if she were acting on behalf of the Court?" ECF 113 at 21.

Why indeed. This is one example of the earlier point: the government insists on absolutes in defending ICE's prerogatives. No principle or competing interest may constrain that agency. E.F.R. had no reason to know of his courthouse privilege. He also had no forum in which to claim it, because the government effectively ended his state court prosecution (and the victim's chances for closure or any restitution) by spiriting him away. What about the judge who took modest, even immaterial, steps within her lawful authority to defend that privilege?[5] In the government's view, she should have a felony conviction.

So "heat" is exactly what Hannah Dugan has gotten. Unjustly. At every relevant moment, she was acting on behalf of a state court; in her robe, at work, and during ordinary working hours of the courthouse in which she presided. She did nothing outside the scope of her judicial powers. Yet here we are.

## C. The Court Erred in Answering the Jury Question on Count Two.

Count Two of this indictment listed one "pending proceeding;" that was "the administrative arrest of E.F.R. for purposes of removal proceedings." It then alleged that

---

[5] Dugan sent E.F.R. into the public hallway (in full view of two federal agents) not quite twelve feet from where he would have emerged into the same hallway had he used the courtroom's public door, as ICE preferred. *See* Tr. 552–53. Consistent with its unyielding defense of ICE prerogatives above all else, the government argues that it would not have mattered had the difference been only six feet. ECF 113 at 41.

Dugan committed "affirmative acts to assist E.F.R. to evade arrest." What followed was a list of five specific acts, not necessarily exhaustive on the plain wording of the indictment.

    1.    *The jury asks.*

The jury later asked this relevant question as to Count Two: "whether or not Judge Dugan needed to know the identity of the subject of the pending proceeding." Tr. 919. This was like its question on Count One.

    2.    *The government and court deflect.*

At that point, though, the government shifted away from its own indictment and repeatedly contended that no such knowledge was needed. Tr. 919-26. Eventually, the Court gave an answer different than its response to the jury's similar question on Count One. As to Count Two, the Court instructed, "To know <u>of</u> the pending proceeding, the defendant needed to have sufficient knowledge about the nature of the pending proceeding." Tr. 926.

So, the focus became the nature of the proceeding, not its subject's identity. But the jury asked about identity, expressly.

That is, the jury asked a specific question about the person who was the *subject* of the proceeding; the Court gave, at the government's urging, a general answer about the *nature* of the proceeding. And as to that, the government only had to prove Dugan that had "sufficient" knowledge, whatever that might have meant to jurors.

    3.    *Then the indictment recedes.*

The government defends that answer, at bottom, by claiming that "in practical terms, based on the evidence, the jury was entitled to find that Dugan knew that

the person whose arrest she sought to prevent was the same person subject to the pending removal proceedings—regardless of whether she knew his name." ECF 113 at 24–25.[6]

That argument betrays both this Court's answer and the indictment's terms. As to the Court's answer, the actual "sufficient knowledge" that the Court described related only to the nature of the pending proceeding; it did not require any knowledge that the "same person subject to" that proceeding was at issue. Even as to the Court's answer, then, the government engages in wishful thinking about what the indictment could have charged, but did not.

Perhaps more importantly, it also sidles away from the indictment. Now, it contends that Count Two was about "'removal proceedings conducted by the Department of Homeland Security,'" quoting an excerpt of a sentence in Count Two that is shorn of the limiting context that precedes it. ECF 113 at 25 (omitting the words right before that excerpt, "namely the administrative arrest of E.F.R. for purposes of"). Somehow, on the government's reasoning, it is incorrect for Dugan to assert that "the only proceeding alleged in the indictment was 'the administrative arrest of E.F.R.'" *Id.*

Her assertion is not incorrect. Again, the indictment as it was, rather than as the government now wishes it was, specifically listed "the administrative arrest of E.F.R. for purposes of removal proceedings" as the only proceeding at issue; the one to

---

[6] The government concedes that Dugan never was shown the warrant or told that E.F.R. was the person being sought. ECF 113 at 7; *see also* Tr. 319, 403-04 (testimony of agents in the hallway that Dugan was not told the name or shown the warrant); Tr. 661 (testimony of court clerk that Dugan was told only, "We have five ICE agents in the hall"). Judge Cervera testified that Dugan said "something about Flores" before they encountered the ICE agents in the hallway. Tr. 452. But the jury, with its specific question and subsequent not guilty verdict on Count One, obviously did not rely on this testimony. As the defense demonstrated in closing, using a timeline of both video and audio recordings, Cervera's contention was a factual impossibility. *See* Tr. 849-50.

which Dugan's intention and acts must have a nexus. Further, the indictment bound the government to prove specifically that her intentions—her "corrupt[ ]" purpose—related to "affirmative acts to assist E.F.R. to evade arrest." R6 at 2. Not someone else; and certainly not DHS removal proceedings generally, as the government would have it now. No, the indictment alleged assisting E.F.R. in particular to evade arrest. The Court can acknowledge that E.F.R.'s identity was essential without revisiting its expansive instruction that turned an administrative arrest into a "pending proceeding" before an agency. *See* ECF 113 at 25–26. That was an error, too, but the Court need not correct it to agree with her here.

That is because the Court's answer to the jury question on Count Two itself watered down and expanded the indictment meaningfully, at the government's urging. On a crowded morning's misdemeanor docket in Milwaukee County, there was every reason to suspect that E.F.R., or any other person, was not the only defendant, victim, witness, or spectator in the courtroom who may have been a removable immigrant. Dugan would have had no way of knowing—as a garbled audio recording at trial suggested.

Still, that one man, E.F.R., was the one on whom this count of the indictment expressly hinged. And Judge Cervera's claims notwithstanding, the agents themselves were very clear: they never showed Dugan the warrant, never named E.F.R. or even told her who they were seeking, and never told her that an administrative removal proceeding concerning E.F.R. was the goal. Tr. 319, 403–04. For her part, Dugan never told E.F.R. or his lawyer that ICE agents were there to arrest him. Tr. 727. There simply was inadequate (if any) evidence here supporting the necessary nexus between Dugan's

knowledge and a pending proceeding. Rather than repeat herself, Dugan asks the Court to review again her post-verdict brief, ECF 109 at 24–26 (Jan. 30, 2026).

        4.      *There is nothing absurd about requiring the government to prove the indictment.*

Unless there is something "absurd" about the Fifth Amendment's grand jury clause itself, then, there is nothing silly about demanding that the government prove the specific crime an indictment alleged, not some broader abstraction of it. *See* ECF 113 at 26–27. Dugan never has asked the Court to add an element to the § 1505 offense. It was the government—or precisely, the grand jury, but the government drafted the indictment—that made E.F.R. the center, the subject, of Count Two. Dugan did not do that.

Her straightforward request is, and always has been, that the Court require the government to prove the crime as the indictment alleged it, rather than expand the basis for conviction. This is what the Fifth Amendment requires. *Stirone v. United States*, 361 U.S. 212, 215–18 (1960) (reaffirming the rule "that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him"); *Russell v. United States*, 369 U.S. 749, 768–71 (1962) (grand jury must decide facts to be proved; bill of particulars cannot fill in missing essential allegations and, "To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure," at 770); *United States v. Miller*, 471 U.S. 130 (1985) (throughout, contrasting constitutionally permissible narrowing "variances" from indictments with impermissible broadening "amendments"). A judge or the government can narrow an indictment, permitting conviction only on less

than the grand jury alleged. But they cannot expand it, permitting conviction on facts beyond what the grand jury alleged. *Miller*, 471 U.S. at 145 (mere variance, not prejudicial amendment, where government struck allegations and thus narrowed rather than broadened the basis for conviction). Broadening this indictment, not narrowing it, is what the government and Court did here.

Here, *United States v. Coleman*, 138 F.4th 489 (7th Cir. 2025), helps. The indictment alleged that Coleman possessed a firearm as a felon when he "possessed a firearm, which was a Glock model 19c firearm bearing a serial number NLW237." *Coleman*, 138 F.4th at 499. But the first element of the jury instruction said only that the government needed to prove that "[t]he defendant knowingly possessed a firearm." *Id.*

Not good enough. The government had to prove the specific gun in the indictment. *Coleman* observed: "[T]he indictment did not have to include the make and serial number of the firearm, but because it did, the jury had to find, beyond a reasonable doubt, that Coleman possessed a Glock with serial number NLW237. Proof of his possession of another weapon would not suffice for a finding of guilt on the felon-in-possession charge." *Id.* at 499–500. On plain error review, however, the Seventh Circuit concluded that Coleman had not been prejudiced by the defective instruction because the specific Glock was at the center of the government's felon-in-possession case and the jury instructions referred back to the indictment. *Id.* at 502–03.

There is no plain error escape hatch here. Dugan objected.

Her case raises the very concern the government acknowledges the Seventh Circuit seeks to avoid. Where the answer to this jury question allowed the jury to

focus broadly on the nature of "removal proceedings conducted by the Department of Homeland Security," as the government puts it, ECF 113 at 25, it really is "impossible to know whether the grand jury would have indicted for the crime actually proved" here. *United States v. Turner*, 836 F.3d 849, 863 (7th Cir. 2016);[7] *see* ECF 113 at 27.

        5.    *Cancel the parade of horribles.*

Finally, the government's single hypothetical case offers not one horror. ECF 113 at 27. This jury question only asked whether the government had to prove the "identity" of the subject person. Tr. 919. Again, Dugan's jury properly was focused on the *subject* of the proceeding, just as the indictment was, not on the *nature* of the proceeding. It was the government and the Court who deflected that question, addressing instead the nature of the proceeding with the vague "sufficient" qualifier further blurring and enlarging the boundaries of the government's required proof. On the government's hypothetical facts, the driver would know the "identity" of the man at issue: he is the man the agent right then was setting upon and the specific one to whom the driver yelled, in that scenario. The hypothetical buttresses Dugan, not the government.

---

[7] This is not critical here, but appellate judges should not guess later what a grand jury might have done on a different set of facts. The task is simpler: the government must prove the indictment that it actually obtained. *See, e.g.*, *Stirone*, 361 U.S. at 217 ("neither this nor any other court can know that the grand jury would have been willing to charge that Stirone's conduct would interfere with interstate exportation of steel from a mill later to be built with Rider's concrete. And it cannot be said with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned"); *Russell*, 369 U.S. at 770 ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure").

### D. Neither Section 1505 Nor the Indictment Are as Broad as the Government and the Court Contended.

At least, § 1505 requires a person know that a civil arrest is part of a particular proceeding. However one construes the terms of § 1505, it was not intended to make a felony of every impediment to federal agency action. The issue is whether the statutory language applies to arrests with no known nexus to a pending proceeding. It does not.

#### 1. Marinello *and* Fischer *control.*

None of the cases the government cites involve arrests. *United States v. Senffner*, 280 F.3d 755, 761 (7th Cir. 2002) (SEC investigation); *Rice v. United States*, 356 F.2d 709, 712 (8th Cir. 1966) (NLRB charge); *United States v. Leo*, 941 F.2d 181, 199 (3d Cir. 1991) (Defense Contract Audit Agency audit); *United States v. Rainey*, 757 F.3d 234, 236 (5th Cir. 2014) (Congressional subcommittee investigation); *United States v. Fruchtman*, 421 F.2d 1019, 1021 (6th Cir. 1970) (FTC investigation); *United States v. Vixie*, 532 F.2d 1277, 1278 (9th Cir. 1976) (IRS investigation); *United States v. Browning, Inc.*, 572 F.2d 720, 724 (10th Cir. 1978) (Bureau of Customs investigation); *United States v. Schwartz*, 924 F.2d 410, 423 (2d Cir. 1991) (Customs Service investigation).

And all of those cases antedate *Marinello v. United States*, 584 U.S. 1 (2018), and *Fischer v. United States*, 603 U.S. 480 (2024). Since 2018, if not earlier, the Supreme Court has been consistent and clear.

First, notice matters. "A broad interpretation [of obstruction under § 7212(a)] would also risk the lack of fair warning and related kinds of unfairness that led this Court in *Aguilar* to 'exercise' interpretive 'restraint.'" *Marinello*, 584 U.S. at 9 (quoting *United States v. Aguilar*, 515 U.S. 593, 600 (1995)).

Dugan could not have known that there was a pending removal proceeding against E.F.R. Even the ICE agent who obtained the warrant believed that there was no proceeding. Special Agent Vasconcellos declined to check the box on the warrant affirming "the pendency of ongoing removal proceedings against the subject." Ex. 1A, Tr. 387–89. He testified why:

> Q. Why didn't you check that box at this time?
>
> A. Because at the time I generated Form I-200, there were no removal proceedings against Mr. Flores-Ruiz.
>
> Q. Okay. And by that you mean there wasn't a -- any hearings for an immigration -- immigration-related hearings pending at that point in time?
>
> A. Correct, sir.

Tr. 391.

Second, the Supreme Court has insisted in recent years that internal consistency and cohesion matter on obstruction offenses. The government contends that *Marinello* was concerned with rendering superfluous provisions of the same enactment. ECF 113 at 32. But *Fischer* extended its concern across obstruction provisions as a whole: "In light of [the Court's] obligation to give meaning where possible to each word and provision in the Code,[] our narrower interpretation of [obstruction under § 1512(c)(2)] is the superior one." *Fischer*, 603 U.S. at 493 (cite to *Williams v. Taylor*, 529 U.S. 362, 404 (2000) omitted).

The government also argues that *Fischer* was concerned about consistency within the "the statutory scheme in Section 1512." ECF 113 at 35. But *Fischer* was concerned with the chapter as a whole: "If the Government were correct, then the 'otherwise obstructs, influences, or impedes any official proceeding' provision—which is buried in

subsection (c)(2) of Section 1512—would largely obviate the need for that broad array of other obstruction statutes." *Fischer*, 603 U.S. at 493.

*Fischer* is based on principle. One obstruction statute should not be read to encompass all other obstruction statutes. Although some surplusage may be inevitable, a "construction that creates substantially less of it is better than a construction that creates substantially more." *Fischer*, 603 U.S. at 496 (quoted source omitted). The government's reading of a single obstruction statute turns the chapter on its head: misdemeanor obstruction of an arrest or service of process, § 1071, becomes felony obstruction of a pending proceeding being had before an agency. That is the evil that *Marinello* and *Fischer* sought to protect against. *Marinello*, 584 U.S. at 2 ("Interpreting the Omnibus Clause to apply to all Code administration could transform the Code's numerous misdemeanor provisions into felonies, making them redundant or perhaps the subject matter of plea bargaining"); *Fischer*, 603 U.S. at 492–93.

2.      *Official or not, a proceeding must be "pending."*

This indictment charged Dugan with endeavoring to obstruct a "pending proceeding." That adjective, "pending," also is in the text of the relevant paragraph of § 1505. The government argues that *Fischer* should not apply to § 1505 because § 1512 is limited to "official proceedings." But *Fischer* did not turn on the term "official." Rather, a "pending" proceeding is exactly that: pending. The government ignores that qualifier—in both the indictment and the statute—to make a misdemeanor allegation into a felony.

3.   *The government's interpretation of § 1505 renders § 1071 superfluous.*

The government admits that, "Section 1505 requires that the defendant *knew* of the pending proceeding she endeavored to obstruct." ECF 113 at 30 (emphasis in original). That is Dugan's argument. Section 1505 requires that she knew of the proceeding: not *an* arrest; not *any* proceeding. *The* proceeding. On this indictment, that was *the* removal proceeding of E.F.R. But the government convinced the Court to tell the jury that Dugan didn't need to know that E.F.R.'s specific removal proceeding was pending. Instead, the Court told the jury that "to know <u>of</u> the pending proceeding, the defendant needed to have sufficient knowledge about the nature of the proceeding." Tr. 926.

Still the government contends that § 1071 is irrelevant because § 1505 existed in different form prior to 1948. Yet nothing in the prior iteration of § 1505 suggests that it was intended as the broad catch-all provision the government now imagines. The statute originated in 1940 as a witness protection statute. *See* 18 U.S.C. § 241a, Act of Jan. 13, 1940, 54 Stat. at 13. Similarly, in 1948, Congress titled the new section 1505 as one prohibiting "influencing or injuring witnesses appearing before agencies and committee." Act of June 25, 1948, chs. 49 & 73, 645, Pub. L. No. 80-772, 62 Stat. 683, 755, 769-70. Nothing in this history suggests that Congress intended § 1505 to apply to arrests or to render superfluous the concurrent misdemeanor enactment of § 1071.

In the end, the answer to the jury question broadened § 1505 beyond any reach that *Marinello* and *Fischer* tolerate. It also removed the requirement of a nexus between Dugan's acts and the *particular* proceeding that the indictment alleged. *Marinello*, 584 U.S. at 13, citing *Aguilar*, 515 U.S. at 599.

### E. Dugan Had a Lawful Right to Do Everything She Did.

Before and at trial, Dugan asked the Court to give a series of jury instructions all providing that acts a defendant has a legal right to undertake do not violate 18 U.S.C. § 1505. R57 at 20–29, Defense Proposed Jury Instructions Nos. 11–20, citing *United States v. Edwards*, 869 F.3d 490, 498 (7th Cir. 2017), *United States v. Matthews*, 505 F.3d 698 (7th Cir. 2007), and (as to most of those proposed instructions) WIS. STAT. § 753.03. The Court rejected those requests, writing later in explaining its decision that this defense "pertain[s] to acts like taking the Fifth or asserting a valid privilege, not the conduct alleged here." R97 at 4, 6.

The Court's view, then, wholly negated Wisconsin statutory law as a source of a state judge's lawful authority in this federal prosecution. It did that without visible consideration of federal-state comity. It did that without considering how a direct conflict between federal and state law easily might have been avoided and both accommodated.

With unmistakable exasperation, the government complains that Dugan "did not have a legal right to obstruct." ECF 113 at 38, heading VI.A. Put that way, of course she did not. But that is not really the government's argument. It is offended that she "still continues to insist" that the indictment charged her only with acts she was entitled lawfully to take. Her claim of right "'to take multiple legal steps, *regardless of motive*' is absurd." *Id.* (italics in government's response). For the government, proof of "corrupt intent," *id.* at 39, is everything; it makes the lawful, unlawful.

#### 1. *Even mixed motives do not convert the lawful into the unlawful.*

As to "corrupt" motive, the government leans heavily on the jury instructions' legal fiction that anything "improper" or wrongful suffices. ECF 113 at 30, 39.

Of course, all crimes are "improper" and involve acting "wrongfully." ECF 113 at 14. So the government's actual evidence of corruption became circular—and less than corruption.

But for now, examine the government's claim at face value. Suppose that groups of citizens gather in city streets to protest ICE enforcement actions or just to train their smart phone cameras on ICE agents. We might suppose that behavior like this, if non-violent, would be protected by the First Amendment. It would be something the citizens had a legal or lawful right to do.

Not so fast, says the government, in another example of its unyielding views of ICE prerogatives. We have to inquire into the *motives* of the citizens before we can decide that they are not behaving criminally. Are those motives "improper"? Do they oppose ICE altogether and hope its efforts to seize removable immigrants will fail? To the government, that is "corrupt," for it is improper and wrongful in the sense that it disputes what ICE has a lawful right to do under federal law.

Do they seek to make it more difficult for ICE to round up its quarries by merely filling the streets peacefully and recording the ICE agents' behavior? Of course they do, at least many of them. Now, in the government's view, they immediately are not people exercising First Amendment freedoms. They are criminals.

There are less extreme examples, even though Americans have protested in the streets against ICE. How about the state or federal judge who enters an order barring ICE from removing a criminal defendant from the district during the pendency of his case because he doubts ICE's integrity and has sympathy for the removable defendant, and then continues the case repeatedly for otherwise legitimate reasons:

scheduling, witness availability, older cases, sickness, or whatever? His motives in part might be to slow or obstruct the ICE removal process, because that may be the only way he can try to hold the defendant to account for separate criminal behavior (or see the defendant's name cleared) and offer a measure of justice to a victim. That judge is committing a federal felony, on the government's position. Or if a judge grants bond to a removable immigrant who is a criminal defendant in that judge's courtroom, that means ICE no longer can just lodge a detainer with a cooperating sheriff's office that runs the county jail. It will have to arrest elsewhere. ICE has been impeded or obstructed to that extent and maybe that was some part of the judge's motive. His lawful act of granting bond to a defendant now makes him a potential defendant in a federal felony case.

Or consider the hypothetical state prosecutor. She agrees to reduce criminal charges against a non-citizen, dropping a crime that would make him automatically removable in favor of one that would not. She, too, has impeded ICE on the government's logic, at least if she acted in any part on a desire to allow the man to remain lawfully in the United States rather than become removable and unlawfully present.

    2.    *Cueto does not make "improper" motive determinative here.*

Intuitively, this cannot yet be the rule governing American lives and freedoms. And in fact, it is not. The one case the government cites, *United States v. Cueto*, 151 F.3d 620 (7th Cir. 1998), was different than this one. That case concerned 18 U.S.C. § 1503. Yet again for the government, then, cases interpreting § 1503 (or § 1512) are directly applicable to § 1505 when they support its views, and utterly inapplicable when they contradict its views.

But compare that case to this one anyway. Cueto was a business partner of a man engaged in an illegal gambling operation and racketeering; he had a direct stake in the illegality. Their financial entanglements included secret partnerships. He also was a lawyer advising the man. Although Cueto never entered an appearance before or after his partner/client's indictment, he did continue to offer help and advice to the man and his trial lawyer. That advice and help included repeated efforts to convince a state prosecutor to charge one of the investigating agents criminally, urging and preparing repeated court filings with outright false statements in them, and trying to slow or stop the federal investigation to preserve his ongoing profits from the illegal gambling and other shared business interests. *Cueto*, 151 F.3d at 624–29.

The government's theory of prosecution there rested "on the fact that Cueto held a personal financial interest in protecting the illegal gambling enterprise, which formed the requisite corrupt intent for his conduct to qualify as violations of the statute." *Id.* at 631. The Seventh Circuit distinguished between "an honest lawyer who unintentionally submits a false statement to the court and an attorney with specific corrupt intentions who files papers in bad faith knowing that they contain false representations and/or inaccurate facts in an attempt to hinder judicial proceedings." *Id.* at 632.[8] The *Cueto* court noted that false and misleading speech is outside the First Amendment, too. *Id.* at 634 n.11.

---

[8] This is a good place to address the government's ongoing claim that Dugan made a "false" statement to ICE agents when she told them that they needed a judicial warrant, not just an administrative warrant, to arrest someone for removal. *See, e.g.,* ECF 113 at 7. First, Special Agent Vasconcellos admitted that Dugan never said that. Tr. 403–04. FBI Special Agent Jackling agreed. Tr. 319. More, none of the government's witnesses recalled hearing Dugan say that they needed a judicial warrant to arrest. *See* Tr. 257-59; 363-67; 536-39.

But second, even if she had told them that, claiming that such a statement was "false" is unfair. The United States Supreme Court never has decided that very question. To be sure, Dugan probably was mistaken. But the last time the Supreme Court considered the validity of an administrative warrant to arrest an unlawful

In all, that case gives the government little shelter. Dugan was not in business with, or profiting from, E.F.R. or his activities. She did not make repeated false statements in legal filings. She did not try to have an ICE agent indicted to slow or stop his investigation. Whatever the wisdom or correctness of the Seventh Circuit's decision in *Cueto*, this case is not alike. *See also United States v. Gerace*, 731 F. Supp.3d 497, 506–22 (W.D.N.Y. 2024) (applying the lawyer safe harbor, 18 U.S.C. § 1515(c), to a "case in which criminal liability hinges on the government being 'permitted to inquire into the motives of criminal defense attorneys' for an action that they had a reasonable justification—and arguably an obligation—to take;" distinguishing *Cueto* and, echoing the magistrate judge's words here, holding that "the safe harbor protects defense attorneys from being accused of obstructing justice merely for doing their jobs;" *Gerace*, 731 F. Supp.3d at 515).

The only "corrupt" motive the government ever argued is that Dugan strongly disliked ICE and disapproved of its methods, Tr. 26–27, 818–19, speculating on all that from an email chain, a note taped to her courtroom door about appearing by Zoom, and her demeanor in the hallway. If so, that made her like millions of other Americans. That is not a corrupt motive. *See* Tr. 831, 833, 836, 888 (government closing argument or rebuttal excerpts); *see also* Dugan's original post-verdict brief, ECF 109 at 33–43.

---

immigrant was in 1960. There, it specifically declined to answer the question because it noted, correctly, that the defendant and his lawyer voluntarily had waived that issue in the courts below. *Abel v. United States*, 362 U.S. 217, 230–32 (1960). The reason that Dugan likely was wrong is that Justice Frankfurter's majority opinion went on, in *dicta*, to detail the pedigree of such administrative immigration warrants in lower court decisions obliquely accepting them and in statutes dating back to 1798. *Abel*, 362 U.S. at 232–34. So, when and if the Court squarely decides the question, odds are that it will approve administrative warrants as a basis to arrest removable immigrants. Until then, guessing wrongly or mistakenly about that legal question is not making a knowingly "false" statement, as the government claims.

3. *Congress itself recognizes lawful conduct with mixed motives.*

This case would be easier had Dugan been a lawyer in her courtroom, rather than the judge. There is a statutory safe harbor for lawyers that applies to § 1505 and to every other statute in that chapter, as the *Gerace* court noted. "This chapter does not prohibit or punish the providing of lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding." 18 U.S.C. § 1515(c). Almost surely, Congress never dreamed that it might need to create a similar safe harbor for the judge, rather than the advocates. But describing Dugan's acts as "lawful" and "bona fide" is exactly right. She is stumped on why the judge should get less consideration here than a practicing lawyer. Her proposed instructions would have eliminated the gap.

4. *In any event, a privilege was at issue here as lawful conduct.*

On the Court's own reasoning, though, Dugan's proposed lawful acts defense applied. The state and federal privileges forbidding civil arrests of parties and witnesses in courthouses are exactly the sort of well-established privileges that this Court acknowledged would have supported that defense instruction. The civil arrest privilege in courthouses does concern "asserting a valid privilege," in the Court's words. R97 at 4, 6.

As Dugan argues above, that privilege itself warrants acquittal. The government's evidence proved its applicability here. But even if the government were to get a second chance to disprove the application of that privilege, Dugan would be entitled to a new trial at which the jury would be properly instructed that acts she had a lawful right to perform did not violate § 1505. This Court's instructions denied her a perfectly valid

defense that squarely applied to the evidence here, even viewed most favorably to the government. Those instructions invited the jury to convict an innocent person.

**F.      No Evidence of Absent Good Faith Supported the Guilty Verdict.**

On the issue of good faith, the government has shifted a great distance from its position in pretrial motions that "good faith" rather than judicial immunity was the appropriate safeguard to prevent § 1505 convictions for otherwise lawful judicial acts. *See* R46 at 23. The government now contends that consideration of "good faith" is irrelevant in light of the statutory element of "corruptly." ECF 113 at 40. And that omits the intervening steps when it successfully opposed any and all jury instructions that would have limited the definition of "corruptly" to acts that a judge had no good-faith or legal basis to take. R68 at 8-11, 17.  Its current unbridled position also is consistent with the government's argument to the jury that Judge Dugan's position gave her no legal right whatsoever to impede ICE in any way:

> She is a state court judge.  She has no more authority over what federal law enforcement officers do in a public place than you or I do.

Tr. 839.

The unbounded position of the government going forward becomes clear. With good faith and state statutory authority removed as a meaningful defense, all state and local officials are at risk: judges, mayors, governors, and so on. To the federal government here, they have no authority to take any action or perform any duty that may impede an ICE arrest in any way. The official performance of duties created by state constitutions and statutes must give way entirely to the commands of ICE.

At the pretrial stage, this Court expressed "very real concerns" regarding the potential of judges being criminally liable for routine judicial acts. R48 at 19–20. That pretrial deference to the bare indictment no longer applies and the concern no longer is hypothetical. The conviction on Count Two rests on acts that state court judges legally and routinely take: controlling ingress and egress through courtroom doors (that ultimately were not even 12-feet apart in the public hallway), Tr. 476-77, 509-11, 522-23, 723-24, 730, 745; holding hearings off-the-record, Tr. 747, 680-83, 475-76; and offering appearances by Zoom, Tr. 476.

G.     **Remaining Jury Instruction Issues.**

Dugan stands on her previous arguments about the jury instructions defining an "endeavor" and rejecting an element of materiality. Materiality, though, is a last issue revealing the government's insistence that ICE should have no principled limits, doing as it wants without any opposition or impediment by anyone, no matter how lawful the other people's acts and how trivial—how immaterial—the impediment to ICE.

In the government's telling, ICE may ignore a privilege against civil arrests in courthouses. It can insist on conducting hallway arrests, too, in a state's courthouses, not just in a federal courthouse or immigration court. On the government's reasoning here, even an attempt—an "endeavor"—to send a man out one door twelve feet from another door into the same hallway makes a federal felony on these facts. Dugan's proposed jury instructions and earlier briefing on acquittal offer the Court her arguments to the contrary.

H.     **Judicial Immunity and the Tenth Amendment.**

As the government's waiver argument now demonstrates, it is flexible about when it will contend a challenge is either fatally premature, or fatally late. For Dugan's

immunity argument, even though immunity is a bar, challenging the indictment before trial was too early; bare allegations in the indictment got determinative deference. But when there was no actual legal defect in the indictment, later raising a legal privilege that turns on facts for its application after the government rested at trial was tardy; a waiver.

The government was mistaken on both points. With the benefit of time since last summer, though, Dugan concedes this: the government has been consistent in at least one way. Its response to her immunity motion first displayed the unbound insistence on ICE prerogatives—or on federal executive prerogatives more generally—that has carried through the government's current response brief. Its proposed rule then that would permit federal prosecutors to charge judges with felonies for merely presiding over trials in which they allowed witnesses and court staff to handle, possess, or pass around contraband—say, illegal drugs or child pornography—marked the first display of a litigation strategy that eschews any discernible, principled limits at all on federal prosecutorial options to punish honest official actions by judges or other government officials. This Court was disquieted at the time. *United States v. Dugan*, 797 F. Supp.3d 855, 870 (E.D. Wis. 2025) ("Saying 'that is not the way the criminal justice system operates' (R. 46 at 22), and that as a matter of 'common-sense' operatives in the system would not violate the criminal law if they 'are in good faith carrying out their required duties' (R. 46 at 23), as the government does, is unsatisfying").

But, constrained by the indictment's allegations at that stage, it sided with the government. *Dugan*, 797 F. Supp.3d at 870–71 ("While it would be improper to consider facts outside the four corners of the indictment on a motion to dismiss, viewing the facts that are alleged in the light most favorable to the government, as I must at this stage, and

accounting for the indictment's allegation that defendant 'knowingly concealed' E.F.R. and acted 'corruptly,' I cannot say as a matter of law that defendant's alleged conduct falls within even this more limited version of immunity"); R48 at 20.

This is a different stage. The Court can say now, after a full trial, what it decided it could not say before trial: Dugan properly was immune from criminal prosecution here, because her acts all were official (not unofficial, either wholly or because tainted by graft, malice, or self-advantage) and none of them trenched upon individual liberties that the Reconstruction Amendments protect.

In sum, the Court can and should acquit Hannah Dugan now. Charging and trying her was not just bad prosecutorial judgment, although it was that, too. She had a good claim of judicial immunity from criminal charges and valid Tenth Amendment concerns. Beyond that, the evidence failed anyway.

## III.

## CONCLUSION

The Court should acquit Hannah Dugan. There was no crime. Additionally but alternatively, it should order a new trial in the interest of justice. She waived nothing here.

Her jury returned a split verdict on an expansive renovation of Count Two. That expansion and renovation project began mid-trial and continued most pointedly through the Court's answer to the final jury question. People in this country have a right under the Fifth Amendment to face trial only on the specific felony that a grand jury alleged, though, not on a broader version that the government later constructs. Dugan was denied that.

29

For all of the reasons she has explained since summer 2025, this prosecution and trial worked an injustice. It also failed factually.

Dated at Madison, Wisconsin, March 4, 2026.

Respectfully submitted,

HANNAH C. DUGAN, *Defendant*

*s/ Steven M. Biskupic*
Steven M. Biskupic
  Wisconsin Bar No. 1018217

STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com

*s/ Jason D. Luczak, Nicole M. Masnica*
Jason D. Luczak
  Wisconsin Bar No.  1070883
Nicole M. Masnica
  Wisconsin Bar No. 1079819

GIMBEL, REILLY, GUERIN & BROWN LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
(414) 271-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com

*s/ Dean A. Strang, R. Rick Resch*
R. Rick Resch
  Wisconsin Bar No. 1117722
Dean A. Strang
  Wisconsin Bar No. 1009868

STRANGBRADLEY, LLC
613 Williamson Street, Suite 204
Madison, Wisconsin 53703
(608) 535-1550
rick@strangbradley.com
dean@strangbradley.com